UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK



| | |
|---|---|
| UNITED STATES OF AMERICA |  SEALED INFORMATION |
| v. | 24 Cr. |
| HDR Global Trading Limited, a/k/a "BitMEX," | |
| Defendant. | **2 4 CRIM 42 4** |

## COUNT ONE
### (Violation of the Bank Secrecy Act)

The United States Attorney charges:

### Overview

1.     From at least in or about 2014 and continuing up to and including at least in or about September 2020, HDR Global Trading Limited, a/k/a "BitMEX," the defendant (hereinafter, "BitMEX"), operated as an online trading platform through the website wwww.bitmex.com. During this time period, BitMEX solicited and accepted orders for trades in, among other things, futures contracts and other derivative products tied to the value of cryptocurrencies, including Bitcoin.  BitMEX accepted Bitcoin to margin and guarantee its derivative products, and from at least in or about March 2017 up to and including at least in or about September 2020, offered its customers up to 100 times leverage on certain of its products.

2.     From its launch in November 2014 and continuing up to and including at least in or about September 2020, BitMEX, the defendant, knowingly provided services to thousands of customers located in the United States, even after claiming that it had withdrawn from the U.S. market to avoid being subject to U.S. laws in or about September 2015.

3.     By engaging in the foregoing activities, BitMEX, the defendant, was a futures

commission merchant ("FCM") required to comply with the Bank Secrecy Act, 31 U.S.C. § 5311, *et seq.* (the "BSA").

4.      From at least in or about September 2015 and continuing up to and including at least in or about September 2020, BitMEX, the defendant, and its owners and executives, including Arthur Hayes, Benjamin Delo, Samuel Reed, and Gregory Dwyer, willfully failed to establish, implement, and maintain an adequate anti-money laundering ("AML") program, including an adequate customer identification program, more commonly referred to as a know your customer ("KYC") program, for BitMEX, in violation of the BSA.

### BSA Requirements

5.      The Bank Secrecy Act, as amended by the Patriot Act of 2001, is designed to "prevent, detect, and prosecute international money laundering and the financing of terrorism" and "protect the financial system of the United States from criminal abuse." 31 U.S.C. § 5311. The BSA imposes reporting, recordkeeping, and controls requirements on covered "financial institutions," which include FCMs that are required to register as such under the Commodity Exchange Act (the "CEA"). 31 U.S.C. § 5312(c).

6.      The CEA requires an entity to register as an FCM with the United States Commodity and Futures Trading Commission (the "CFTC") if it solicits or accepts orders for commodity futures contracts, swaps, or retail commodity transactions (among other specified products), and in or in connection with such activity accepts any money or property to margin, guarantee, or secure any trades or contracts that result or may result therefrom.  Bitcoin and certain other cryptocurrencies are "commodities" under the CEA.

7.      Under the BSA, an FCM must establish an AML program that is approved by senior management and that includes, at a minimum: "policies, procedures, and internal controls

2

reasonably designed to prevent the financial institution from being used for money laundering or the financing of terrorist activities"; independent compliance testing; designation of an individual or individuals responsible for implementing and monitoring the operations and internal controls of the program; ongoing training for appropriate personnel; and "risk-based procedures for conducting ongoing customer due diligence." *See* 31 U.S.C. § 5318(h)(1); 31 C.F.R. § 1026.210. FCMs must also file suspicious activity reports ("SARs") including for transactions involving funds or other assets of at least $5,000 if the FCM knows, suspects, or has reason to suspect, among other things, that the transaction involves funds derived from illegal activity or that the FCM is being used to facilitate criminal activity. *See* 31 U.S.C. § 5318(g); 31 C.F.R. § 1026.320.

8.      As part of its AML program, an FCM must implement a written KYC program that includes "risk-based procedures for verifying the identity of each customer to the extent reasonable and practicable." This KYC program must enable an FCM to "form a reasonable belief that it knows the true identity of each customer." At a minimum, an FCM must collect the name, date of birth, address, and government identification number of each customer prior to account opening, and must take steps to verify that information in a reasonable time. The KYC program must also include procedures for "determining whether a customer appears on any list of known or suspected terrorists or terrorist organizations issued by any Federal government agency." *See* 31 U.S.C. § 5318(l); 31 C.F.R. § 1026.220.

## BitMEX's Corporate Structure and Design

9.      Arthur Hayes, Benjamin Delo, and Samuel Reed (the "Founders") founded BitMEX, the defendant, in or about January 2014. BitMEX began to support live trading in or about November 2014.

3

10.     From at least in or about September 2015 and continuing up to and including at least in or about September 2020, BitMEX, the defendant, was owned and operated by and through one or more parent companies (collectively with BitMEX, the "Company") registered in the Seychelles.  During the period from at least in or about September 2015 and continuing up to and including at least in or about September 2020, the Company also had subsidiaries and affiliates doing business in the United States and elsewhere that conducted BitMEX operations and employed staff involved in BitMEX's operations.

