UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
                                             :

  UNITED STATES OF AMERICA              :

                                             :

    v.                                      :

                                           :

  HDR GLOBAL TRADING LIMITED,      :  Case No. 24-cr-00424 (JGK)

                                           :

                           *Defendant*. :

                                         :

                                         :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

 

## POST-HEARING AND SUPPLEMENTAL SENTENCING SUBMISSION ON BEHALF OF HDR GLOBAL TRADING LIMITED

**A&O SHEARMAN**

ALLEN OVERY SHEARMAN
STERLING US LLP
599 Lexington Avenue
New York, NY 10022

David Esseks
Eugene Ingoglia
Melinda Bothe
Megan Sharkey

*Attorneys for Defendant HDR Global
Trading Limited*

December 10, 2024

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................ 1

2.   THE FATICO HEARING ON GAIN ........................................................................... 2

2.1   Deposits Do Not Map to Gain ................................................................................. 2

2.2   The Government's Evidence Does Not Establish U.S. Source Deposits Or U.S. Users ......... 3

A.   The Government Has Largely Failed To Establish That The Deposits Were From U.S. Sources ................................................................................................................. 4

B.   Most Of The Deposits Went Into Non-U.S. Accounts At BitMEX ......................... 5

(i)   Many Of The "Subpoena Response" Transfers Were To Non-U.S. Accounts.................... 6

(ii)   The Evidence Shows Most Of The Recipient Accounts Were Non-U.S. ........................... 7

(A)  Alameda ......................................................................................... 8

(B)  Cumberland ................................................................................... 12

(C)  Galaxy ........................................................................................... 15

(D)  Genesis .......................................................................................... 18

(E)  Akuna ............................................................................................ 18

(F)  Altpoint Capital ............................................................................ 20

(G)  Circle ............................................................................................. 22

(H)  CMT / Axcess Limited ................................................................. 25

(I)  Deeter Investments ....................................................................... 28

(J)  Hudson River Trading ................................................................... 28

(K)  Jane Street ..................................................................................... 31

(L)  Jump Trading ................................................................................. 33

(M)  Merlin Capital ............................................................................... 35

(N)  Mosaic Exchange ........................................................................... 36

(O)  Phoenix Nest Invest ...................................................................... 37

(P)  Pier Asset Management ................................................................. 37

(Q)  Profluent Trading .......................................................................... 37

(R)  Tower Research .............................................................................. 37

2.3   The Government Has Proven No Gain Beyond the $30 Million ............................. 40

A.   Guidelines Analysis .............................................................................................. 41

B.   Offsets ................................................................................................................... 41

3.   THE INTERESTS OF JUSTICE DO NOT REQUIRE ANY ADDITIONAL FINE ................. 42

4.   CONCLUSION ........................................................................................................ 44

## <u>TABLE OF AUTHORITIES</u>

Page(s)

**Cases**

*Gall v. United States*,
  552 U.S. 38 (2007)........................................................................................................ 42

*Kimbrough v. United States*,
  552 U.S. 85 (2007)........................................................................................................ 42

*Peugh v. United States*,
  569 U.S. 530 (2013)........................................................................................................ 2

*United States v. Cuti*,
  No. 08 CR. 972 (DAB), 2011 WL 3585988 (S.D.N.Y. July 29, 2011).................................... 3

*United States v. Deutsch*,
  987 F.2d 878 (2d Cir. 1993)............................................................................................. 3

*United States v. Granik*,
  386 F.3d 404 (2d Cir. 2004)........................................................................................... 42

*United States v. Hayes,*
  No. 1:20-cr-00500-JGK (S.D.N.Y. Oct. 2, 2020) ........................................................... 41, 42

**Statutes**

7 U.S.C. § 2(i) .................................................................................................................. 7

18 U.S.C. § 3553(a) ......................................................................................................... 42

18 U.S.C. § 3571 ............................................................................................................. 42

**Other Authorities**

17 C.F.R. § 23.23(a)(23) .................................................................................................. 7

31 C.F.R. § 1010.100(iii) .................................................................................................. 7

U.S.S.G. § 8C2.4(a) .......................................................................................................... 2

U.S.S.G. § 8C2.6 ............................................................................................................. 41

U.S.S.G. § 8C3.4 ............................................................................................................. 41

HDR Global Trading Limited ("HDR" or the "Company") respectfully submits this brief to address the evidence offered at the December 3, 2024 *Fatico* hearing and to supplement its prior sentencing submissions.

## 1.    PRELIMINARY STATEMENT

The Company's prior submissions set out both its view of the applicable Guidelines calculations and its position that all the goals of sentencing have already been met with respect to the Company's admitted violation of the Bank Secrecy Act ("BSA"), and therefore that no fine need be imposed beyond that already imposed on the founders and that paid by the Company for the same conduct to the CFTC and FinCEN.  Because the parties do not agree on the gain-from-the-offense input to the Guidelines calculation, the *Fatico* hearing was requested by the Government.  We offer below HDR's analysis of the Government's second effort to prove gain from the offense, and some additional points relevant to sentencing.

The Government's first attempt at proving gain from the offense relied on its reading of certain spreadsheets produced by the Company to the CFTC and to the Government (the "2020 User Data Spreadsheets").  The Government contended that 9.51% of the Company's users were U.S. users, and therefore that 9.51% of the Company's revenues must have come from those U.S. users.  HDR rebutted the Government's misinterpretation of its data in its reply submission, and thereafter the Court found that it "could not determine based on the parties' submissions that the Government has presented a reliable estimate of the loss."  (Dkt. 31).

The Government has now sought to prove gain from the offense through a different route, by establishing the proportion of bitcoin deposits to the BitMEX platform in the relevant period from the United States, and then arguing that that proportion of the Company's total revenues in the same period constitute gain from the offense.  As we develop below, that effort fails for at least three reasons:  (a) deposits do not map to revenue, meaning deposits themselves generate no revenue to the Company and

the Government has not established that deposits are a reliable proxy for trading volumes such that there is a reliable inference from deposit volumes to trading volumes and the resulting income to the Company; (b) the Government's evidence does not establish that the deposits on which it has focused were in fact from the United States; and (c) the Government, in focusing on deposits from allegedly U.S. sources, has ignored the evidence that those deposits (whatever their geographic source) were received into accounts that, with certain exceptions conceded by the Company, were non-U.S. accounts that, however much revenue they may have generated for the Company, were not U.S. user accounts and hence were not part of the BSA violation.  In short, as unpacked below, HDR submits that the Government has not established a basis for the Court to find any gain from the offense beyond the $30 million to which the Company's founders agreed at their respective sentencings.

### 2.    THE *FATICO* HEARING ON GAIN

To determine the appropriate sentence for the Company, the Court must first "calculate[]  the applicable Guidelines range," to serve as "the starting point and the initial benchmark" for the Court's determination.  *Peugh v. United States*, 569 U.S. 530, 536 (2013).  The organizational Guidelines are driven by the gain or loss from the offense.  *See* U.S.S.G. § 8C2.4(a).  Here, there is no loss associated with any of the offense conduct, and therefore gain is the key metric for determining an appropriate Guidelines range.  The parties agree that, for the purposes of calculating gain from the offense, the correct metric is profit from U.S. users trading on the BitMEX platform, as the offense is operating the platform with U.S. users and without BSA-compliant KYC and AML programs.  (*See* HDR Sent'g Mem. at 15, Dkt. 15 *and* Gov't Sent'g Mem. at 12, Dkt. 18).

### 2.1    Deposits Do Not Map To Gain

The Government's second attempt to prove gain from the offense involves seeking to establish the proportion of all deposits to BitMEX wallets sourced from the U.S., and then arguing that the resulting

proportion should be applied to the Company's total revenue to find gain from the offense.  Even assuming the premise is properly proven (we unpack below why it has not been), the conclusion does not follow because deposits do not map to gain.

It is uncontested that BitMEX's revenue came from commissions on trades.  Deposits themselves generated no revenue, and indeed if an accountholder deposited a fortune of bitcoin to her account, held it there for years, and then withdrew it, BitMEX would have received no revenue whatsoever from those deposits.  (*See* GX 29 at 3 (an excerpt from the Company's website from 2015) ("Is there a fee to deposit Bitcoin?  No.  Is there a fee to withdraw Bitcoin?  No.") *and* GX 30 at 3 (same from 2020) ("Is there a fee to deposit Bitcoin?  No, BitMEX does not charge fees on deposits.")).  It is a fair statement that you would expect a majority of BitMEX accountholders deposited bitcoin in order to trade, and hence most accountholders generated some revenue for the Company,[1] but there is no evidence in the record of any relationship between gross size of deposit and trading volume (and hence revenue).  The Government has simply asserted that the gross size of deposit and trading volume are correlated, and the law requires more.  Precision is not required at sentencing, but a reasonable estimate requires more than "pure speculation."  *United States v. Cuti*, No. 08 CR. 972 (DAB), 2011 WL 3585988, at *4 (S.D.N.Y. July 29, 2011)(quoting *United States v. Deutsch*, 987 F.2d 878, 886 (2d Cir. 1993)).  Therefore, in the absence of evidence adequately connecting deposits to revenue, the Government's presentation fails to establish any particular gain from the offense.

---

[1]     In addition, during the charged period, safe and secure non-exchange virtual asset wallet options were limited.  During this time, BitMEX emphasized security and that it had never been successfully hacked, (GX 31, 32), so it is not unfeasible that many accountholders deposited bitcoin to BitMEX for safe keeping rather than trading.