11.     From the founding of the Company continuing up to and including at least in or about July 2019, the Founders were co-owners of the Company and collectively held an approximately 90% ownership share in the Company.

12.     From at least in or about September 2015 and continuing up to and including at least in or about September 2020, the Founders controlled the Company.  During this period, Arthur Hayes was the Chief Executive Officer of the Company.  From at least March 2015 until at least January 2018, Benjamin Delo was the Chief Operating Officer of the Company, and Delo was the Chief Strategy Officer of the Company from at least September 2018 until May 2019. From at least in or about September 2015 and continuing up to and including at least in or about September 2020, Samuel Reed was the Chief Technology Officer of the Company.  Gregory Dwyer is a longtime friend and former colleague of Arthur Hayes.  Dwyer was hired by the Company as its first non-Founder employee in or about late 2015, and Dwyer served a variety of functions at the Company, including the Head of Business Development.

### The Company

13.     From in or about November 2014 and continuing up to and including at least in or about September 2020, BitMEX, the defendant, offered and allowed its customers to trade

4

"Bitcoin futures," the value of which are derived by reference to the Bitcoin/U.S. dollar exchange rate as published on third-party cryptocurrency exchanges. At various times after its launch in or about November 2014, BitMEX expanded its product offering to include additional futures contracts based on cryptocurrencies other than Bitcoin and/or the U.S. dollar.

14.     From in or about May 2016 and continuing up to and including at least in or about September 2020, BitMEX, the defendant, also offered and allowed its customers to trade a "Bitcoin perpetual swap," the value of which is derived by reference to the Bitcoin/U.S. dollar exchange rate as published on third-party cryptocurrency exchanges.

15.     From in or about November 2014 and continuing up to and including at least in or about September 2020, BitMEX, the defendant, accepted Bitcoin to margin customer trades. In or about 2015, BitMEX offered up to 50 times leverage on certain of its products. From at least in or about March 2017 up to and including at least in or about September 2020, BitMEX offered up to 100 times leverage on certain of its products. At all relevant times, margin on BitMEX was denominated in Bitcoin.

16.     From in or about November 2014 and continuing up to and including at least in or about September 2020, BitMEX, the defendant, accepted Bitcoin to guarantee customer trades.

17.     From in or about November 2014 and continuing up to and including at least in or about September 2020, BitMEX, the defendant, solicited and accepted offers on its cryptocurrency futures and swaps from customers located in the United States, including individual retail customers. As of in or about September 2018, for example, internal BitMEX records reflected thousands of BitMEX accounts with United States location information that were enabled for trading.

18.     Because BitMEX, the defendant, was, during the period from at least in or about

September 2015 up to and including at least in or about September 2020, a derivatives exchange
that offered and sold commodity futures and swaps to retail and non-retail customers in the
United States, and in connection with such offers and sales accepted property to margin,
guarantee, and secure those trades and contracts, it was required to register with the CFTC as an
FCM. At no point during the period from at least in or about September 2015 up to and
including at least in or about September 2020 was BitMEX registered with the CFTC as an
FCM.

19.      From at least in or about 2017 through in or about early 2019, personnel at BitMEX,
the defendant, including Gregory Dwyer and others known and unknown, conducted BitMEX
operations from an office in Manhattan, New York, including but not limited to customer support,
business development, and marketing, involving customers located in the United States and
elsewhere.

**BitMEX Failed to Implement BSA-Compliant AML and KYC Programs**

20.      At all times relevant to this Indictment, BitMEX, the defendant, and the Founders
and executives Arthur Hayes, Benjamin Delo, Samuel Reed, Gregory Dwyer, and those working
at their direction, intended for BitMEX to solicit and accept customers in the United States, and
otherwise operate there, without complying with the AML and KYC requirements imposed
under United States law. By at least in or about September 2015, BitMEX and its Founders and
executives understood that such AML and KYC requirements would in fact apply to BitMEX if
it served U.S. customers or operated within the United States. BitMEX thus took affirmative
steps purportedly designed to exempt BitMEX from the application of United States laws like
AML and KYC requirements. For example, BitMEX formally incorporated in the Seychelles, a
jurisdiction that BitMEX believed had less stringent regulation. However, BitMEX continued to

6

serve U.S. customers and operate within the United States, making it subject to AML and KYC requirements.