**2.2    The Government's Evidence Does Not Establish U.S. Source Deposits Or U.S. Users**

In attempting to prove U.S. source deposits, the Government has relied on three categories of data:  (1) records from two U.S.-based crypto exchanges, Coinbase and Gemini, in which U.S.-KYC'd Coinbase and Gemini accounts sent bitcoin to BitMEX wallets; (2) transfers to BitMEX wallets allegedly from accounts associated with four other crypto entities, Galaxy, Cumberland, Alameda, and Genesis, that allegedly were in the U.S.; and (3) transfers of bitcoin from anywhere on the blockchain to BitMEX wallets held by a particular list of accounts.  This evidence suffers from two flaws:  (A) much of it does not establish that the source of the deposits was the U.S.; and (B) it does not address the status of the accounts into which the deposits were made.  We address these failings in turn.

> A.    The Government Has Largely Failed To Establish That The Deposits Were From U.S. Sources

While the first category of data (the subpoena returns from Coinbase and Gemini) demonstrate transfers to BitMEX wallets from wallets belonging to U.S.-KYC'd accounts (as per Coinbase and Gemini's determination of what constitutes a U.S.-KYC'd account) on Coinbase and Gemini, the second and third categories of data have not been proven to be U.S.-sourced deposits.

The second category of data, retrieved with the blockchain analytics tool from TRM Labs, purportedly consisted of all transfers from any wallet associated with Alameda Research, Cumberland, Galaxy, or Genesis, which Agent Vasiliades was instructed by the case team were U.S. sources.  (*Fatico* Tr. 53:13–54:3).  While the TRM tool apparently makes some judgement about the connection of the wallet addresses to a designated entity, such as Alameda Research, Agent Vasiliades testified that (a) the blockchain itself does not disclose who the wallet-holder is; (b) he does not know how TRM makes its attributions to particular entities; (c) the TRM analysis does not include any geo-locating function so it says nothing about the geographic location of any wallet or of the instructions to make any particular transfer from a wallet; and (d) the TRM attributions to, e.g., "Alameda Research" or the other platforms

at issue may encompass various legal entities.  (*Fatico* Tr. 56:16–63:1).  The Government has not offered

the evidence apparently available from TRM showing which legal entities TRM includes in the

"Alameda Research" or "Galaxy Digital" or "Cumberland" or "Genesis" buckets, (*see* GX 35, slide 6,

for an example of such information available from TRM with respect to BitMEX; *see also Fatico* Tr.

60:19–62:9).  Thus, even assuming that the TRM attribution machine is roughly accurate in assigning

wallets to "Alameda Research," etc., the evidence does not establish that any of those wallets belong to

a *U.S.* Alameda Research entity rather than the non-U.S. Alameda entity that opened accounts at

BitMEX, as demonstrated below.  So for the TRM bucket of data, the Government has failed to prove

that these transfers are "U.S. source[d]" transfers as they were described in GX 35 (slide 9).

The third category of data was also retrieved using the TRM tool, and suffers from the same

flaws:  there is no evidence in the record that these transfers originated in the U.S.  Rather, the record is

simply that these transfers occurred during the relevant time period, from any wallet on the blockchain

to wallets at BitMEX for a range of accounts at BitMEX selected by the Government.  While we analyze

below the Government's effort to establish that those accounts are held by U.S. users, it has not

demonstrated that these transfers originated in the U.S.

### B.  Most Of The Deposits Went Into Non-U.S. Accounts At BitMEX

While the Government's evidence focuses on from where the deposits to BitMEX accounts

allegedly were sent, HDR's analysis has focused on the accounts into which the deposits were made.  As

summarized in Mr. Tilsner's testimony and Defense Exhibit 7, most of the deposits identified by the

Government's analysis ended up in accounts at BitMEX that were demonstrably non-U.S. accounts.

Because of the evolving level of KYC for BitMEX users over time, the record is varied for different

accounts, across broadly three categories of evidence:  (1) accounts that eventually went through the

Company's full KYC procedures, implemented by the end of 2020, that have been tested twice by

Guidehouse, an external consultant, as required by the FinCEN settlement; (2) accounts that went through

the Company's corporate onboarding process in 2018–2020, before full KYC was in place; and (3) accounts that did neither but where the self-declared country and the GeoIP data in the Company's systems reflected non-U.S. locations.

The Government has questioned relying on KYC scrutiny that occurred after the relevant period of 2015–September 2020.  But the fact that these accounts passed muster at the end of 2020, against a standard approved by FinCEN and twice vetted by an external consultant, is probative of their non-U.S. status at prior points in time—especially where the Government has no evidence to contradict the provenance of any particular account.  That deposits to a given account may have originated in the U.S. is not the same as establishing, on an account-by-account basis, that an accountholder in the U.S. sent bitcoin to its own BitMEX account—something the Government has not done.

(i)     Many Of The "Subpoena Response" Transfers Were To Non-U.S. Accounts

In its analysis of the Coinbase and Gemini subpoena responses, the Government makes the simple assumption that transfers from U.S. accounts on those exchanges to accounts at BitMEX reflect U.S. user activity on BitMEX.  (*See* GX 35, slide 9).  But it is equally likely that a U.S. accountholder of Coinbase, for example, would transfer bitcoin to an accountholder at BitMEX that is non-U.S.  (*See Fatico* Tr. 50:1–52:7).  Indeed, as reflected in slides 3 and 4 of Defense Exhibit 7, Mr. Tilsner's analysis of the transfers from the Coinbase and Gemini accounts held by U.S. users of those exchanges showed that significant portions of those transfers were to BitMEX accounts that later passed full KYC as non-U.S. Many of those accounts also had some contemporaneous identification verification through the Jumio verification process.  Almost $30 million in deposits from Coinbase accounts went to accounts that provided non-U.S. identification through the Jumio process during the relevant period. (DX 1). Similarly, almost $85 million in deposits from Gemini accounts went to accounts that provided non-U.S. identification through the Jumio process during the relevant period. (DX 2).

Moreover, regarding this "subpoena response" bucket of data from Coinbase and Gemini, the Government attempts to extrapolate an average monthly deposit volume from each return to plug the gap left by its failure to obtain records from those platforms to cover the full period (*see* lines for "extrapolated transfers" on GX 35, slide 9). The Government's extrapolation methodology, at best, gives a rough approximation for U.S. sourced funds to BitMEX for the missing period, but as described above and demonstrated by the defense analysis, this extrapolation ignores the fact that such funds often went to non-U.S. BitMEX accounts. (*See* DX 7, slides 3–4). Because the Government failed to update the subpoena response data, HDR and the Court have been prevented from understanding what deposits went to which BitMEX accounts for those missing months, and the extrapolated deposit amounts should not be accepted without the requisite U.S. user analysis for the receiving BitMEX accounts. (*Fatico* Tr. 115: 4–11) ("Q [Mr. Rehn]: Did you do anything besides just . . . assume a zero number for these missing months? A [Mr. Tilsner]: . . . as I understand it, [the Government's extrapolation is] just sort of a math trick. . . . there's no transactional data for me to tie to BitMEX systems. Therefore, I couldn't perform the same analysis related to KYC and customer location.") Assumptions about destinations are not supported by the record here.

(ii)    The Evidence Shows Most Of The Recipient Accounts Were Non-U.S.

Beyond the Coinbase and Gemini subpoena returns, most of the transfers relied on by the Government were to accounts at BitMEX that the Government has not proven were U.S. accounts. HDR has established, as detailed below, that most of those accounts were non-U.S.

In assessing that question, the Company has focused on the legal standard concerning U.S. persons, as reflected in HDR's current U.S. Person definition approved by FinCEN in 2021, and twice tested by external consultant Guidehouse. (*See* DX 10). The test for whether an account is a U.S. or non-U.S. account is informed by various U.S. statutes. *See e.g.* the Commodity Exchange Act's applicability

provisions of 7 U.S.C. § 2(i) and related CFTC final cross-border Rule, 17 C.F.R. 23.23(a)(23) *and* 31 C.F.R. § 1010.100(iii) (FinCEN's definition for "U.S. person").

For corporate accounts, the test under U.S. law and the Company's U.S. Person definition is explicitly not an ultimate beneficial owner test, and hence an entity may be a non-U.S. entity even if the ultimate beneficial owner ("UBO") of the entity is a U.S. corporation, resident or citizen. We review the evidence regarding each of these accounts below, applying the FinCEN-approved standard.

(A)    Alameda

The Government asserts that all deposits to or from Alameda Research that were identified by TRM Labs and reflected on GX 17–18, GX 74, DX 6, and DX 8 should be treated as U.S. deposits.  The Government relies on (i) KYC information provided about Alameda Research Inc. to Gemini, reflected on GX 15, and (ii) the fact that Alameda Research was founded and owned by Samuel Bankman-Fried, a U.S. citizen.  The Government gives no weight to the legal form of the entity trading on BitMEX, nor the fact that Mr. Bankman-Fried testified in his trial that he had begun to transition the headquarters of Alameda to Hong Kong in November 2018 following his attendance at the Sora Summit, which took place on November 13–14, 2018.  *See* Ex. 1, Excerpt of Trial Tr. 27:12–28:8, *United States v. Bankman-Fried*, 22-cr-00673 (LAK), (S.D.N.Y. Oct. 27, 2023), ECF No. 376.  The fact that Samuel Bankman-Fried, a U.S. citizen, owned Alameda Research is not sufficient to make accounts held by that non-U.S. entity into U.S. accounts.

When Alameda was setting up its corporate account in December 2018, BitMEX employees made clear that the entity could not be resident in the U.S., nor could any trading occur from the U.S.  (GX 38).  As Alameda did have a U.S. UBO, in line with then-current policy, Alameda provided additional documentation at onboarding, beyond the board resolution and non-U.S. Person Agreement and Representation required for all corporate onboarding.