21.     From at least in or about September 2015 and continuing up to and including at least in or about September 2020, BitMEX, the defendant, and its Founders and executives Arthur Hayes, Benjamin Delo, Samuel Reed, and Gregory Dwyer, and others known and unknown, rejected adoption or implementation of BSA-compliant AML and KYC programs. For instance, BitMEX did not adopt or implement formal policies, procedures, and internal controls for AML; independent compliance testing for AML; and training for appropriate personnel in AML. Because BitMEX did not have an adequate KYC program, BitMEX could not and did not monitor its customer transactions for money laundering and sanctions violations. From its launch in or about November 2014 and continuing up to and including at least in or about September 2020, BitMEX did not file any SARs reporting suspected illegal activity on BitMEX.

22.     From at least in or about 2014 and continuing up to and including at least in or about September 2020, BitMEX, the defendant, also allowed customers, including individual retail customers, to register and trade without providing sufficient identifying information or documents to allow BitMEX to form a reasonable belief that it knew the true identity of its customers. Prior to in or about August 2020, customers could register to trade on BitMEX anonymously, by providing only a verified email address and without providing any identifying information or documentation. Indeed, in its initial marketing period in 2015, BitMEX's website expressly advertised that "[n]o real-name or other advanced verification is required on BitMEX."

23.     As a result of its failure to implement AML and KYC programs, BitMEX, the defendant, made itself available as a vehicle for money laundering and sanctions violations. For example, in or about May 2018, executives and employees at BitMEX, including Arthur Hayes,

the then-CEO, were notified of claims that BitMEX was being used to launder the proceeds of a cryptocurrency hack. BitMEX did not implement a formal AML policy in response to this notification. Further, internal BitMEX reports identified that customers located in Iran, who were subject to U.S. sanctions, traded on the platform from at least in or about November 2017 through at least in or about April 2018. Indeed, executives and employees at BitMEX, including Hayes and Benjamin Delo, personally communicated with BitMEX customers who self-identified as Iranian. BitMEX did not implement a formal AML policy in response to this Iranian customer activity.

24. From in or about September 2015, when the CFTC issued public enforcement orders clarifying that certain cryptocurrencies, including Bitcoin, are commodities for purposes of the CEA, and continuing up to and including at least in or about September 2020, the Founders and executives of BitMEX, the defendant, and others working at their direction knew that BitMEX could not serve U.S. customers without complying with U.S. AML and KYC requirements, that BitMEX did not have adequate AML and KYC programs, and that BitMEX in fact continued to serve customers in the United States. BitMEX actively encouraged or allowed its platform to be accessed and used by U.S. customers, and failed to take steps to effectively restrict U.S. customers from accessing the platform, as described below.

25. After in or about September 2015, when the CFTC issued the public enforcement orders clarifying that certain cryptocurrencies, including Bitcoin, were commodities for purposes of the CEA, BitMEX, the defendant, announced that it was withdrawing from the U.S. market. BitMEX implemented an internet protocol ("IP") address check (the "IP Address Check") purportedly designed to identify and block customers located in the United States from trading on BitMEX. But BitMEX applied the IP Address Check on just a single occasion for each

8

customer.  As a result, if a customer showed a non-U.S. IP Address for the IP Address Check, that customer could thereafter access and trade on BitMEX's platform from U.S. IP Addresses. BitMEX further undermined the effectiveness of the IP Address Check by, among other methods, providing an anonymous means of accessing the platform through the Tor network, a special Internet network that makes it practically impossible to physically locate the computers hosting or accessing websites on the network.  BitMEX also took no steps to restrict access to BitMEX via virtual private network ("VPN") services, which allowed U.S. customers to circumvent the IP Address Check by making it falsely appear as though they were accessing BitMEX from outside the United States.  BitMEX also implemented a policy through at least in or about September or October 2018 that exempted U.S. IP addresses – and only U.S. IP addresses – from an internal term of service rule which putatively blocked BitMEX access from IP addresses in certain restricted jurisdictions.  The Founders further knew that certain specific customers that resided in the United States continued to access BitMEX's platform into in or about 2018, yet failed to take steps to deactivate the accounts of these U.S. customers.

26.     BitMEX, the defendant, also engaged in marketing activities with the effect and intent of attracting U.S. customers.  BitMEX executives, including Arthur Hayes and Gregory Dwyer, regularly attended cryptocurrency conferences in New York and elsewhere in the United States, and had meetings in the United States with potential and existing BitMEX customers based in the U.S.  In or about May 2018, BitMEX rented three Lamborghinis and had them parked outside of the Consensus Bitcoin conference in Manhattan.  Arthur Hayes declared this "stunt" a success based on the coverage from U.S. news media.  And in or about 2018, Hayes made repeated appearances on U.S. television shows with viewership primarily in the United States during which he promoted BitMEX.

9

## BitMEX's False Statements to a Foreign Bank

27.     As part of ongoing efforts by BitMEX, the defendant, to willfully violate the

BSA, BitMEX and its senior executives also made false statements to a foreign bank, in order to

convince the bank to open an account that BitMEX could surreptitiously use for its operations.