GX 38

> >>>>>>> Hi Sam,
>
> >>>>>>
>
> >>>>>>> Your account should be active again now. We're giving you guys a few days bridge to get your documents in and properly onboarded. If not done within the week you will be banned again.
>
> >>>>>>
>
> >>>>>>> As a first step to opening a corporate account with us, please confirm if your trading entity or its parent entity has a US citizen as a UBO (Ultimate Beneficial Owner), Director or >10% Shareholder? This will dictate the documentation required for your onboarding.
>
> >>>>>>
>
> >>>>>>> Please note as per our Terms of Service https://www.bitmex.com/app/terms <https://www.bitmex.com/app/terms> US persons are not permitted to transact on BitMEX. Similarly, any entity that holds positions on BitMEX or otherwise transacts with a BitMEX account may not be a US entity. In addition, neither the legal entity for which positions are held nor the persons directing and controlling trading may be physically in the United States. No trading decisions or trading functions can take place within the US geographically.
>
> >>>>>>
>
> >>>>>>> If it is determined that any BitMEX trading participant has given false representations as to their location or place of residence, BitMEX reserves the right to close any of their accounts immediately and to liquidate any open positions.

Alameda also informed the Company of Alameda's Hong Kong office, including by discussing employees in the Hong Kong office on December 19, 2018, in a call with Company employee Amy Yu, (GX 5), and provided the formation documentation for Alameda Research Limited, an entity established in the British Virgin Islands. (*See* GX 39). Mr. Bankman-Fried also met with Company personnel in Hong Kong. (GX 39).

GX 5

Alameda Research
Sam Bankman-Fried
Rory (didn't get his last name, starting up in HK office right now)

GX 39



CERTIFICATE OF INCORPORATION
(SECTION 7)

The REGISTRAR of CORPORATE AFFAIRS, of the British Virgin Islands HEREBY CERTIFIES, that pursuant to the BVI Business Companies Act, 2004, all the requirements of the Act in respect of incorporation having been complied with,

**ALAMEDA RESEARCH LTD**

BVI COMPANY NUMBER: 1987279

is incorporated in the BRITISH VIRGIN ISLANDS as a BVI BUSINESS COMPANY, this 24th day of July, 2018.

9

GX 39

**Non-U.S. Person Agreement and Representation**

As set forth in our Terms of Service, access to and use of the BitMEX exchange is not available to persons residing in or operating from certain jurisdictions. This includes the United States. In order to retain access to the exchange and your account, please review and certify to the following representation:

By confirming and returning this Non-U.S. Person Agreement and Representation, the undersigned customer ("Customer") hereby represents and certifies to BitMEX that (1) it is not a U.S. entity or U.S. resident, and (2) it conducts no business, other than back office functions, related to engaging in transactions on BitMEX from within the United States.

| | |
|---|---|
| Signed / Confirmed: | DocuSigned by: [signature redacted] 24A1FF75CB6444D... |
| Date: | 12/14/2018 |
| Signed by: | Samuel Bankman-Fried |
| Name: | Samuel Bankman-Fried |
| Title: | CEO |
| Customer Name: | Alameda Research LTD |

Over the course of the Company's relationship with Alameda, Alameda provided various documentation showing its presence outside of the U.S. The Government introduced December 2018 correspondence providing Alameda Research Limited's Certificate of Incorporation in the British Virgin Islands, its Memorandum of Association and Articles of Association, and a written representation that the entity was not a U.S. entity or resident, and that no trading would occur from the U.S. (GX 39). Over time, Alameda also provided documentation showing that Mr. Bankman-Fried resided outside of the U.S., (DX 19), board resolutions authorizing specific traders to trade on behalf of Alameda Research Limited, (DX 20, 21), and proof of non-U.S. residence and address for Alameda's authorized traders. (*See* DX 16, 17, 22, 23). The information provided by Alameda Research was sufficient to complete the

Company's full KYC program that was implemented at the end of 2020, and shows that (i) the relevant

entity was not a U.S. entity, and (ii) that the relevant accounts engaged in transactions outside of the U.S.

DX 19



DX 16



DX 20

It is resolved that the below individual is the trader of the Company:
Name: ▮▮▮▮▮▮▮▮▮
Chinese ID number: ▮▮▮▮▮▮▮▮▮

It is also resolved to combine the following accounts registered in BitMEX under the corporate umbrella of the Company:
abitmex1@alameda-research.com

DX 21

It is resolved that the below individual is the trader of the Company:
Name: ▮▮▮▮▮▮▮▮
Hong Kong ID number: ▮▮▮▮▮

It is also resolved to combine the following accounts registered in BitMEX under the corporate umbrella of the Company:
abitmex1@alameda-research.com

DX 23



    (B)    Cumberland

The Government asserts that all deposits to or from Cumberland that were identified by TRM Labs and reflected on GX 19–20 and DX 3 should be treated as U.S. deposits.  The Government has said that Cumberland's parent company, DRW Trading, is based in Chicago and that the Company had at least one meeting with Cumberland in Chicago.  (GX 3, 4, 76).  The Government also points to Cumberland DRW LLC, an entity based in Chicago, as alleged by the SEC in October 2024, (GX 93), and an email showing that Mr. Hayes was aware that, in 2015, Cumberland had traders in Chicago, New York and London, and that Mr. Hayes did not reference any Cumberland operations in the Cayman Islands. (GX 1; *Fatico* Tr. 121:3–18).  The Government seems to suggest that, based on these documents, all affiliates and subsidiaries of DRW and Cumberland DRW LLC should be treated as U.S. entities.

Cumberland set up its account using an entity organized in the Cayman Islands, Dual Oasis Limited, which was then renamed  Cumberland Global Limited.  (*See* DX 42–44).  In 2019, during the course of the CFTC's investigation into the Company, the CFTC spoke with a number of the same firms the Government is now alleging are U.S. entities. When the CFTC spoke on the phone with Cumberland on July 16, 2019, as reflected in handwritten notes taken by the CFTC of the call, (DX 95–100),  and

when Cumberland responded in writing to certain CFTC questions, Cumberland confirmed that the traders using the Cumberland Global Limited accounts were all based outside of the U.S., with one trader based on Montreal, one in London, and two in Singapore.  (*See* DX 95, 96).

DX 43

---

**DUAL OASIS LIMITED**
**(THE "COMPANY")**

**WRITTEN RESOLUTIONS OF THE DIRECTORS**
**OF THE COMPANY DATED 26 JUNE 2018**

**APPROVAL OF BITMEX**

**IT IS NOTED** that it is proposed the Company onboard to, and enter into transactions through, the BitMex trading platform using the account associated with bitmex9999@cumberlandmining.com (the "**BitMex Onboarding**");

**IT IS RESOLVED** that the BitMex Onboarding be and is hereby authorized and approved with immediate effect.

---

DX 90

---

Request 5: *Documents sufficient to identify all DRW/Cumberland agents or employees involved in trading for DRW/Cumberland on the BitMEX trading platform.*

The following are the agents or employees that currently trade for DRW on the BitMEX platform:

- ███████
- ███████
- ███████
- ███████

---

DX 96



In addition to statements to the CFTC, Cumberland Global Limited provided HDR with its corporate formation documents in the Cayman Islands, including its Certificate of Incorporation and

various certificates reflecting the change of name for the entity from Sublunary Limited to Dual Oasis Limited to Cumberland Global Limited. (DX 39–44). Cumberland also provided a representation that it was not a U.S. entity and that no trading activity occurred from the U.S. (DX 42). The Company gathered information establishing that the entity was not in the U.S. Meetings in Chicago do not negate the Company's knowledge that the Cumberland traders on the platform were trading from non-U.S. locations.

DX 39



> I, V. DAPHENE WHITELOCKE  Assistant Registrar of Companies of the Cayman Islands
> DO HEREBY CERTIFY, pursuant to the Companies Law  CAP. 22,  that all requirements of the said
> Law in respect of registration were complied with by
>
> **Sublunary Limited**
>
> an Exempted Company incorporated in the Cayman Islands with Limited Liability with effect from the
> 10th day of August Two Thousand Seventeen

DX 40



> COMPANIES LAW (AS AMENDED)
>
> COMPANY LIMITED BY SHARES
>
> ARTICLES OF ASSOCIATION OF
>
> SUBLUNARY LIMITED

DX 41



> I DO HEREBY  CERTIFY that
> **Dual Oasis Limited**
>
> having by Special resolution dated 9th day of July Two Thousand Eighteen changed its name, is now
> incorporated under name of
>
> **Cumberland Global Limited**

DX 44



*I DO HEREBY CERTIFY that*

**Sublunary Limited**

*having by Special resolution dated 11th day of May Two Thousand Eighteen changed its name, is now incorporated under name of*

**Dual Oasis Limited**

DX 42

By confirming and returning this Non-U.S. Person Agreement and Representation, the undersigned customer ("Customer") hereby represents and certifies to BitMEX that (1) it is not a U.S. entity or U.S. resident, and (2) it conducts no business, other than back office functions, related to engaging in transactions on BitMEX from within the United States.

| | |
|---|---|
| Signed / Confirmed: | ▮▮▮▮▮▮▮▮▮▮ |
| Date: | May 25, 2018 |
| Signed by: | -------- |
| Name: | ▮▮▮▮▮▮ |
| Title: | Director |
| Customer Name: | Dual Oasis Limited |

(C)    Galaxy

The Government appears to claim that all deposits to or from Galaxy that were identified by TRM Labs on GX 21–22 and DX 4 should be treated as U.S. deposits because a May 2018 email to BitMEX customer support included an email signature with a New York address. (GX 2).

Galaxy Digital UK Limited is a legal entity organized under the laws of the United Kingdom. (DX 45). Galaxy's trading on BitMEX was done from outside of the U.S., as represented by Galaxy in multiple attestations that all trading activity took place outside of restricted jurisdictions. (DX 47, 51, 52).