In or about July 2015, BitMEX acquired a company called Shine Effort Inc. Limited ("Shine

Effort"), which was at all relevant times a Hong Kong-registered company.  In or about August

2015, BitMEX "sold" Shine Effort to one of the Founders, Benjamin Delo, for $1.  Although

Delo was the record owner of Shine Effort, BitMEX was in fact the true beneficial owner of the

entity.  This arrangement was ultimately memorialized in a Declaration of Trust, which provided

that Delo held his ownership interest in Shine Effort on behalf of the true owner, BitMEX.  The

Declaration of Trust was signed in or about December 2015 by Arthur Hayes on behalf of

BitMEX and by Delo on behalf of Shine Effort.

28.     In or about September 2015, Benjamin Delo opened a bank account in the name

of Shine Effort (the "Shine Effort Bank Account") at a Hong Kong subsidiary of an international

bank ("Bank-1").  Arthur Hayes assisted Delo in opening the Shine Effort Bank Account.

29.     The Shine Effort Bank Account at Bank-1 was used to, among other things,

conduct operations of BitMEX, the defendant.  For example, Shine Effort was used to convert

the Bitcoin earned by BitMEX – which did not have a corporate bank account in its own name –

into U.S. dollars and other fiat currencies, which were deposited in the Shine Effort Bank

Account.  Shine Effort employed some of the staff responsible for conducting proprietary

market-making on BitMEX, and paid some of those salaries using the Shine Effort Bank

Account.  The Shine Effort Bank Account was further used by BitMEX to pay certain of

BitMEX's operating costs and salaries; to make BitMEX dividend and salary payments to

entities wholly owned by BitMEX owners Arthur Hayes and Samuel Reed; and to fund
BitMEX's cryptocurrency trading on third-party exchanges, including through U.S. dollar wire
transfers to exchanges based in the U.S.

30.     Neither BitMEX, the defendant, nor its senior executives informed Bank-1 that
the account was in fact intended to be used by BitMEX in connection with BitMEX's own
operations, or of the relationship between Shine Effort and BitMEX.  Rather, in connection with
opening the Shine Effort Bank Account in or about September 2015, and in response to periodic
reviews conducted by Bank-1 through at least in or about October 2018, Arthur Hayes and
Benjamin Delo made and caused to be made numerous misrepresentations to Bank-1 regarding
the nature of Shine Effort's business, including false claims that Shine Effort was involved in
"information Technology," rather than the truth that Shine Effort was merely a pass-through on
behalf of BitMEX.  Hayes and Delo also made misrepresentations designed to conceal Shine
Effort's connections to BitMEX and the nature and purpose of Shine Effort's business and wire
transfer activity.  These other misrepresentations included, for example, that Delo was the sole
beneficial owner of Shine Effort and that BitMEX was a "client" of Shine Effort.

31.     BitMEX, the defendant, and its senior executives, caused misrepresentations to be
made to Bank-1 in order to, among other things, ensure that Bank-1 would allow Shine Effort to
open and maintain the Shine Effort Bank Account, so that Shine Effort could continue to process
U.S. dollar transactions through Bank-1's U.S. dollar correspondent bank in furtherance of
BitMEX's business activities.

32.     As a result of these false statements to Bank-1 by executives of BitMEX, the
defendant, from at least in or about 2015 through at least in or about 2019, the Shine Effort Bank

Account was used to conduct over $100 million in incoming and outgoing wire transfers in U.S. dollars in furtherance of the business activities of BitMEX.

33.     The false statements to Bank-1 were part and parcel of the effort by BitMEX, the defendant, to avoid scrutiny from Bank-1 about its lack of adherence to the AML and KYC requirements of United States law, while obtaining valuable access to U.S. dollar transfers.

## STATUTORY ALLEGATIONS

34.     From at least in or about September 2015, up to and including in or about September 2020, in the Southern District of New York and elsewhere, BitMEX, the defendant, did willfully violate the Bank Secrecy Act by failing to establish, implement, and maintain an anti-money laundering program that satisfies the minimum standards required by 31 U.S.C. §§ 5318 and 5322, and 31 C.F.R. §§ 1026.210 and 1026.220, to wit, BitMEX, a futures commission merchant with U.S. customers, failed to establish and implement an anti-money laundering program that included policies, procedures, and internal controls reasonably designed to prevent BitMEX from being used for money laundering or terrorist financing; independent compliance testing; ongoing training for appropriate personnel; and risk-based procedures for verifying the identity of each BitMEX customer to the extent reasonable and practicable.

(Title 31, United States Code, Sections 5318(h)(1) and (l), 5322(a) and (c); Title 31, Code of
Federal Regulations, Sections 1026.210 and 1026.220;
and Title 18, United States Code, Section 2.)

DAMIAN WILLIAMS
United States Attorney

12