DX 45

The Registrar of Companies for England and Wales, hereby certifies that

**GALAXY DIGITAL UK LIMITED**

is this day incorporated under the Companies Act 2006 as a private company, that the company is limited by shares, and the situation of its registered office is in England and Wales

Given at Companies House, Cardiff, on **3rd August 2018**

DX 52

**Resolution in writing of the majority of directors of** Galaxy Digital UK Limited (company number: 11500330) (the "**Company**") whose registered office is at We Work, North West House 119-127 Marylebone Road, London, United Kingdom, NW1 5PU:

**BACKGROUND**

The company is organized and operating under the laws of England and Wales

The Company wishes to open and authorise the opening of a trading account on the BitMEX platform (the "Platform").

The Company wishes to authorise the following individuals to trade on behalf of the Company on the Platform (each a "Designated Individual"):

DX 47

(iii)  the Customer is not a legal person located, organized or incorporated, or otherwise established or with its principal place of business, in any Restricted Jurisdiction, or it is either (A) an "exempted undertaking" (as defined under the Exempted Undertakings Tax Protection Act 1966 of Bermuda) (a "**BEU**") or (B) an "international business company" (as defined under the International Business Companies Act 2016 of the Republic of Seychelles) (an "**SIBC**");

(iv)  the Customer (including its individual owners, representatives, employees, or any other person with access to the Customer's BitMEX account) does not conduct or control (including by, in substance or effect, making decisions with respect to) its trading activities on BitMEX from within any Restricted Jurisdiction, provided that where the Customer is (A) a BEU, it may do so from Bermuda (or any other jurisdiction that is not a Restricted Jurisdiction), or (B) an SIBC, it may do so from the Republic of Seychelles (or any other jurisdiction that is not a Restricted Jurisdiction); and

(v)  the Customer (including its individual owners, representatives, employees, or any other person with access to the Customer's BitMEX account) will not submit trading instructions or conduct any business related to engaging in transactions with respect to its BitMEX account from within any Restricted Jurisdiction, provided that where the Customer is (A) a BEU, it may do so from Bermuda (or any other jurisdiction that is not a Restricted Jurisdiction), or (B) an SIBC, it may do so from the Republic of Seychelles (or any other jurisdiction that is not a Restricted Jurisdiction).

Signed/Confirmed: 

Date: 16 September 2019

Signed by:
Name
Title: Director
For and on behalf of Galaxy Digital UK Limited

Galaxy also provided proof of address for the two traders authorized to trade on behalf of Galaxy Digital UK Limited, (DX 49), in the form of a Japanese phone bill and a United Kingdom bank statement, (DX 48, 50).

DX 48



DX 50



Galaxy closed its accounts on BitMEX on October 24, 2023. (DX 53).

DX 53

As it relates to support ticket #742110. I am requesting closure of the following inactive/dormant accounts at BitMex.com under the legal entity Galaxy Digital UK Ltd:

The documentation gathered by the Company established that (i) the entity was not a U.S. entity, and (ii) the traders were trading from non-U.S. locations. None of the documents provided by the Government suggest that either of those two points are incorrect, particularly as back-office, non-trading functions could occur from the U.S.

(D)    Genesis

The Government asserts that deposits to accounts that TRM Labs has attributed to Genesis on GX 23–24 and DX 5 should be considered U.S. deposits. While the Company does not have any KYC information for Genesis, the only document related to Genesis put forward by the Government is dated in 2015 and does not relate to any of the trading at issue. (GX 1). Genesis had offshore subsidiaries and offices outside of the U.S., including in Singapore. *See* Voluntary Petition for Non-Individuals Filing for Bankruptcy, *In re Genesis Asia Pacific PTE. LTD.*, 1:23-bk-10065 (Bankr. S.D.N.Y. Jan. 19, 2023), ECF No. 1. The Government has not established that any trading done by Genesis has a U.S. nexus, though the Company acknowledges that it too does not have any documentation to establish that the trading occurred outside of the U.S.

(E)    Akuna

The Government claims that deposits to accounts owned by Akuna Digital Australia Pty Ltd ("Akuna Digital"), identified by TRM Labs on GX 74 and DX 8, should be considered U.S. deposits because an Akuna affiliate company has a U.S. presence. The Government included a calendar invite from December 2017, showing that the COO/CFO of another entity, Akuna Capital LLC, was based in Chicago, (GX 37), and BitMEX employees may have met with that Akuna entity in Chicago, (GX 76). This does not mean that the legal entity onboarded to BitMEX, Akuna Digital, is a U.S. entity.

Akuna Digital provided representations in 2018 and 2020 that no trading activity on behalf of Akuna Digital occurred from a restricted jurisdiction, including the U.S. (DX 12, 15).

### DX 12

By confirming and returning this Non-U.S. Person Agreement and Representation, the undersigned customer ("Customer") hereby represents and certifies to BitMEX that (1) it is not a U.S. entity or U.S. resident, and (2) it conducts no business, other than back office functions, related to engaging in transactions on BitMEX from within the United States.

| | |
|---|---|
| Signed / Confirmed: | █████████████ |
| Date: | 7ᵗʰ December 2018 |
| Signed by: | █████████████ |
| Name: | |
| Title: | DIRECTOR |
| Customer Name: | SCHUBERT HOLDINGS |

### DX 15

(iii)   the Customer is not a legal person located, organized or incorporated, or otherwise established or with its principal place of business, in any Restricted Jurisdiction, or it is either (A) an "exempted undertaking" (as defined under the Exempted Undertakings Tax Protection Act 1966 of Bermuda) (a "**BEU**") or (B) an "international business company" (as defined under the International Business Companies Act 2016 of the Republic of Seychelles) (an "**SIBC**");

(iv)   the Customer (including its individual owners, representatives, employees, or any other person with access to the Customer's BitMEX account) does not conduct or control (including by, in substance or effect, making decisions with respect to) its trading activities on BitMEX from within any Restricted Jurisdiction, provided that where the Customer is (A) a BEU, it may do so from Bermuda (or any other jurisdiction that is not a Restricted Jurisdiction), or (B) an SIBC, it may do so from the Republic of Seychelles (or any other jurisdiction that is not a Restricted Jurisdiction); and

(v)   the Customer (including its individual owners, representatives, employees, or any other person with access to the Customer's BitMEX account) will not submit trading instructions or conduct any business related to engaging in transactions with respect to its BitMEX account from within any Restricted Jurisdiction, provided that where the Customer is (A) a BEU, it may do so from Bermuda (or any other jurisdiction that is not a Restricted Jurisdiction), or (B) an SIBC, it may do so from the Republic of Seychelles (or any other jurisdiction that is not a Restricted Jurisdiction).

Signed / Confirmed: _█████████████
Date: March 5, 2020

Signed by:
Name: ███████████
Title: CFO/COO
For and on behalf of _____ Akuna Digital Australia Pty Ltd
[*insert Customer legal entity name*]

19

Akuna Digital also provided historical documentation regarding Schubert Holdings Pty Ltd's formation in Australia, which renamed to Akuna Digital in 2020, and a board resolutions stating that Schubert Holdings Pty Ltd did not have any U.S. citizen director, UBO, or shareholder owning more than 10% of the entity. (*See* DX 11, 13–14).  None of the documents on which the Government relies contradict that the relevant entity was a non-U.S. entity and that no trading occurred from the U.S.

DX 11

| Organisation Details | |
|---|---|
| **Current Organisation Details** | |
| Name: | SCHUBERT HOLDINGS PTY LTD |
| ACN: | 622 349 393 |
| ABN: | 59622349393 |
| Registered in: | New South Wales |
| Registration date: | 19/10/2017 |
| Next review date: | 19/10/2018 |
| Name start date: | 19/10/2017 |
| Status: | Registered |
| Company type: | Australian Proprietary Company |
| Class: | Limited By Shares |
| Subclass: | Proprietary Company |

DX 13

Please accept this letter as authorization and approval to maintain Schubert Holdings Pty Ltd's (E-Mail: trades@schubertholdings.com.au) account with BitMex.

This letter also confirms that the Director(s), UBO(s), and/or Shareholder(s) with more than 10% ownership of Schubert Holdings Pty Ltd, is not a US Citizen(s).

DX 14

It was **noted** that the Company has proposed to change the name of the Company from Schubert Holdings Pty Ltd to Akuna Digital Australia Pty Ltd.

It was **noted** that the change of name of the Company will take effect from the date on which the Australian Securities and Investments Commission (**ASIC**) alters the details of the Company's registration.

(F)    Altpoint Capital

The Government did not put forward any exhibits related to Altpoint Capital, but asserts that deposits attributed to Altpoint Capital by TRM on GX 74 and DX 8 should be considered U.S. deposits.

20

The account identified by the Government is owned by Altpoint Cipher LP. Altpoint Cipher LP provided the Company with KYC documentation as a limited partnership registered in the Cayman Islands.  (DX 24).  Altpoint Cipher LP provided its formation documents and a representation that it did not trade or direct trading from within the U.S., (DX 25, 26), and supplemented this documentation when its name changed to Kepler Fund LP in March 2019, (DX 28).  There is no evidence to suggest that Altpoint Cipher LP (and later Kepler Fund LP) should be treated as U.S.

DX 24

I, *FLOSSIEBELL M. MARAGH* *Assistant Registrar of Exempted Limited Partnership  in the Cayman Islands DO HEREBY CERTIFY, pursuant to the Exempted Limited Partnership Law, 2018 that all the requisitions of the said Law in respect of registration were complied with by*

**Altpoint Cipher LP**

*an Exempted Limited Partnership registered  in the Cayman Islands on the 15th day of May Two Thousand Eighteen*

DX 25

**INITIAL EXEMPTED LIMITED PARTNERSHIP AGREEMENT OF ALTPOINT CIPHER LP**

DX 28

I, *D. EVADNE EBANKS*, *Assistant Registrar of Exempted Limited Partnership in and for the Cayman Islands DO HEREBY CERTIFY, that the name of the Exempted Limited Partnership duly registered as*

**Altpoint Cipher LP**

*on the 15th day of May Two Thousand Eighteen has been changed to*

**Kepler Fund LP**

*and the same name has been entered in the Partnership register this 1st day of March Two Thousand Nineteen*

DX 26

By confirming and returning this Non-U.S. Person Agreement and Representation, the undersigned customer ("Customer") hereby represents and certifies to BitMEX that (1) it is not a U.S. entity or U.S. resident, and (2) it conducts no business, other than back office functions, related to engaging in transactions on BitMEX from within the United States.

| | |
|---|---|
| Signed / Confirmed: | |
| Date: | August 13, 2018 |
| Signed by: | ████████ |
| Name: | |
| Title: | CFO |
| Customer Name: | Altpoint Cipher LP |

(G)    Circle

The Government asserts that TRM Labs identified deposits into an account owned by Circle Internet Financial Trading Company Limited, and then Circle Trade Europe Ltd, reflected on GX 74 and DX 8, should all be treated as U.S. deposits. The Government relies in part on documentation related to HDR's own over-the-counter trading, (GX 75, 87, 90), which is not relevant to the question of gain from the offense as it does not relate to revenue from the BitMEX platform. The Government also relies on an audit letter related to Circle, (GX 85, 86), a board resolution, not specific to BitMEX, from an entity different from the one onboarded (GX 84), discussions of meetings in New York or on eastern time (GX 89, 90), a 2014 email scheduling a call with Circle in eastern standard time, (GX 88), and correspondence with BitMEX customer support in which Circle was "unable to provide" a signed document attesting they were not trading from a restricted jurisdiction, (GX 91).

The BitMEX account identified by TRM Labs was opened in July 2017, on behalf of Circle Internet Financial Trading Company Limited, an Irish entity, (GX 77–80), and transitioned to Circle Trade Europe Ltd, an entity organized in the United Kingdom, at the end of 2018, (DX 29, 101, 102).

### GX 80

| Company | 540941 | **CIRCLE INTERNET FINANCIAL TRADING COMPANY LIMITED**<br>**Change of name registered on 03/10/2014** |
|---|---|---|
| **Previous Name(s)** | | Circle Internet Financial Ip Trading Company Limited |
| **Registered Office** | | 8 Clanwilliam Square |
| | | Grand Canal Quay |
| | | Dublin 2 |
| **Eircode** | | |
| **R.O.A.** | | |
| **Type** | | Ltd - Private Company Limited By Shares |

GOVERNMENT EXHIBIT 80
24 Cr. 424 (JGK)

<u>DX 29</u>

The Registrar of Companies for England and Wales, hereby certifies that

**CIRCLE TRADE EUROPE LTD**

is this day incorporated under the Companies Act 2006 as a private company, that the company is limited by shares, and the situation of its registered office is in England and Wales.

Given at Companies House, Cardiff, on **16th March 2018**.

<u>DX 31</u>

By confirming and returning this Non-U.S. Person Agreement and Representation, the undersigned customer ("Customer") hereby represents and certifies to BitMEX that (1) it is not a U.S. entity or U.S. resident (i.e. person living and working in the United States), and (2) it does not conduct business operations related to engaging in transactions on BitMEX from within the United States.

| | |
|---|---|
| Signed / Confirmed: | ███████████ |
| Date: | 25 May 2018 |
| Signed by: | Circle |
| Name: | ████████ |
| Title: | Legal Director, EMEA |
| Customer Name: | Circle Trade Europe Limited |

<u>DX 32</u>

I, ████████, the duly elected and acting President and Chief Executive Officer of Circle Trade Europe Limited, (the "Company"), on behalf of the Company, hereby certify that trader@circle.com is the email address authorized in connection with opening an account, completing trades and any other authorized activity.

In May 2018, Circle Trade Europe Ltd provided a signed attestation that it did not engage in transactions on BitMEX from within the U.S., (DX 31), though due to some confusion, the account was not officially transitioned to ownership of Circle Trade Europe Ltd until December 2018, (DX 101, 102). At all times, the relevant entities were non-U.S. entities and had represented that no trading was occurring from the U.S.

DX 101

OK.
If possible it would be really good to have your docs back overnight. Any longer and we may have to put a lock on your account until we have the correct entity onboarded.

Amy Yu
BitMEX

On Dec 19, 2018, at 12:48 AM, ▮▮▮▮▮▮▮▮@circle.com> wrote:

I think the legal distro only works internally.  So I believe  we're going to need to re-onboard and require the rest of our KYC docs from this entity.
We'll be following up shortly.  Sorry about this confusion thought the account had already been transitioned.

DX 102

On Dec 19, 2018, at 2:03 AM, ▮▮▮▮▮▮▮▮@circle.com> wrote:

Hey Amy,
As part of that attestation we intended to have the Bitmex registration under Circle Europe Trade Limited (a UK Ltd Company) Reg. No. 11258547, which is a wholly owned subsidiary of Circle UK Trading Limited (UK Ltd Company) Reg. No. 09543077 which is in turn wholly owned by the Irish org on file Circle Internet Financial Trading Company Limited (Irish Ltd Company) Reg. No. 540941.

The existing information should still be relevant for the most part relating to the parent org, but happy to provide additional documentation if needed to shift it over to Circle Europe Trade Limited.

In 2019, Circle confirmed to BitMEX customer support that its traders sat in Hong Kong and London, and that accidental logins from the U.S. were the result of a company VPN issue, or accidental login while in transit to a conference in the U.S., and that such logins were just "to view risk and pricing," not for trading.  (DX 105).

DX 105

US loggin again, will not happen again! I sit >> in HK full time and access bitmex from there only. >> >> ▮▮▮▮>> >> On Thu, Apr 4, 2019 at 12:18 AM ▮▮▮▮▮▮▮▮@circle.com> >> wrote: >> >>> Hey Amy & Greg, >>> Hope all has been well. >>> We've recently been erroneously receiving the restricted jurisdiction / >>> 7 day account closing notification for our Bitmex account under >>> trader@circle.com. Given its under our UK entity and ▮▮▮▮ myself sit >>> in HK and London respectively just want to make sure we're all set there. >>> >>> Cheers, >>> ▮▮▮▮ >>> >>> >>> >> >> This e-mail and all information in, attached to, or linked via this >> e-mail (together the 'e-mail') is confidential and may

None of the Government's exhibits undermine the fact that the Circle entity on the BitMEX platform was outside the U.S. and that the traders transacting through the Circle account were doing so from outside of the U.S.  Beyond Circle Trade Europe Ltd completing the non-U.S. representation, these points were reiterated to the Company through customer support interactions:

Circle Trade, the OTC and trading arm of Circle, was then acquired by Kraken in December 2019, (DX 106), and therefore was not operational in 2020 at the time of the Company's request for an updated restricted jurisdiction representation, (GX 91). Circle Trade Europe Ltd.'s last trade on BitMEX was prior to Kraken's acquisition in December 2019.

DX 106

> Today, we're excited to announce that Kraken is acquiring one of the most recognized OTC desks in crypto, Circle Trade.
>
> Our industry-leading, global OTC desk (https://www.kraken.com/en-us/features/otc-exchange), run by Wall Street veteran Nelson Minier, will now expand to more than 20 global professionals, deepening our ability to provide the personal, white-glove service that you expect from Kraken.
>
> This acquisition will also significantly bolster our services and capabilities by providing:
>
> - New trading partners around the world, particularly in Asia

(H)    CMT / Axcess Limited

The Government contends that GX 74 and DX 8 identify deposits into accounts owned by Axcess Limited (previously named CMT Trading Limited), which it contends should be considered deposits from the U.S. The Government's basis appears to be that CMT Digital Limited, a different entity, has an office in Chicago (GX 40–42, 76), and a November 28, 2018 email from BitMEX employee Amy Yu in which she noted that she would "check if [Axcess Limited] want to KYC for restricted jurisdiction privilege." (GX 43). This restricted jurisdiction privilege would allow Axcess Limited to log in to its account from the U.S. without automatically restricting the account, a process which was implemented to allow back-office compliance functions in the U.S. to review accounts.

When onboarding with the Company, Axcess Limited established that it was a non-U.S. entity. Axcess Limited provided its Cayman Islands Certificate of Incorporation, and name change from CMT Trading Limited to Axcess Limited. (DX 33, 34).

25

DX 33

> I, **DONNELL HARLEE DIXON**     *Senior Assistant Registrar of Companies of the Cayman Islands*
> *DO HEREBY CERTIFY, pursuant to the Companies Law CAP. 22, that all requirements of the said*
> *Law in respect of registration were complied with by*
>
> **CMT TRADING LIMITED**
>
> *an Exempted Company incorporated in the Cayman Islands with Limited Liability with effect from*
> *the 25th day of November Two Thousand Three*

DX 34

| | |
|---|---|
| **1.** | **CHANGE OF NAME** |
| 1.1 | **IT IS RESOLVED** as a special resolution that the name of the Company be changed from "CMT Trading Limited" to "Axcess Limited". |

Axcess Limited also provided multiple attestations in 2018 and 2020 that it was a Cayman Islands entity and that no trading occurred from the U.S. (DX 33–38).

DX 35

> This letter is to authorize the User ID bitcoin@cmtam.com for deposits, withdrawals, trading, and other related activity on the BitMEX cryptocurrency derivatives trading platform. The User ID bitcoin@cmtam.com is associated with Axcess Limited, a Cayman Islands Limited Company.

DX 36

> By confirming and returning this Non-U.S. Person Agreement and Representation, the undersigned customer ("Customer") hereby represents and certifies to BitMEX that (1) it is not a U.S. entity or U.S. resident, and (2) it does not conduct business operations related to engaging in transactions on BitMEX from within the United States.

| | |
|---|---|
| Signed / Confirmed: | ███████████ |
| Date: | 5/29/2018 |
| Signed by: | ███████ |
| Name: | |
| Title: | CFO |
| Customer Name: | Axcess Limited |

DX 37

**IT IS NOTED** that

1. The Company confirmed and returned a Non-U.S. Person Agreement and Representation to BitMEX on May 29, 2018.

2. It recently came to the Company's attention that BitMEX has flagged account bmex.cmt1@gmail.com for violating TOS (jurisdiction).

**IT IS RESOLVED** that

1. the Directors hereby confirm that the above email address in addition to the accounts under bmex.cmt@gmail.com and bmex.cmt2@gmail.com are associated with the Company and fulfill the same Non-U.S. Person Agreement and Representation that was made to BitMEX.

DX 38

(iii)    the Customer is not a legal person located, organized or incorporated, or otherwise established or with its principal place of business, in any Restricted Jurisdiction, or it is either (A) an "exempted undertaking" (as defined under the Exempted Undertakings Tax Protection Act 1966 of Bermuda) (a "**BEU**") or (B) an "international business company" (as defined under the International Business Companies Act 2016 of the Republic of Seychelles) (an "**SIBC**");

(iv)    the Customer (including its individual owners, representatives, employees, or any other person with access to the Customer's BitMEX account) does not conduct or control (including by, in substance or effect, making decisions with respect to) its trading activities on BitMEX from within any Restricted Jurisdiction, provided that where the Customer is (A) a BEU, it may do so from Bermuda (or any other jurisdiction that is not a Restricted Jurisdiction), or (B) an SIBC, it may do so from the Republic of Seychelles (or any other jurisdiction that is not a Restricted Jurisdiction); and

(v)    the Customer (including its individual owners, representatives, employees, or any other person with access to the Customer's BitMEX account) will not submit trading instructions or conduct any business related to engaging in transactions with respect to its BitMEX account from within any Restricted Jurisdiction, provided that where the Customer is (A) a BEU, it may do so from Bermuda (or any other jurisdiction that is not a Restricted Jurisdiction), or (B) an SIBC, it may do so from the Republic of Seychelles (or any other jurisdiction that is not a Restricted Jurisdiction).

Signed / Confirmed: ▮▮▮▮▮▮▮
Date: __5/8/2020__

Signed by: ▮▮▮▮▮▮
Name: ▮▮▮▮▮▮▮
Title: __CFO__
For and on behalf of __Access Limited__
[*insert Customer legal entity name*]

As with the other entities, the Government has not put forward evidence sufficient to disregard the legal reality that the entity is based in the Cayman Islands, and the Government has not addressed that the entity has traders outside of the U.S. such that no trading on BitMEX occurred from the U.S.

27

(I)    Deeter Investments

The Government asserts that deposits to an account it has identified on GX 74 as belonging to Deeter Investments should be treated as U.S. deposits.  The Government relies on a LinkedIn profile, (GX 44), a FINRA BrokerCheck for the same individual, which lists Deeter Investments as an Austin, Texas based firm, (GX 46), and one of the 2020 User Data Spreadsheets that does not appear to include the relevant account, (GX 45). The Company does not have any KYC materials for Deeter Investments as it was not registered as a corporate account. The user data gathered by the Company does not contain any U.S. nexus.

(J)    Hudson River Trading

The Government asserts that deposits into two BitMEX accounts should be considered U.S. deposits to Hudson River Trading. Both accounts appear to be owned by retail users who successfully completed KYC as non-U.S. persons, (DX 87, 88), and neither appears to have any tie to Hudson River Trading.

DX 87                                    DX 88



A Hudson River Trading subsidiary, HRTJ Limited, was onboarded to BitMEX in 2018 as an entity organized in the Cayman Islands, (DX 54), provided an attestation that it was not a U.S. entity and

did not engage in any business, other than back-office functions, related to engaging in transactions on BitMEX from within the U.S., (GX 47, DX 57).

### DX 54

> I, V. DAPHENE WHITELOCKE  Assistant Registrar of Companies of the Cayman Islands
> DO HEREBY CERTIFY, pursuant to the Companies Law  CAP. 22,  that all requirements of the said Law in respect of registration were complied with by
>
> **HRTJ Limited**
>
> an Exempted Company incorporated in the Cayman Islands with Limited Liability with effect from the 11th day of March Two Thousand Fifteen

### DX 57

> the Customer is not a legal person located, organized or incorporated, or otherwise established or with its principal place of business, in any Restricted Jurisdiction, or it is either (A) an "exempted undertaking" (as defined under the Exempted Undertakings Tax Protection Act 1966 of Bermuda) (a "**BEU**") or (B) an "international business company" (as defined under the International Business Companies Act 2016 of the Republic of Seychelles) (an "**SIBC**");
>
> the Customer (including its individual owners, representatives, employees, or any other person with access to the Customer's BitMEX account) does not conduct or control (including by, in substance or effect, making decisions with respect to) its trading activities on BitMEX from within any Restricted Jurisdiction, provided that: (1) where the Customer is (A) a BEU, it may do so from Bermuda (or any other jurisdiction that is not a Restricted Jurisdiction), or (B) an SIBC, it may do so from the Republic of Seychelles (or any other jurisdiction that is not a Restricted Jurisdiction); and (2) this paragraph shall not apply to support or back office services rendered, or the performance of support or back office duties, by personnel or agents of the Customer, in the ordinary course of their business activities, with respect to any legal, compliance, audit, accounting, marketing and preparation of promotional materials, software development or information technology services provided to the Customer conducted from within the United States of America; and
>
> the Customer (including its individual owners, representatives, employees, or any other person with access to the Customer's BitMEX account) will not submit trading instructions or conduct any business related to engaging in transactions with respect to its BitMEX account from within any Restricted Jurisdiction, provided that: (1) where the Customer is (A) a BEU, it may do so from Bermuda (or any other jurisdiction that is not a Restricted Jurisdiction), or (B) an SIBC, it may do so from the Republic of Seychelles (or any other jurisdiction that is not a Restricted Jurisdiction); and (2) this paragraph shall not apply to support or back office services rendered, or the performance of support or back office duties, by personnel or agents of the Customer, in the ordinary course of their business activities, with respect to any legal, compliance, audit, accounting, marketing

> and preparation of promotional materials, software development or information technology services provided to the Customer conducted from within the United States of America.
>
> Signed / Confirmed: ███████████
> Date: 21 May 2020
>
> Signed by:
> Name: ███████████
> Title: Authorized signatory
> For and on behalf of HRTJ Limited

In response to an inquiry from the CFTC in July 2019, Hudson River Trading LLC produced documents showing that all HRTJ Limited traders on BitMEX were outside of the U.S. (*See* DX 91, 92). Of the 18 individuals identified as involved with trading on BitMEX, all were based in Dublin, London, or Singapore.  (DX 92).  HRTJ Limited also provided assurances to the Company that it remains outside of the U.S., with an Officers' Certificate dated February 19, 2021, specifically stating that "[t]he trading and operational teams responsible for the trading decisions for HRTJ's account at BitMEX are located in the United Kingdom and Singapore," and that "[t]he trading algorithms that trade for HRTJ's account at BitMEX are located in Dublin."  (DX 58).

<u>DX 58</u>

(6) The trading and operational teams responsible for the trading decisions for HRTJ's account at BitMEX are located in the United Kingdom and Singapore.

(7) The trading algorithms that trade for HRTJ's account at BitMEX are located in Dublin.

<u>DX 92</u>

| First name | Last name | Team | Office |
|---|---|---|---|
| | | Operations | Dublin |
| | | Operations | Dublin |
| | | Operations | Dublin |
| | | Operations | London |
| | | Operations | London |
| | | Operations | London |
| | | Operations | London |
| | | Operations | London |
| | | Operations | London |
| | | Operations | London |
| | | Operations | London |
| | | Operations | London |
| | | Systems | London |
| | | Operations | Singapore |
| | | Operations | Singapore |
| | | Operations | Singapore |
| | | Operations | Singapore |
| | | Systems | Singapore |

(K)    Jane Street

To establish that deposits identified on GX 74 and DX 8 as related to Jane Street are U.S. deposits,

the Government relies on an October 22, 2018, chat between two BitMEX employees that identified Jane

Street as on a "list of accounts with geoipcountry=US and riskValue>100 XBT."  (GX 52).  The

Government further relies on a customer support interaction creating an account for Jane Street's "UK

company," but where the account was being created from within the U.S. (GX 53).

The accounts identified by the Government were owned by two Jane Street entities that

onboarded with BitMEX, one being JSCT Europe Limited and the other JSGC Limited. JSCT Europe

Limited provided its United Kingdom certificate of incorporation and a representation that it was not a

U.S. entity, nor did it engage in any business, other than back-office functions, related to engaging in

transactions on BitMEX from within the U.S.  (DX 59, 61, 62).

DX 59

The Registrar of Companies for England and Wales, hereby certifies that

**JSCT EUROPE LIMITED**

is this day incorporated under the Companies Act 2006 as a private company, that the
company is limited by shares, and the situation of its registered office is in England
and Wales.

Given at Companies House, Cardiff, on **7th June 2018**.

DX 61

**JSCT Europe Limited (Registered Number 11402638)**
**(the "Company")**

**Resolutions in Writing of the Sole Director of the Company**
**passed in accordance with Article 10 of the Articles of Association of the Company**

DX 62

By confirming and returning this Non-U.S. Person Agreement and Representation, the undersigned customer ("Customer") hereby represents and certifies to BitMEX that (1) it is not a U.S. entity or U.S. resident, and (2) it conducts no business, other than back office functions, related to engaging in transactions on BitMEX from within the United States.

| | |
|---|---|
| Signed / Confirmed: | ████████████████ |
| Date: | 2018-07-09 |
| Signed by: | ████████████████ |
| Name: | |
| Title: | DIRECTOR |
| Customer Name: | JSCT EUROPE LIMITED |

JSGC Limited similarly provided its Cayman Islands certificate of incorporation, name change from Jane Street Global International (Cayman) Limited to JSGC Limited, and representation that it was not a U.S. entity, nor did it engage in business operations related to engaging in transactions on BitMEX from within the U.S.  (DX 64, 66, 68).  While one of the accounts may have been created from inside the U.S., setting up accounts is a back-office function that does not mean that trading occurred from within the U.S., nor does it negate the fact that the entities themselves were non-U.S. companies.

DX 64

I, **D. EVADNE EBANKS** *Assistant Registrar of Companies of the Cayman Islands DO HEREBY CERTIFY, pursuant to the Companies Law CAP. 22, that all requirements of the said Law in respect of registration were complied with by*

**Jane Street Global International (Cayman) Limited**

*an Exempted Company incorporated in the Cayman Islands with Limited Liability with effect from the 10th day of December Two Thousand Eight*

DX 66

We, the undersigned, being the only Shareholder of the Company having the right to receive notice of, attend and vote at general meetings hereby **RESOLVE AS SPECIAL RESOLUTIONS** that:

1.    the name of the Company be changed from "Jane Street Global International (Cayman) Limited" to "JSGC Limited"; and

DX 68

By confirming and returning this Non-U.S. Person Agreement and Representation, the undersigned customer ("Customer") hereby represents and certifies to BitMEX that (1) it is not a U.S. entity or U.S. resident, and (2) it does not conduct business operations related to engaging in transactions on BitMEX from within the United States.

Signed / Confirmed:  ⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛

Date: _2018/05/04_

Signed by: ⬛⬛⬛⬛⬛⬛⬛⬛

Name: ⬛⬛⬛⬛⬛⬛⬛⬛

Title: _MANAGING DIRECTOR_

Customer Name: _JBGC LIMITED_

(L)     Jump Trading

In an effort to establish that deposits identified by TRM Labs on GX 74 and DX 8 as received in Jump Trading accounts on BitMEX are U.S. deposits, the Government relies on a few pieces of disparate information with U.S. ties. These include a meeting with Jump Trading in Chicago, an email from Jump Trading asking about progress on updates to the BitMEX trading engine, call notes with Jump Trading that note Jump has some U.S. offices in addition to offices in London, Shanghai, and Singapore, and a customer support interaction setting up an account for Jump's Cayman Islands entity, seemingly from the U.S. (GX 54–57, 76). None of these suggest that the entity trading on BitMEX was a U.S. entity or that trading was occurring from the U.S.

TMS International Ltd, the Cayman Islands affiliate of Jump, provided its Cayman Islands certificate of incorporation and representation that it was not registered in or trading from a restricted jurisdiction. (DX 75, 80). Setting up an account is a back-office activity, while trading on the BitMEX platform occurred from outside the U.S. Further, meetings and inquiries about updates to the platform

do not indicate that TMS International Ltd was a U.S. entity or that the traders were not transacting from an office outside of the U.S.

### DX 75

> I, **JOY A. RANKINE**  Assistant Registrar of Companies of the Cayman Islands
> DO HEREBY CERTIFY, pursuant to the Companies Law  CAP. 22,  that all requirements of the said Law in respect of registration were complied with by
>
> ### TMS International Ltd.
>
> an Exempted Company incorporated in the Cayman Islands with Limited Liability with effect from the 9th day of May Two Thousand Eighteen

### DX 80

(iii)    the Customer is not a legal person located, organized or incorporated, or otherwise established or with its principal place of business, in any Restricted Jurisdiction, or it is either (A) an "exempted undertaking" (as defined under the Exempted Undertakings Tax Protection Act 1966 of Bermuda) (a "**BEU**") or (B) an "international business company" (as defined under the International Business Companies Act 2016 of the Republic of Seychelles) (an "**SIBC**");

(iv)    the Customer (including its individual owners, representatives, employees, or any other person with access to the Customer's BitMEX account) does not conduct or control (including by, in substance or effect, making decisions with respect to) its trading activities on BitMEX from within any Restricted Jurisdiction, provided that where the Customer is (A) a BEU, it may do so from Bermuda (or any other jurisdiction that is not a Restricted Jurisdiction), or (B) an SIBC, it may do so from the Republic of Seychelles (or any other jurisdiction that is not a Restricted Jurisdiction); and

(v)    the Customer (including its individual owners, representatives, employees, or any other person with access to the Customer's BitMEX account) will not submit trading instructions or conduct any business related to engaging in transactions with respect to its BitMEX account from within any Restricted Jurisdiction, provided that where the Customer is (A) a BEU, it may do so from Bermuda (or any other jurisdiction that is not a Restricted Jurisdiction), or (B) an SIBC, it may do so from the Republic of Seychelles (or any other jurisdiction that is not a Restricted Jurisdiction).

Signed / Confirmed: _____
Date: 03 May 2020  _____

Signed by:
Name: _____
Title: ___TMS International Ltd.___
For and on behalf of __TMS International Ltd._____
[insert Customer legal entity name]

In response to an inquiry from the CFTC in July 2019, Jump also confirmed that "all Jump trades" were executed by Cayman Islands entities, and that "the responsible traders for Jump's trading on BitMEX" were both based in London. (DX 93).

DX 93



cryptocurrency based on the approximate market value of the relevant cryptocurrency. For trades prior to May 31, 2018, all Jump trades were executed by the Cayman Island entity Tai Mo Shan Ltd. For trades on or after May 31, 2018, all Jump trades were executed by the Cayman Island entity Tai Mo Shan International, Ltd.

**Request No. 5** *Documents sufficient to identify all Jump agents or employees involved in trading for Jump on the BitMEX trading platform.*

Jump has designated ████████████████, both located in London, as the responsible traders for Jump's trading on BitMEX. In addition, the following individuals are most involved with overseeing Jump's trading on BitMEX:

1.
2.
3.
4.
5.
6.

(M)    Merlin Capital

The Company has no KYC information regarding Merlin Capital, and acknowledges that the GeoIP information for the account is the U.S. (DX 7, 8). The Government's sole document supporting its characterization of Merlin Capital as a U.S. entity is a slide deck that notes Merlin Capital was founded in 2022. (GX 58). The trading identified by TRM Labs on GX 74 and DX 8 occurred in January 2020, two years prior to the founding of the Merlin Capital as referenced in GX 58. While the Company cannot provide documentation establishing whether or not Merlin Capital was a U.S. entity, the Government has not provided reliable evidence that the Merlin Capital in GX 58, which was founded in 2022, received deposits on BitMEX in 2020.

(N)    Mosaic Exchange

To assert that all deposits identified by TRM Labs on GX 74 and DX 8 as received by the Mosaic Exchange account on BitMEX are U.S. deposits, the Government relies on two documents received by BitMEX customer support that do not suggest any U.S. nexus, and a CFTC press release that claims that the owner of Mosaic Exchange, Sean Michael, was at some point resident in Florida.  (GX 59–61).  As noted in the Government's own exhibit, Mr. Michael represented to BitMEX customer support that he and the entity were both located in the United Kingdom, and his email signature provided a phone number for a London office.  (GX 60).

At onboarding, Mosaic Exchange provided its United Kingdom formation documents, and attested that no trading would occur from the U.S. (DX 69–71)  Mr. Michael also made clear that Mosaic was a UK entity and that it did "not have office locations or operate from USA." (DX 72).

DX 69

The Registrar of Companies for England and Wales, hereby certifies that

MOSAIC EXCHANGE LIMITED

is this day incorporated under the Companies Act 2006 as a private company, that the company is limited by shares, and the situation of its registered office is in England and Wales.

Given at Companies House, Cardiff, on **14th January 2019**.

DX 71

By confirming and returning this Non-U.S. Person Agreement and Representation, the undersigned customer ("Customer") hereby represents and certifies to BitMEX that (1) it is not a U.S. entity or U.S. resident, and (2) it conducts no business, other than back office functions, related to engaging in transactions on BitMEX from within the United States.

DX 72

Hello Deion,
Here are the requested documents we are located and reside in the United Kingdom. If you have any questions please advise. We do periodically visit USA but we do not have office locations or operate from USA.

Sean Michael
CEO of Mosaic Exchange
London Office +44 ▮▮▮▮
Cel +1 ▮▮▮▮▮
www.MosaicExchange.co

In March 2019, when an issue arose with a U.S. login on the Mosaic Exchange account, the BitMEX customer support team was clear that no trading could occur from the U.S. (DX 74). In response, Michael confirmed to the customer support team that "no transactions were made on USA jurisdiction and no USA citizen is transacting on the platform." (*Id.*)

DX 74

| |
|---|
| Yes we understand this information we will take precautionary measures and notify the team that no login can be made from USA. Fortunately none of our trading team is from USA. Thank you for the detailed response this is much more clear. We will remove our remote access server and also make sure nobody is to login from USA even when traveling. Only the account was viewed no transactions were made on USA jurisdiction and no USA citizen is transacting on the platform. |

(O)    Phoenix Nest Invest

While the Company does not have any KYC information for Phoenix Nest Invest, the Government has not put forward any information establishing that Phoenix Nest Invest is a U.S. entity. The Company acknowledges that the GeoIP information for the account is the U.S. (DX 7, 8).

(P)    Pier Asset Management

The Company does not have any KYC information about Pier Asset Management, as it did not onboard as a corporate entity and its account was restricted in 2018, with its last trade in December 2018. The Company acknowledges that the GeoIP information for the account is the U.S. (DX 7, 8).

(Q)    Profluent Trading

The Company does not contest the Government's characterization of Profluent Trading as a source of U.S. deposits.

(R)    Tower Research

Finally, the Government asserts that deposits identified on GX 74 and DX 8 into accounts owned by Tower Research Capital (Singapore) Pte. Ltd. should be considered U.S. deposits. The Government relies on the Delaware certificate of formation for Tower Research Capital Investments LLC, a June 28, 2018 chat between two BitMEX employees with notes of a call with in-house counsel from Tower

regarding the Company's KYC requirements, a meeting with Tower at a hotel in Manhattan during the Consensus 2018 crypto conference, and an email with a Tower employee in New York. (GX 70–73).

At onboarding, Tower Research Capital (Singapore) Pte. Ltd. provided a certificate confirming its incorporation in Singapore, Singaporean government identification in the form of work authorization for two of the entity's directors, and a representation that it was not a U.S. entity, nor did it engage in any business, other than back-office functions, related to engaging in transactions on BitMEX from within the U.S. (DX 82–85). None of the Government's evidence suggests that trading was occurring on behalf of Tower Research Capital (Singapore) Pte. Ltd. from within the U.S., and the Tower employee who requested that Tower's in-house counsel speak with the Company was himself based in Singapore.  (*See* GX 71, DX 84).

DX 82



DX 83

DX 84



DX 85

> By confirming and returning this Non-U.S. Person Agreement and Representation, the undersigned customer ("Customer") hereby represents and certifies to BitMEX that (1) it is not a U.S. entity or U.S. resident, and (2) it conducts no business, other than back office functions, related to engaging in transactions on BitMEX from within the United States.

| | |
|---|---|
| Signed / Confirmed: | ███████████████ |
| Date: | 14 - 06 - 18 |
| Signed by: | ███████████████ |
| Name: | |
| Title: | Director |
| Customer Name: | Tower Research Capital Singapore |

In August 2019, in response to an inquiry from the CFTC, Tower Research confirmed to the CFTC that the only Tower Research entity that had traded on BitMEX was Tower Research Capital (Singapore) Pte. Ltd., and that the relevant traders were all based in London, Singapore, or Gurgaon, India, while the portfolio managers "are not involved in the day-to-day trading." (DX 94).

DX 94

| Name | Team | Location | Role |
|---|---|---|---|
|  | Daedalus | London | Trader |
|  | Daedalus | Singapore | Trader |
|  | Daedalus | New York | Portfolio Manager |

| Name | Team | Location | Role |
|---|---|---|---|
|  | North Moore | Gurgaon | Trader |
|  | North Moore | Gurgaon | Trader |
|  | North Moore | Gurgaon | Trader |
|  | North Moore | London | Trader |
|  | North Moore | London | Trader |
|  | North Moore | London | Trader |
|  | North Moore | Gurgaon | Trader |
|  | North Moore | Singapore | Trader |
|  | North Moore | Singapore | Trader |
|  | North Moore | New York | Portfolio Manager |
|  | North Moore | Gurgaon | Portfolio Manager |

## 2.3    The Government Has Proven No Gain Beyond the $30 Million

The Government contends that $2.141 billion in deposits onto the BitMEX platform should be treated as U.S. deposits, and that the proportion of the total deposits that the Government attributes to the U.S. should be used to estimate the proportion of revenue attributable to the U.S.  But the deposits, whether from the U.S. or elsewhere, do not map to revenue and hence are not helpful to the Court in assessing gain from the offense.  And most of the deposits cited by the Government in fact were to non-U.S. accounts that cannot have driven gain to the Company from the BSA offense.  Accordingly, the Government has proven no gain beyond the $30 million conceded by the founders in connection with their respective sentencings.

A.    Guidelines Analysis

Because the Government has failed to prove gain beyond the $30 million agreed by the Government with Messrs. Hayes, Delo, and Reed in *United States v. Hayes*, the Court's calculation of the Sentencing Guidelines should use $30 million as the gain from the offense. The Guidelines then require calculation of the culpability score, which, as set out in our prior briefing, should result in a culpability score of 6. (*See* HDR Sent'g Mem. at 17, Dkt. 15). With a culpability score of 6, U.S.S.G. § 8C2.6 provides for a minimum multiplier of 1.2 and a maximum multiplier of 2.4, resulting in a fine range of $36 million to $72 million.

B.    Offsets

HDR asks the Court to apply two offsets to the Guidelines range.

First, the Guidelines recognize that where the owners of a closely-held corporation have been fined for criminal conduct, the Court may offset any fine against the entity by those paid by the owners, on an ownership-proportionate basis. U.S.S.G. § 8C3.4. Here, where the founders for the vast majority of the relevant period owned 100% of HDR, their $30 million in fines equates to an offset of $30 million.[2] The Guidelines fine range should therefore be reduced to between $6 million and $42 million.

Second, while not an offset included in the Guidelines, the Court should consider and credit against the ultimate criminal fine obligation the Company's payments of $80 million to the CFTC and FinCEN. In *Hayes*, the Government agreed to a resolution, and the Court accepted a resolution, that allowed payment to the CFTC by Messrs. Hayes, Delo and Reed to satisfy the criminal fine imposed at sentencing. *See* Hayes Sent'g Tr. 55:20–23, *Hayes*, ECF No. 342; Delo Sent'g Tr. 28:21–23, *Hayes*, ECF No. 380; Reed Sent'g Tr. 23:16–19, *Hayes*, ECF No. 396.

---

[2]    Messrs. Hayes, Delo, and Reed were the sole owners of HDR until May 2019.

As recognized by the Government and the Court in *Hayes*, the CFTC action stems from the same conduct as the criminal charge at issue here.  And the FinCEN action against HDR also self-evidently rests on the same conduct.  *See Assessment of Civil Monetary Penalty In the Matter of: HDR Global Trading Limited et. al*, Number 2021-02, FinCEN (Aug. 10, 2021), https://www.fincen.gov/sites/default/files/enforcement_action/2021-08-10/Assessment_BITMEX_508_FINAL.pdf.  On the same facts in *Hayes,* the Government consented to a full offset of the criminal fine against the civil penalty, so it cannot contend that such an offset is inconsistent with the Government's or the public's interest in a penalty commensurate with the harm caused by the offense.  And when the Court approved the offset in *Hayes*, it was exercising its judgment regarding the appropriate ultimate penalty for the conduct before the Court, including whether the interests present in a criminal case were properly served by such an offset.  The Court had an obligation to determine the proper level of criminal fine.  *See* 18 U.S.C. § 3571.  Just as the Court must find Guidelines facts such as loss notwithstanding the parties' agreement on loss, *see United States v. Granik,* 386 F.3d 404, 411 (2d Cir. 2004), the size and structure of a criminal fine is a judgment for the Court to make, even where the parties have proposed an agreed arrangement for the Court's consideration.  HDR asks the Court to reach the same conclusion here that it did in *Hayes* that the criminal fine may appropriately be offset by the amounts paid to civil enforcement authorities to resolve the same violations as are before the Court in the criminal matter.  The Court has authority to do so pursuant to 18 U.S.C. § 3553(a).

3.    **THE INTERESTS OF JUSTICE DO NOT REQUIRE ANY ADDITIONAL FINE**

As the Court well appreciates, it must determine a sentence that is "sufficient, but not greater than necessary" to accomplish the goals of sentencing. *Kimbrough v. United States*, 552 U.S. 85, 89 (2007).  After calculating the correct Guidelines range as a starting point, the Court must make an "individualized assessment," considering the factors provided in 18 U.S.C. § 3553(a).  *Gall v. United States*, 552 U.S. 38, 50 (2007).  Starting with the Guidelines analysis set out above, and factoring in the history of this

prosecution, its novelty, its effect on the founders of the Company, its effect on their business, the Company's acknowledgment of its wrongdoing by pleading guilty, the significant remediation carried out by the Company as recognized by the civil enforcement authorities, and the penalties paid by the founders and by the Company to the civil enforcement authorities, justice has been served and no further fine is required to accomplish the goals of sentencing.

The Company has changed substantially since 2020 and has reshaped itself into a compliant business that is wholly outside of the U.S. For almost four years, and as twice tested to FinCEN's satisfaction by an independent consultant, the Company has had policies and procedures in place to prevent U.S. persons from accessing the platform.  The offense conduct, while clearly serious, began during a time of regulatory uncertainty for the crypto market, and the Company, like many other crypto exchanges, was admittedly too slow to adjust to the changes.  The Company has rectified its past mistakes and is ready to finally put this chapter of its history behind it, over four years after its founders were initially indicted.  We submit that no further fine is required in these circumstances.

4.    **CONCLUSION**

For the foregoing reasons, the Company respectfully requests the Court find a gain from the offense of no more than $30 million, and impose a sentence of no fine beyond the $110 million already paid by the Company and its founders for the conduct at issue in this prosecution.

Dated: New York, New York
    December 10, 2024

Respectfully submitted,

David C. Esseks
Eugene Ingoglia
Melinda Bothe (admitted *pro hac vice*)
Megan Sharkey
ALLEN OVERY SHEARMAN
STERLING US LLP
599 Lexington Avenue
New York, New York 10022
Tel: (212) 848-4000
*david.esseks@aoshearman.com*
*eugene.ingoglia@aoshearman.com*
*melinda.bothe@aoshearman.com*
*megan.sharkey@aoshearman.com*

*Attorneys for Defendant HDR Global Trading Ltd.*