OC3KHDR1

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   UNITED STATES OF AMERICA,

 4              v.                           24 Cr. 424 (JGK)

 5   HDR GLOBAL TRADING LIMITED,

 6                                           Hearing
                    Defendant.
 7   ------------------------------x

 8
                                           New York, N.Y.
 9                                         December 3, 2024
                                           10:20 a.m.
10

11   Before:

12                     HON. JOHN G. KOELTL,

13                                          District Judge

14                          APPEARANCES

15   DAMIAN WILLIAMS
          United States Attorney for the
16        Southern District of New York
     JESSICA GREENWOOD
17   NATHAN REHN
          Assistant United States Attorneys
18
     A&O SHEARMAN
19        Attorneys for Defendant
     BY:  DAVID C. ESSEKS
20        EUGENE E. INGOGLIA
          MEGAN W. SHARKEY
21        BROOKE N. PETTIBON

22
     Also Present:
23   Dean Iannuzzelli, Paralegal, USAO

24

25
```

OC3KHDR1

1              (Case called)

2              MS. GREENWOOD:  Good morning, your Honor.  Assistant

3     United States Attorneys Jessica Greenwood and Thane Rehn,

4     joined at counsel table by Paralegal Specialist

5     Dean Iannuzelli.

6              THE COURT:  Good morning.

7              MR. ESSEKS:  Good morning, Judge.  For defendant,

8     David Esseks, Gene Ingoglia, Megan Sharkey, and Brooke

9     Pettibon, A&O Shearman.

10             THE COURT:  All right.

11             So, this is a *Fatico* hearing.  Do the parties want to

12    make any opening remarks?

13             MS. GREENWOOD:  Just very briefly, your Honor, just to

14    set sort of the stage for what we intend to do today.

15             So, as we discussed, your Honor, at the last

16    conference, we sort of intend to deal with the evidence in

17    substantially two parts.  One will be the testimony today of

18    the government's witness, FBI Agent Alex Vasiliades.  And the

19    second will be briefing on exhibits that the government will

20    move in en masse today at the hearing.

21             And what you will learn from Agent Vasiliades, your

22    Honor, is he was given certain documents and asked to make

23    certain presumptions by the investigative team by the

24    prosecutors.  And based on the information that he was given,

25    essentially did a number of calculations, and he will attest to

1    how he performed those calculations, the data sources that he

2    used, in one instance, talk about a law enforcement tool that

3    he used to identify relevant transactions.  And at base, your

4    Honor, the exercise he engaged in is fairly simple.  You'll

5    hear that during the relevant time period, BitMEX transacted

6    with its customers solely in the form of Bitcoin.  So if they

7    wanted to make deposits to the platform to engage in trading,

8    they would have to transfer Bitcoin to the platform.

9          At the same time, your Honor, BitMEX also used what's

10   called vanity addresses to receive money from its customers or

11   to receive Bitcoin from its customers, and those addresses

12   start with a prefix labeled 3BMEX.  So, essentially, what

13   Agent Vasiliades did, at our instruction, was, for the time

14   period we identified as relevant to the indictment, which is

15   September 2015 to September 2020, he identified all transfers

16   that had been made on the blockchain to any Bitcoin wallet that

17   starts with 3BMEX, because those were the vanity prefixes used

18   by BitMEX for its customer deposit wallets.  So he identified

19   an overall universe of deposits, and then, using, again, the

20   documents and assumptions provided by us, identified, out of

21   that entire universe of transfers to BitMEX during the relevant

22   time period, what percentage of those transfers came from

23   sources that we've identified as being United States nexus

24   sources, and he will describe for you the data he was given and

25   the assumptions he was asked to make.

OC3KHDR1

```
1            He will not testify, your Honor, and he does not have

2    personal knowledge about the sort of underlying bases for those

3    assumptions.  So, for example, if he was instructed by the case

4    team to treat a particular entity as being a U.S.-based entity

5    such that the funds sent to BitMEX are being treated as a

6    U.S.-based transfer, he does not have personal information

7    about that.  So that's sort of the second piece of the evidence

8    that we will put to the Court just en masse on exhibits, and

9    then brief after the hearing today, which is documentary

10   evidence to support the conclusion that particular people and

11   entities, when they made transfers to BitMEX, were doing so

12   either from the United States or as with U.S. entities.

13           So, at the end of the day, the calculation we've asked

14   the Agent to do is a fairly simple one, the numerator simply

15   being what is the total dollar value of Bitcoin transfers made

16   by people and entities you've been instructed to treat as being

17   from the United States, what is the overall figure, and then

18   what's that percentage.  As I said, your Honor, we'll --

19           THE COURT:  Percentage of what again?

20           MS. GREENWOOD:  Sure.

21           So, you'll hear Agent Vasiliades explain that from

22   September 2015 to September 2020, there was a total universe of

23   approximately $18.4 billion worth of Bitcoin that was

24   transferred to any deposit wallet associated with a BitMEX

25   account.  So that's the entire universe.
```

OC3KHDR1

1              From that, again, based on documents we provided him

2      and assumptions we asked him to make, he calculated a total of

3      $2.141 billion.  Of that total, $18.4 billion came from sources

4      identifiable as United States sources.  So that comes out to an

5      11.6 percent of the overall deposits originating from sources

6      that, for the reasons we will argue on the papers, we think are

7      fairly identifiable as United States individuals or entities.

8              So that will be the nature of the presentation today.

9      If you have any questions other than that, I'll leave it to

10     Agent Vasiliades.

11             THE COURT:  Okay.  Thank you.

12             One other question:  Why is the percentage relevant

13     rather than the total relevant, the 11.6 rather than the

14     2.14 billion?

15             MS. GREENWOOD:  So, your Honor, in this case, because

16     BitMEX, as you know, has pled guilty to violating the Bank

17     Secrecy Act by not maintaining a know-your-customer program,

18     what we can't do, and what we don't have information sufficient

19     to do, is to go to their internal customer databases and

20     identify everyone who was definitively from the United States

21     and pull just those revenues to attempt to figure out the

22     revenue totals.

23             So, instead, what we're attempting to do is

24     approximate the deposits from U.S. sources as a percentage of

25     their overall deposits as sort of a proxy for identifying the

OC3KHDR1

1    percentage of U.S. revenues versus total revenues from any

2    source.

3         For guideline purposes, your Honor, it would be

4    perfectly appropriate to use the entire revenue of the company

5    for the time period as the basis for the guidelines

6    calculation.

7         THE COURT:  Why isn't the relevant total the total

8    from U.S. sources — according to your calculations, the

9    2.14 billion — rather than the 11.6 percent?

10        MS. GREENWOOD:  So we're trying to calculate -- that

11   is the 11.6 percent, your Honor, right?  So the 2.14 makes the

12   11.6 percent, but the 2.14 are deposits.  For example, let's

13   say a customer deposits a Bitcoin, but then removes a Bitcoin,

14   and it doesn't result in necessarily trading revenue.  What

15   we're trying to do is approximate -- because we do have a

16   revenue number, right, we have an overall revenue number for

17   the relevant time period.  And so what we're trying to do is,

18   rather than just say any dollar that came in from a U.S.

19   source, because we can't say definitively what happened to that

20   dollar and definitively how much revenue that Bitcoin, let's

21   say, generated, by instead using it as a percentage, we can

22   say, okay, if 11.6 percent of all the Bitcoin that BitMEX

23   received during the relevant period came from the

24   United States, there's a fair inference that 11.6 percent of

25   their revenues are U.S. revenues.  So while we have a U.S.

OC3KHDR1

1  revenue -- our total revenue number, we then use that

2  11.6 percent to attempt to approximate the U.S. source revenue

3  during the relevant time period.

4          THE COURT:  Okay.

5          MS. GREENWOOD:  And that's because, your Honor, we

6  don't have internal revenue data that the company obviously

7  would uniquely have access to, we do not have that information.

8  So this, for purposes of the *Fatico* and for purposes of

9  sentencing, is how we have attempted to reasonably approximate

10  that so that the Court can make a finding by a preponderance of

11  a reasonable figure.

12          THE COURT:  And 11.6 percent of the total revenue

13  comes to what?  I thought --

14          MS. GREENWOOD:  The revenue is approximately

15  1.3 billion, is my understanding, your Honor, so it's

16  approximately 150 million.

17          THE COURT:  So, ultimately, that's the figure you're

18  asking me to use for purposes of the guideline calculation of

19  the fine, about 150 million?

20          MS. GREENWOOD:  Yes, your Honor.

21          THE COURT:  I got it.  Okay.

22          MR. ESSEKS:  Your Honor, good morning.

23          THE COURT:  Good morning.

24          MR. ESSEKS:  By way of preview for the defense, the

25  colloquy the Court just had with the prosecution is helpful

OC3KHDR1

1    because it brings us to where I wanted to start, which is we're

2    here because there's a difference of view between the parties

3    about gain from the offense.

4           We understand that that goes into a guidelines

5    calculation that the Court has made clear and, we agree, is

6    only a starting point and part of the overall thought process

7    around sentencing, and we have said it, and we'll have a lot

8    more to say on the other factors, but we need to grapple with

9    gain.  So, that's what we're here about.

10          The government is presenting evidence today about

11   deposits to the BitMEX platform that they argue are from U.S.

12   sources.  Our starting point is, we understand their inference

13   argument, but, as we'll expand a little bit today and more in

14   our papers, deposits do not map to revenue.  This is a trading

15   platform and takes a commission per trade.  And one could put

16   $17 billion worth of Bitcoin on the platform, leave it there

17   for five years, take it out, not pay a single Satoshi on any

18   bit of value to the platform.  Enormous deposit; no revenue at

19   all.

20          So, I accept that we're in a land of preponderance of

21   evidence and inferences for sentencing, and we accept that, but

22   we just don't think that deposits map to revenue in any useful

23   way.

24          That said, that's the evidence that the government is

25   offering, and so we will put on our own witness, who is going

OC3KHDR1

1    to examine for the Court the analysis that the government has

2    offered and try to unpack it to show that it shows much less,

3    much less, by way of U.S. user deposits than the government

4    contends.

5            THE COURT:  Okay.

6            Both the government and you have focused on the amount

7    of revenue from U.S. sources that the defendant earned over

8    that period.

9            When you're trying to figure out what the amount of

10   U.S. — and I'm not going to use these terms precisely — U.S.

11   revenue is, why isn't it at least relevant to look at the total

12   amount of the deposits from U.S. sources?  The whole gist of

13   the violation was the company said that it was not operating in

14   the U.S. or from U.S. sources.  If it took in a substantial

15   amount of deposits from U.S. sources, the fact that it didn't

16   charge, or earn revenue from, the U.S. sources shouldn't

17   somehow be irrelevant to the ultimate determination of what the

18   appropriate fine is in this case.

19           Isn't that right?

20           MR. ESSEKS:  So, Judge --

21           THE COURT:  And I realize that the guidelines have a

22   very careful calculation about how to calculate the guideline

23   fine, but the guidelines are only a starting point.

24           MR. ESSEKS:  Indeed.

25           THE COURT:  And if you found, for example, that a

OC3KHDR1

1    trillion dollars from U.S. sources was being deposited in the

2    defendant's accounts, but the defendant was maintaining, we

3    don't get any assets from U.S. sources, we don't advertise for

4    purposes of getting money from U.S. sources, but meanwhile

5    takes in a trillion dollars, but doesn't charge, doesn't get

6    revenue from it, that might not be fit into the guideline

7    calculation for a fine, but it goes back to what I have often

8    been positing for all the parties, surely it would go into the

9    calculation of what an appropriate sentence is for the

10   defendant, wouldn't it?

11          MR. ESSEKS:  So, your Honor, we are not saying that

12   the deposits are irrelevant to sentencing.  We're not saying

13   that.  We are saying that the dispute between the parties at

14   present, at least among them, is gain as it is input into a

15   guidelines calculation.  And that makes sense in the following

16   sense, Judge:  The violation is operating the business with

17   U.S. users and not complying with the BSA.  So, the thing that

18   makes this a crime, that the company has pled guilty to a

19   crime, is having the U.S. users, and then the guidelines say,

20   well, what's the gain from the crime.  If the crime is having

21   the U.S. users, then the question is, what's the gain from

22   having the U.S. users, the company only gained in this sense

23   economically by charging for trades, and, hence, our argument

24   that the deposit information does not map to gain and is, in

25   that sense, not helpful to the Court.

OC3KHDR1

1          We do not say it is utterly irrelevant to sentencing —

2    we'll address that later — but for this purpose, what brings us

3    here today, our position is it's not really helpful to the

4    Court because it isn't mapping the gain, but they're offering

5    it, we are unpacking it, and that's what we have for the Court

6    today.

7          THE COURT:  Thank you.

8          MR. ESSEKS:  Thank you, Judge.

9          THE COURT:  That's helpful.

10         All right.  The government may call its witness.

11         MS. GREENWOOD:  The government calls Special Agent

12   Alex Vasiliades.

13         THE COURT:  Is there a binder with exhibits?

14         MS. GREENWOOD:  There is, your Honor.  We're going to

15   mass admit a number of exhibits.  With this witness, we're only

16   going to use one.  So we're happy to hand you the whole binder,

17   but Government Exhibit 35 will be the single summary exhibit

18   we'll use with this witness.

19         35 and 92, your Honor, will be the only ones that we

20   use with this witness, just so you know.

21         THE COURT:  Thank you.

22   ALEXANDER VASILIADES,

23        called as a witness by the Government,

24        having been duly sworn, testified as follows:

25         THE DEPUTY CLERK:  Can you please state your full name

OC3KHDR1                        Vasiliades - Direct

1    and spell your last name slowly for the record.

2              THE WITNESS:  Alexander Vasiliades,

3    V-a-s-i-l-i-a-d-e-s.

4              THE DEPUTY CLERK:  Thank you.

5              THE COURT:  All right.  Ms. Greenwood, you may

6    examine.

7    DIRECT EXAMINATION

8    BY MS. GREENWOOD:

9    Q.  Good morning, Agent Vasiliades.

10   A.  Good morning.

11   Q.  Where do you work?

12   A.  The Federal Bureau of Investigation.

13   Q.  How long have you been with the FBI?

14   A.  Since March 2020.

15   Q.  And are you assigned to a particular unit within the FBI?

16   A.  Yes.  The White-Collar Crime Squad in Long Island,

17   New York, C28.

18   Q.  At a high level, what are your roles and responsibilities

19   as a member of C28?

20   A.  We investigate violations of white-collar crimes, to

21   include money laundering, bank fraud, wire fraud.

22   Q.  Prior to joining the FBI, did you ever serve as a law

23   enforcement officer in a different capacity?

24   A.  Yes.

25   Q.  Where did you work?

OC3KHDR1                          Vasiliades - Direct

1   A.  The United States Secret Service.

2   Q.  What was your title there?

3   A.  Special agent.

4   Q.  And how long did you work with the Secret Service?

5   A.  I began working with the Secret Service December 2016.

6   Q.  Did you work there until you joined the FBI in 2020?

7   A.  Yes.

8   Q.  What, at a high level, were your roles and responsibilities

9   as a Secret Service agent?

10  A.  I was an investigator.  We also investigated white-collar

11  cyber-enabled fraud investigations.

12  Q.  In your years as a Secret Service agent, and now as an FBI

13  agent, have you had training and experience in matters

14  involving Bitcoin and other cryptocurrencies?

15  A.  Yes.

16  Q.  At a high level, what types of training and experience have

17  you had?

18  A.  I've received hours of self-based online training from my

19  agency.  I've also received certifications from blockchain

20  investigative tools.  And I also, as a collateral duty, am a

21  member of the Virtual Currency Response Team, which is in

22  addition or a collateral duty that assists other agents in the

23  field with general investigative practices in regards to

24  cryptocurrency investigations.

25  Q.  And as part of your investigative duties, do you regularly

OC3KHDR1                          Vasiliades - Direct

1    investigate matters involving Bitcoin and other

2    cryptocurrencies?

3    A.  Yes.

4    Q.  On a daily basis?

5    A.  Yeah, I would say.

6    Q.  In preparation for today's hearing, were you asked to

7    review certain documents and answer certain questions posed to

8    you about the cryptocurrency exchange known as BitMEX?

9    A.  Yes.

10   Q.  Prior to your preparation for today's hearing, did you have

11   any role in investigating or prosecuting BitMEX or its

12   individual founders?

13   A.  No.

14   Q.  In the course of your work as an FBI agent, have you

15   generally become familiar with what BitMEX is?

16   A.  Yes.

17   Q.  Other than that general familiarity, and the documents and

18   information you were provided for this hearing, do you have any

19   personal knowledge about BitMEX's internal operations?

20   A.  No.

21   Q.  Agent Vasiliades, did the materials you reviewed in advance

22   of the proceeding today include voluminous materials, as well

23   as specific dates and numbers and calculations, that would be

24   difficult for you to recall offhand?

25   A.  Yes.

OC3KHDR1                        Vasiliades - Direct

```
 1   Q.  I'm showing you what's been marked for identification as
 2   Government Exhibit 35.
 3           MS. GREENWOOD:  If you would, Mr. Iannuzzelli.
 4   Q.  Do you recognize that document?
 5   A.  Yes.
 6   Q.  What is it?
 7   A.  This is an excerpt from a grand jury subpoena return from
 8   the cryptocurrency exchange Gemini.
 9   Q.  We'll get into the details, but Government Exhibit 35
10   itself, is that a document that you reviewed with myself prior
11   to today's proceeding?
12   A.  Yes.
13   Q.  And have you confirmed that the contents of it are
14   accurate, and did you assist in preparation of the materials?
15   A.  Yes.
16   Q.  Would having access to Government Exhibit 35 help you in
17   giving accurate testimony today?
18   A.  Yes, it would.
19           MS. GREENWOOD:  With the Court's permission, the
20   government offers Government Exhibit 35.
21           MR. ESSEKS:  No objection.
22           THE COURT:  Government Exhibit 35 received in
23   evidence.
24           (Government's Exhibit 35 received in evidence)
25           MS. GREENWOOD:  You can go to slide 10,
```

OC3KHDR1                          Vasiliades - Direct

1    Mr. Iannuzzelli.

2    BY MS. GREENWOOD:

3    Q.   But before we get into the details of slide 10,

4    Agent Vasiliades, I want to ask you a few basic questions about

5    Bitcoin and BitMEX before we dive in, okay?

6    A.   Okay.

7    Q.   Based on your training and experience as an FBI agent, and

8    at a very high level, what is Bitcoin?

9    A.   Bitcoin is a cryptocurrency which is encrypted and

10   transacts on a computer-based decentralized ledger system known

11   as the blockchain.

12   Q.   How is Bitcoin different from a fiat currency?

13   A.   Fiat currency is government-backed, and Bitcoin is not.

14   Q.   Can both fiat currency and Bitcoin and other virtual

15   currencies be used to buy and sell goods and services?

16   A.   Yes.

17   Q.   How is Bitcoin transferred from one person to another?

18   A.   Bitcoin is transferred utilizing the blockchain, where a

19   sending address would send an amount of Bitcoin to the

20   receiving address, and this information is captured on the

21   blockchain.  There's certain attributes that go along with that

22   transaction.

23   Q.   When you said a moment ago that transactions in Bitcoin are

24   captured on the blockchain, what types of information is

25   reflected in the blockchain when there is a Bitcoin

OC3KHDR1                          Vasiliades - Direct

1    transaction?

2    A.  So, the addresses that are involved in the transaction, the

3    transaction hash, timestamp, the amount of Bitcoin sent, things

4    like that.

5    Q.  How do you -- by looking at the blockchain, what

6    information, if any, do you see about the sender and the

7    recipient of Bitcoin?

8    A.  So there are publicly available blockchain explorers that

9    you're able to essentially review transactions.

10   Q.  Are you familiar with the term "wallet address"?

11   A.  Yes.

12   Q.  What's a wallet?

13   A.  A wallet is likened to, to use the analogy, kind of a bank

14   account, or it's the Bitcoin address that is associated with

15   either a sender or receiver of a transaction.

16   Q.  So when Bitcoin is sent on the blockchain, for example,

17   does the blockchain record the wallet address of the sender as

18   well as the wallet address of the recipient?

19   A.  Yes.

20   Q.  Is that information publicly available to anyone who

21   searches a public blockchain explorer?

22   A.  Yes.

23   Q.  Are you familiar with the term "a vanity wallet address"?

24   A.  Yes.

25   Q.  At a high level, what's a vanity wallet?

OC3KHDR1                         Vasiliades - Direct

1    A.   A vanity wallet, to use the analogy of a license plate, is

2    a random string of numbers and letters that could be, I guess,

3    created.  So, for example, if you wanted a vanity license plate

4    to say a specific thing, you could do so.  So I'm just using

5    that as an example, but it is essentially a specific string of

6    characters that a person could create and use as their own

7    wallet.

8    Q.   In preparation for your testimony today, Agent Vasiliades,

9    were you asked to review information, including excerpts from

10   BitMEX's website, about how BitMEX transacted with its

11   customers between 2015 and 2020?

12   A.   Yes.

13   Q.   And in what form of currency did BitMEX accept deposits

14   from its customers in the time period covering September 2015

15   to September 2020?

16   A.   Bitcoin.

17   Q.   Any others?  Any other forms of currency other than

18   Bitcoin?

19   A.   I believe it was Bitcoin.

20   Q.   And based on your review of the information that was

21   provided to you, including screenshots from BitMEX's website,

22   what, if anything, did you learn about the wallet addresses

23   that BitMEX used to receive Bitcoin from its customers during

24   the relevant time period?

25   A.   BitMEX wallet addresses start with the characters 3BMEX.

1  Q.  Looking now at Government Exhibit 35, slide 10, which is in

2  front of you, I want to talk, at a high level, about the

3  exercise that you were asked to do for today's proceeding,

4  okay?

5  A.  Okay.

6  Q.  Looking here, do you see a large pie chart?

7  A.  Uh-huh.

8  Q.  And starting with -- let's talk about the entirety of the

9  pie.  So, focusing on the whole circle, do you see, on the left

10  side of that circle, there's a total listed of 18.472 billion?

11  A.  Yes.

12  Q.  At our instruction, at the case team's construction, what

13  were you totaling in order to reach this total listed on this

14  slide of 18.472 billion?  What does that represent?

15  A.  That represents the dollar value of all of the transfers

16  that BitMEX received during a specific time period.

17  Q.  Again, if I defined the term sort of relevant time period

18  as September 2015 through the end of September 2020, is that

19  the time period that you used for all of the calculations that

20  we're going to discuss today?

21  A.  Yes.

22  Q.  And so when you say that you totaled all of the deposits to

23  BitMEX during that time period, is that only from United States

24  sources, or from any source globally?

25  A.  Any source globally.

OC3KHDR1                          Vasiliades - Direct

1    Q.  And that is the figure that came to 18.472 billion?

2    A.  Yes.

3    Q.  We'll talk in a minute about how you actually determined or

4    how you came up with that $18.472 billion figure, but, next,

5    let's talk about the colored slices of the pie that you see

6    here.

7            Do you see, on the right side of the chart, there's a

8    label that says "Sum of U.S. Sources:  $2.141 Billion"?

9    A.  Yes.

10   Q.  What do those colored slices of the pie that totaled the

11   $2.141 billion, what does that represent?

12   A.  The sum of U.S. sources.

13   Q.  And those U.S. sources, do you have any personal knowledge

14   about whether the sources of those Bitcoin transfers are, in

15   fact, from the United States?

16   A.  Just based on the information I reviewed in the records.

17   Q.  So, based on the documents that you were given and the

18   assumptions you were asked to make by the case team, that, you

19   calculated as $2.141 billion, correct?

20   A.  Correct.

21   Q.  And based on your calculation of $2.141 billion in U.S.

22   source deposits and a total of $18.472 billion in overall

23   deposits, what was the total percentage you determined was

24   attributable to U.S. sources?

25   A.  11.6 percent.

OC3KHDR1                          Vasiliades - Direct

1    Q.  Let's go into the details of how you calculated those two

2    figures, the overall total and the U.S. source total, starting

3    with the overall total.

4             MS. GREENWOOD:  Mr. Iannuzzelli, if you can please go

5    back to slide number 6.

6    Q.  Just to set the context here, Agent Vasiliades, what are we

7    looking at on slide number 6 of GX 35?

8    A.  This is a summary of BitMEX's exchange page from a software

9    that I have access to called TRM Labs.

10   Q.  Can you just describe, at a high level, what TRM Labs is

11   and what the tool is that you used?

12   A.  Yeah.  TRM Labs is a commercially available blockchain

13   investigative tool.

14   Q.  The screen here we're seeing, is that a screen that is

15   available to a user of TRM?

16   A.  Yeah.

17   Q.  And how is it that you generated a screen, for example,

18   that says BitMEX on the left side?  How would you have this

19   information come up in TRM?

20   A.  I just typed in BitMEX into TRM, and there is a summary

21   page that is available, which pretty much shows a depiction of

22   what's on the screen.

23   Q.  What types of information does TRM summarize here about

24   BitMEX?

25   A.  The total amount of transfers that -- in and out of BitMEX

OC3KHDR1                        Vasiliades - Direct

1   for a specific time period.

2   Q.  Agent Vasiliades, how frequently do you use TRM as part of

3   your duties and responsibilities investigating cryptocurrency

4   cases?

5   A.  I use it often.

6   Q.  Have you had an opportunity, in the past, to determine if

7   the information that you were receiving from TRM was reliable

8   and consistent with other sources?

9   A.  Yes.

10  Q.  In what ways have you had the ability to make that

11  assessment?

12  A.  In a matter of my investigations, when I use this tool,

13  I've been able to trace specific cryptocurrency transactions

14  that lead or that TRM depicts as a cryptocurrency exchange or

15  entity, and then I request records from said entity, and I

16  receive results that help further the investigation, for

17  example.

18  Q.  Based on your comparison of information you have seen in

19  your investigations from TRM and from third-party sources, has

20  it shown to be reliable and accurate?

21  A.  Yes.

22  Q.  Based on the information shown here, were you able to

23  filter the time period of the data that you pulled for BitMEX

24  from TRM?

25  A.  Yes.

OC3KHDR1                              Vasiliades - Direct

1    Q.  Did you filter it for the relevant time period that we've

2    been discussing?

3    A.  Yes, I did.

4    Q.  So September 1st, 2015, through September 30, 2020; is that

5    correct?

6    A.  That's correct.

7    Q.  And that's the date in the red bubble there?

8    A.  Mm-hmm.

9    Q.  For that time period, what was the total incoming

10   deposits -- the U.S. dollar value of total incoming deposits

11   that TRM identified to BitMEX during that relevant time period?

12   A.  18,684,756,948.

13   Q.  So approximately 18.6 billion dollars?

14   A.  About, yeah.

15           MS. GREENWOOD:  If you could now go to slide 7,

16   Mr. Iannuzzelli.

17   Q.  Having obtained that overall figure from TRM of deposits to

18   BitMEX during the relevant period, what, if anything, did you

19   do to that total to come to the $18.4 billion total that was

20   listed on slide 10 that we talked about a moment ago?

21   A.  Based on information that I was provided, we were able to

22   pretty much subtract specific accounts that were provided to

23   the investigative team from that number.

24   Q.  So, for example, on slide 7 here, what is this a screenshot

25   of, on slide 7?

OC3KHDR1                    Vasiliades - Direct

1    A.  It's a message or an excerpt advising that there are

2    specific BitMEX accounts that were not used for trading.  And,

3    so, those BitMEX accounts are listed in this letter.  So, it's

4    some of that information that was provided.

5    Q.  So, based on the representation by the company, by defense,

6    that these two particular BitMEX accounts were not, in fact,

7    used for trading, did you attempt to identify any transfers

8    made into those particular accounts and exclude them from the

9    total?

10   A.  Yes.

11   Q.  Is it fair to say that you used BitMEX data to identify the

12   deposit wallets associated with those accounts so that you

13   could exclude them from the overall total?

14   A.  Yes.

15   Q.  When you identified those wallets to exclude them, what was

16   the total value of deposits made to those two particular

17   accounts in the relevant time period?

18   A.  $211.634 million.

19         MS. GREENWOOD:  If you would go to the next side,

20   please, Mr. Iannuzzelli.

21   Q.  Once you reduce the total deposits that had been identified

22   by TRM and subtract out the two accounts that the defense

23   identified as nontrading accounts, what's the new total that

24   you come up with for total Bitcoin transferred to BitMEX

25   wallets in the relevant time period?

OC3KHDR1                        Vasiliades - Direct

1    A.  18.472 billion.

2    Q.  Is that the overall pie that we were talking about on

3    slide 10?

4    A.  Yes.

5    Q.  The total pie of all deposits worldwide?

6    A.  Correct.

7            MS. GREENWOOD:  Mr. Iannuzzelli, if you could go to

8    the next slide, please, now, slide 9.

9    Q.  Agent Vasiliades, I want to walk now through each of the

10   slices of the pie that are labeled here as U.S. source deposits

11   to BitMEX, okay?

12   A.  Mm-hmm.

13   Q.  And, again --

14           THE COURT:  You have to answer with words.

15           THE WITNESS:  Oh.  Yes.  Sorry.

16   BY MS. GREENWOOD:

17   Q.  And, again, when you testified earlier, we looked at the

18   sum of U.S. source total, $2.141 billion, correct?

19   A.  Correct.

20   Q.  And the amounts listed in the chart here under "Source" and

21   "Amount," are those the subtotals that add up to that

22   $2.141 billion?

23   A.  Yes.

24   Q.  So let's go through each line so that we can understand

25   exactly what you did, all right?

OC3KHDR1                          Vasiliades - Direct

1    A.  Okay.

2    Q.  Starting with -- all right?

3    A.  Yes.

4    Q.  Starting with lines 1 and 3, labeled "Documented Transfers

5    from U.S. Coinbase Users" and "Documented Transfers from U.S.

6    Gemini Users," at a high level, can you describe the source of

7    data that you used to identify those particular transfers to

8    BitMEX?

9    A.  The grand jury subpoena returns from Coinbase and Gemini

10   that I was provided by the case team.

11   Q.  In preparation for your testimony today, did you also

12   review the grand jury subpoenas that resulted in that data

13   being produced?

14   A.  Yes.

15   Q.  According to the subpoenas, is it accurate to say that

16   Coinbase and Gemini were asked to identify all transfers made

17   to BitMEX by customers that they had KYC'd as Americans; is

18   that correct?

19   A.  Yes.

20   Q.  Either entities or individuals?

21   A.  Yes.

22   Q.  Having reviewed that information, what did you do to come

23   up with these dollar amounts?

24   A.  We reviewed the returns, and we added the amounts.

25   Q.  So why don't we look at some of the specifics.

1              So let's start with --

2              MS. GREENWOOD:  If you go to slide 1, Mr. Iannuzzelli,

3    and we'll look at some excerpts from the Gemini return.

4    BY MS. GREENWOOD:

5    Q.  Agent Vasiliades, what are we looking at here, on slide 1?

6    A.  This is an excerpt of information provided in the Gemini

7    subpoena return.

8    Q.  What time period did the data that was produced by Gemini

9    cover?

10   A.  September 2015 to March 2020.

11   Q.  Starting with the first, sort of, snapshot on the top of

12   the slide, what type of information did Gemini produce in that

13   chart?

14   A.  The customer information, to include the names and address,

15   email, of their customers, their U.S.-based customers.

16   Q.  Is that Information what's typically referred to as

17   know-your-customer, or KYC, information?

18   A.  Yes.

19   Q.  Now, the KYC information shown in the top chart, is that

20   all the KYC information that Gemini provided, or is this just a

21   snapshot of sample customers from the returns?

22   A.  It's just a snapshot.

23   Q.  In the second chart, what type of information are we seeing

24   that was produced by Gemini?

25   A.  That's just, again, a snapshot of the transfers sent by

OC3KHDR1                     Vasiliades - Direct

1    their customers, and there's the exchange account ID that

2    identifies each of the customers.

3    Q.  So, looking at each of the columns there, for example, do

4    you see one labeled "Timestamp"?

5    A.  Yes.

6    Q.  And what does that represent?

7    A.  The timestamp of each transaction.

8    Q.  Just to back up for a second, Agent Vasiliades, in your

9    training and experience, have you regularly reviewed subpoena

10   returns produced by Gemini and Coinbase in other

11   investigations?

12   A.  Yes.

13   Q.  So, based on that experience, are you familiar with how to

14   read them and the contents of those returns?

15   A.  Yes.

16   Q.  The column labeled here as "TX Hash," what does that

17   contain?

18   A.  The transaction hash.

19   Q.  Is that one of the unique identifiers you mentioned before

20   that would appear on the blockchain for a particular Bitcoin

21   transaction?

22   A.  Yes.

23   Q.  The next column that is of interest is the amount column.

24   Do you see that?

25   A.  Yes.

OC3KHDR1                          Vasiliades - Direct

1   Q.   What does that reflect?

2   A.   The amount of Bitcoin sent in the transaction.

3   Q.   Now, using the KYC data that appears in the first chart and

4   the transaction data that appears in the second chart, are you

5   able to link particular customers to particular transactions in

6   the Gemini data?

7   A.   Yes.

8          MS. GREENWOOD:   Mr. Iannuzzelli, if you would go to

9   slide 2.

10  Q.   And how would you do that?  How would you use the KYC data

11  to identify which transactions were done by which customer?

12  A.   You link the exchange account ID with the specific customer

13  and the transaction.

14  Q.   So, use customer 1368 as an example here.  What do you see

15  when you compare the KYC chart to the transaction chart?

16  A.   Customer 1368, named Jared, from Topanga, California, is

17  associated with the transfers that are depicted in the table

18  below it with --

19  Q.   The first example being a December 2016 transaction for a

20  hundred Bitcoin?

21  A.   Yes.

22  Q.   Just to clarify, do you see in the KYC chart, there is a

23  large sort of redaction box?

24  A.   Yes.

25  Q.   Does that redaction box appear sort of in the original

1   dataset that you were asked is to review?

2   A.  No.

3   Q.  Is that just being redacted for privacy purposes today in

4   court?

5   A.  Yes.

6   Q.  And now, Agent Vasiliades, using the KYC data that you were

7   given for U.S. Gemini customers and the transaction data that

8   Gemini provided, were you able to reach a total dollar amount

9   of the Bitcoin transferred to BitMEX by Gemini customers in the

10  relevant time period?

11  A.  Yes.

12  Q.  How were you able to come up with a total U.S. dollar

13  amount of those transfers?

14  A.  You're able to, I guess, filter the data based on whether

15  it was sent or received.  So I just filtered the data and added

16  up the amount of all the U.S.-based customers from the return.

17  Q.  Do you see, next to the Bitcoin column that we just looked

18  at, there's a column labeled "Amount USD"?  Is that correct?

19  A.  Yes.

20  Q.  So the Gemini data that you received included a U.S. dollar

21  column; is that right?

22  A.  Yes.

23  Q.  And is it your understanding that that represents a

24  conversion of the Bitcoin to a U.S. dollar amount?

25  A.  Yes.

OC3KHDR1                          Vasiliades - Direct

1   Q.  And so when you said that you simply filtered by sent and

2   totaled it up, is it accurate to say that it was as simple as

3   adding up all the sent transactions in the Gemini data?

4   A.  Yes.

5           MS. GREENWOOD:  And going back, Mr. Iannuzzelli, to

6   slide number 9.

7   Q.  When you did that calculation for the Gemini data, looking

8   at the third row here, what was the total U.S. dollar amount

9   that you came up with for the Gemini data?

10  A.  357,000,428.

11          MS. GREENWOOD:  Now, if we go could to slide number 3.

12          I apologize for jumping around a little bit,

13  your Honor.  I'm trying to make this a little bit easier.

14          THE COURT:  Hold on one second.

15          MS. GREENWOOD:  Sure.

16          (Pause)

17          THE COURT:  Okay, go ahead.

18  BY MS. GREENWOOD:

19  Q.  Agent Vasiliades, do you see here now, this slide is

20  labeled "Subpoena Returns from Coinbase"; is that correct?

21  A.  Yes.

22  Q.  What time period did the subpoena returns that you reviewed

23  from Coinbase cover?

24  A.  September 2015 to July 2020.

25  Q.  Did they produce largely the same types of KYC and

OC3KHDR1                          Vasiliades - Direct

1  transaction data that Gemini produced that we just reviewed?

2  A.  Yes.

3  Q.  And so you see the top chart there.  What type of

4  information appears in the sample chart on the top of the

5  slide?

6  A.  The user ID for each individual Coinbase user, the name of

7  the user, and then the KYC information — email address, date of

8  birth, address, et cetera.

9           (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

OC3JHDR2                        Vasiliades - Direct

1  Q   And so you see here again there's some redactions that have

2  been applied to the KYC data; is that correct?

3  A   Yes.

4  Q   That's one that's been left un-redacted.  What is the

5  example customer that's left un-redacted there?

6  A   Alameda Research.

7  Q   Where is Alameda Research located, according to the KYC

8  data produced by Coinbase?

9  A   Berkeley, California.

10 Q   And again, comparing the KYC data produced by Coinbase to

11 the transaction data provided by Coinbase, are you able to

12 identify particular transactions to particular U.S. users?

13 A   Yes.

14 Q   And how would you do that?

15 A   By filtering out the user ID for each specific user and

16 then reviewing the transactions.

17 Q   And so again, using Alameda Research as an example, how

18 would you know that the transactions in the bottom screenshot

19 match to Alameda Research?

20 A   Because the user IDs match based on the return that was

21 provided.

22 Q   And that would be the user IDs in the left column ending

23 70D5?

24 A   Correct.

25 Q   Now, Agent Vasiliades, do you see here, much like the

1   Gemini returns, that these returns also include transaction

2   hashes and transaction times and amounts; is that correct?

3   A    Yes.

4   Q    Did the Coinbase data itself include a conversion of the

5   Bitcoin amounts that had been sent by users into U.S. dollars?

6   A    No.

7   Q    Okay.  How, if at all, were you able to identify a U.S.

8   dollar amount for these particular Bitcoin transactions?

9   A    The FBI was able to essentially generate a column for the

10  U.S. dollar amount and using the closing cost of Bitcoin for

11  specific dates.

12  Q    Okay.  So let's go to slide four, if you wouldn't mind.

13       What is depicted here on slide number four, Special

14  Agent Vasiliades?

15  A    It's a depiction of Yahoo Finance Bitcoin pricing,

16  historical Bitcoin pricing.

17  Q    And so is this publicly available information published by

18  Yahoo online?

19  A    Yeah.

20  Q    And when you say, for example, that it includes Bitcoin

21  closing pricing, what does that mean?

22  A    It's the closing price set -- or set by Yahoo or depicted

23  by Yahoo for specific days.

24  Q    By "close" do you mean end of day?

25  A    Yes.

1   Q   Or end of trading day?

2   A   Yes.

3   Q   And so when you talked about creating a column in order to

4   do a calculation, what information was used to convert Bitcoin

5   to U.S. dollars?

6   A   The Yahoo Finance closing cost for the specific timeframe.

7   Q   Okay.  And so for each transaction, is it accurate to say

8   that the closing cost of Bitcoin for the date of the relevant

9   transaction was used to convert the Bitcoin to U.S. dollars?

10  A   Yes.

11  Q   And did you review that formula for accuracy and have

12  confidence that it was applied to each of the transactions to

13  arrive at a U.S. dollar value?

14  A   Yes.

15  Q   And going back to slide number nine, once you performed

16  that conversion, what was the total dollar value of the

17  transfers from U.S. Coinbase users to BitMEX during our

18  relevant time period?

19  A   $676.2 million.

20  Q   Was that simply a total?

21  A   Yes.

22  Q   And going back to slide number five, you testified earlier,

23  Agent Vasiliades, that in your training and experience as an

24  FBI agent you regularly used Gemini and Coinbase subpoena

25  returns; is that correct?

OC3JHDR2                          Vasiliades - Direct

1    A    I review them, yes.

2    Q    As part of your preparation for today's proceeding, did you

3    sample some of the transaction data in the Gemini and Coinbase

4    returns to determine if the transaction data specifically was

5    accurate on the blockchain?

6    A    Yes.

7    Q    How did you do that?

8    A    I used a open source block explorer to essentially take the

9    transaction hash, which is searchable, and I verified a random

10   sampling of these transactions to verify that the amount was

11   accurate.

12   Q    And based on that sampling, was the data including

13   transaction hashes, dates, and amounts provided by Gemini and

14   Coinbase in its returns accurate based on what was available in

15   the public blockchain?

16   A    Yes.

17   Q    And is what's shown on this particular slide, slide five,

18   just one example of a transaction that you searched in the

19   public blockchain explorer?

20   A    Yes.

21   Q    Going back to slide number nine, please.

22           Agent Vasiliades, we've been talking about a relevant

23   time period covering September 2015 to September 2020; is that

24   correct?

25   A    Yes.

OC3JHDR2                          Vasiliades - Direct

1    Q    Did the data provided by Coinbase and Gemini cover that

2    entire time period?

3    A    I'm sorry.  Say that again.

4    Q    Sure.  Did the data that you reviewed, the actual subpoena

5    returns from Gemini and Coinbase, extend all the way to

6    September 2020?

7    A    No.

8    Q    Okay.  And so for Coinbase, in what month and year did that

9    data end?

10   A    July 2020.

11   Q    And for Gemini, in what month and year did that data end?

12   A    March 2020.

13   Q    Okay.  And so is it fair to say that for August and

14   September 2020, you were not provided any Coinbase transaction

15   data?

16   A    Yes.

17   Q    And for April 2020 through September 2020, you were not

18   provided with any Gemini transaction data; is that correct?

19   A    Yes.

20   Q    In the absence of any actual transaction data from Coinbase

21   and Gemini for those months, what, if anything, did you do to

22   attempt to extrapolate or approximate the amount of U.S.

23   transfers from Gemini and Coinbase in those months?

24   A    Took the prior six month amounts, so the six months of each

25   data set, the previous six months or the latest six months of

1    the data set, and then we were -- I was able to get an average.

2    And then we just, for the Coinbase return, doubled it for the

3    two months.

4    Q    Okay.  So just to make sure I understand what you're

5    saying, so when you say that you took the last six months of

6    data and found an average, are you saying that you found an

7    average of deposits per month over the last six months of data

8    that was available?

9    A    Yes.

10   Q    And so for Coinbase, when you say that you doubled it, do

11   you mean that you used that monthly average for August and

12   September, so two times?

13   A    Yes.

14   Q    Okay.  And for Gemini, you did that same exercise but

15   covering a six month period; is that correct?

16   A    Correct.

17   Q    So when you took the monthly average of the last six months

18   of available data and applied it to August and September 2020,

19   what was the total amount you got for Coinbase?

20   A    33.973 million.

21   Q    And when you did that exercise for Gemini, what was the

22   amount that you identified for an estimate of U.S. transfers

23   from Gemini for April to September 2020?

24   A    151.267 million.

25   Q    And without doing that extrapolation, is it fair to say

OC3JHDR2                        Vasiliades - Direct

1    that your total would reflect no transfers at all from U.S.

2    users from Coinbase and Gemini for the missing months; is that

3    correct?

4    A    Yeah.

5    Q    Okay.  All right.  Let's change gears a little bit and talk

6    about the next four rows all together, which are labeled

7    "blockchain transfers from four different entities."  Do you

8    see that?

9    A    Yes.

10   Q    What are the four entities whose blockchain transfers are

11   identified in the next four rows?

12   A    You want me to name them.

13   Q    Yep.

14   A    Alameda, Cumberland, Genesis, Galaxy.

15   Q    Are you generally familiar with what Alameda, Cumberland,

16   Genesis, and Galaxy are?

17   A    Yes.

18   Q    What are they?

19   A    Cryptocurrency entities.

20   Q    Were you instructed by the case team to treat those

21   entities as U.S. entities for purposes of this exercise?

22   A    Yes.

23   Q    Do you have any personal knowledge about the operations of

24   those entities?

25   A    Only with Alameda, reviewing what I know in the news, but

OC3JHDR2                    Vasiliades - Direct

1   that's it.  I mean --

2   Q   And so for those four entities — Alameda, Cumberland,

3   Genesis, and Galaxy — how did you go about identifying the

4   total amount of Bitcoin that each of those crypto exchanges

5   transferred to BitMEX during the relevant time period?

6   A   I used the TRM search feature and I put in the entity's

7   name in the tool, and I was able to download the transfers

8   between the entities, like, for example, Alameda and BitMEX for

9   a specific timeframe.  And so I just downloaded the transfers

10  and used that data to get the total.

11  Q   And is that tool the same tool you talked about before that

12  you used to identify the total transfers to BitMEX during the

13  relevant time period, the TRM tool?

14  A   Yes.

15  Q   And the way that you search for each of those, is that the

16  same which that you search for BitMEX on the TRM tool?

17  A   Yes.

18  Q   When you extracted that data or downloaded the transaction

19  data from TRM, did it include a conversion of Bitcoin to U.S.

20  dollar?

21  A   Yes.

22  Q   So the first step, Agent Vasiliades, to coming to these

23  numbers was downloading the transaction data from TRM; is that

24  correct?

25  A   Yes.

OC3JHDR2                          Vasiliades - Direct

1    Q    Okay.  Do you recall earlier when we were discussing how

2    you came up with 18.472 billion as the overall universe of

3    Bitcoin deposits?  Do you recall that testimony?

4    A    Yes.

5    Q    Do you recall at that time we talked about reducing the

6    total transfers to BitMEX by the transfers that had been made

7    to two wallets that were identified or two accounts identified

8    by BitMEX as nontrading; is that correct?

9    A    Yes.

10   Q    Okay.  Once you identified the total transfers from

11   Alameda, Cumberland, Genesis, Galaxy to BitMEX, did you also

12   subtract out any transfers that those exchanges had made to

13   those two nontrading accounts?

14   A    Yes.

15   Q    Once you did that for Alameda, what was the total value of

16   Bitcoin transfers that had been made from Alameda to BitMEX

17   during the relevant time period?

18   A    263.407 million.

19   Q    And what was the total value of the transfers from

20   Cumberland?

21   A    173.011 million.

22   Q    What was the total value of transfers from Genesis to

23   BitMEX?

24   A    15.756 million.

25   Q    And what was the total value of transfers from Galaxy to

OC3JHDR2                    Vasiliades - Direct

1    BitMEX?

2    A    17.087 million.

3    Q    Turning now to the last row in this subtotal, do you see a

4    row labeled there "additional U.S. entity deposits"?

5    A    Yes.

6    Q    Did there come a time, Agent Vasiliades, when the case team

7    provided you with specific wallet addresses to search on the

8    blockchain?

9    A    Yes.

10   Q    Okay.  And could you please pull up Government Exhibit 92,

11   please, to assist in this part of the testimony.

12              Agent Vasiliades, do you recognize the data that

13   appears in Government Exhibit 92?

14   A    Yes.

15   Q    Who prepared this chart?

16   A    I did.

17   Q    Okay.  And the entities listed on the left side, where did

18   you obtain the names of the entities that are listed here?

19   A    The case team.

20   Q    And what is reflected on the right side of the chart for

21   each of those entities?

22   A    The U.S. dollar amount for each deposit address associated

23   with the names of the entities that control them.

24   Q    So once the case team provided you with the wallet

25   addresses to search — let's use Jane Street as an example --

OC3JHDR2                    Vasiliades - Direct

1    A    Uh-huh.

2    Q    Is it accurate to say that the case team provided you with

3    deposit wallets that it identified as being associated to Jane

4    Street?

5    A    Yes.

6    Q    Once you received those deposit wallet addresses from the

7    case team, what did you do with them to come up with this total

8    dollar amount next to Jane Street?

9    A    I was able to put that address into TRM, and then it's --

10   it was a BitMEX deposit address.  It had -- so I was able to

11   put that specific address into TRM and then essentially

12   download the transfers for a specific date range.

13   Q    Okay.  And having downloaded all the transfers to those

14   particular wallets, did you then total them up?

15   A    Yes.

16   Q    Okay.  And after you totaled them up, did you make any

17   effort to make sure that the transfers reflected here weren't

18   already reflected in another of the rows that were in your

19   chart?

20   A    Yes.

21   Q    Okay.  And what did you do to make sure there was not any

22   duplication from the numbers that we see in this chart to the

23   other rows of the chart on page 9 of Government Exhibit 35?

24   A    I de-duplicated all the transfers from -- that I was

25   provided, so all of the addresses that are associated with

OC3JHDR2                        Vasiliades - Direct

1    these entities.  And then I went through the process to

2    de-duplicate any transactions that occurred on the other data

3    sets.

4    Q    And once you did that for each of these entities using all

5    of the wallet addresses that were provided to you by the case

6    team, what's the total dollar amount that you calculated was

7    sent to three BMEX wallets during the relevant time period?

8    A    Approximately $452.8 million.

9    Q    And if you go back to slide nine on Government Exhibit 35,

10   please.

11           Is that the figure listed next to "additional U.S.

12   entity deposits"?

13   A    Yes.

14   Q    Okay.  And totaling all of those up again, what is the

15   grand total of the U.S. source deposits that you calculated

16   based on the methodology we just discussed?

17   A    $2.141 billion.

18   Q    Going back to slide number ten, please.

19           Again, once you totaled $2.141 billion as the U.S.

20   sources, what was the overall percentage of U.S. source

21   deposits from the total deposits to BitMEX in the relevant

22   period?

23   A    11.6 percent.

24           MS. GREENWOOD:  At this time, your Honor, the

25   government would also offer Government Exhibit 92.

OC3JHDR2                          Vasiliades - Cross

1          MR. ESSEKS:  No objection.

2          THE COURT:  Government Exhibit 92 received in

3    evidence.

4          (Government's Exhibit 92 received in evidence)

5          MS. GREENWOOD:  Nothing further with this witness,

6    your Honor.

7    CROSS-EXAMINATION

8    BY MR. ESSEKS:

9    Q   Good morning, agent.

10   A   Good morning.

11   Q   I'm David Esseks.  I represent HDR Global.  I'm going to

12   ask you some questions about the work that you did.

13          MR. ESSEKS:  Ms. Pettibon, can we get slide ten back

14   up.

15          Judge, we're working through some technical

16   difficulties.  Could I ask that the government, could they

17   please put their exhibit up with thanks?

18          THE COURT:  Hold on a second, please.  Go ahead.

19          MR. ESSEKS:  Thank you very much.

20   Q   So agent, this is the summary slide of your work, right?

21   A   Yes.

22   Q   And I just want to make sure I understand the process that

23   you went through and what you're depicting here.

24          The total circle are all Bitcoin transfers on the

25   blockchain in the defined period of time into any BitMEX

OC3JHDR2                          Vasiliades - Cross

1    wallet, correct?

2    A    So that is the depiction of all the BitMEX transfers, yes,

3    into BitMEX for a specific time period minus the addresses that

4    was discussed.

5    Q    Okay.  So you get into this circle if it's anyone anywhere

6    in the world as far as the blockchain shows is sending Bitcoin

7    to an address that is a BitMEX platform address, right?  Is

8    that fair?

9    A    Again, that's what was depicted on the tool I used.

10   Q    Okay.  And you understand that as a BitMEX platform wallet

11   because it has this 3BMEX prefix on the wallet address, right?

12   A    Yes.

13   Q    Okay.  And you understand, do you, that that means that

14   it's a wallet at BitMEX, it's not belonging to the entity

15   itself; is that correct?

16   A    I don't understand the question.

17   Q    Well, the platform itself has some wallets; is that

18   correct, including the ones that you backed out of your total?

19   A    I'm not -- I don't understand the question.  I really

20   don't.  Could you say it in a different way.

21   Q    Sure.  BitMEX, HDR Global as a company, has some wallets

22   that have a 3BMEX prefix that it owns and controls; you

23   understand that?

24   A    Yes.

25   Q    Okay.  There are other 3BMEX wallets, lots of them, that

OC3JHDR2                         Vasiliades - Cross

1   are used by its customers on the platform but that are not HDR

2   Global controlled wallets?

3   A   I do not.

4   Q   You don't know whether that's true or not?

5   A   I know that 3BMEX addresses are associated with the entity

6   BitMEX.  That's what I know.

7   Q   Okay.  And what you're depicting in the colored portion of

8   the pie chart on slide ten --

9   A   Yes.

10  Q   -- are what's labeled as "sum of U.S. sources," right?

11  A   Yes.

12  Q   And do I understand right that that means you're saying --

13  your analysis is these -- this is Bitcoin that came from

14  somewhere in the United States and landed in a BitMEX wallet?

15  A   No.

16  Q   No.  What does it mean?

17  A   That's just the sum of U.S. based users based on the data

18  set I was provided.

19  Q   But your slide is labeled, the colored portion of the pie

20  chart is labeled "sum of U.S. sources," and so I'm just trying

21  to understand what that means.

22  A   So from grand jury subpoena records that we reviewed that

23  are associated with United States based customers, for example

24  Gemini and Coinbase, that -- those are two data sources that

25  make up some of that information.  So that's --

OC3JHDR2                         Vasiliades - Cross

1   Q    Okay.  So you've got broadly two different categories of

2   deposits.  Could we go, please, to --

3   A    I don't understand what you mean.

4   Q    So the prior slide, slide nine.  You have from your

5   testimony two categories of information here, subpoena returns.

6   A    Yes.

7   Q    Right?

8   A    Yes.

9   Q    And that is for -- sorry, if we can go back to slide nine,

10  please.  We're now with the back table exhibits.  Thank you

11  very much.  Slide nine.

12          So the first four lines of your table on the left here

13  on slide nine --

14  A    Yes.

15  Q    -- describe your analysis of subpoena return information,

16  correct?

17  A    Yes.

18  Q    Okay.  And the others are based on information from TRM; is

19  that right?

20  A    That is correct.

21  Q    Okay.  And the subpoena return category is the government

22  got information from these two platforms, Coinbase and Gemini,

23  got information about users on those platforms that had

24  provided U.S. KYC information to those platforms, right?

25  A    Yes.

OC3JHDR2                      Vasiliades - Cross

1   Q   And then they provided information and you analyzed it

2   showing what Bitcoin those U.S. KYC users sent to a 3BMEX

3   wallet, right?

4   A   Yes.

5   Q   Okay.  And then on the rest of it, you were given

6   information about Alameda, Cumberland, Genesis, and Galaxy, and

7   you went into TRM and you grabbed information about what

8   wallets were associated with them and what transfers were made

9   to 3BMEX wallets; is that right?

10  A   That is right.

11  Q   Okay.  I want to come back to that in a moment.

12  A   Okay.

13  Q   But it looks to me -- but I want to test this, that what

14  you were doing here is saying, okay, we have two -- broadly,

15  two sources of information, subpoena return information, where

16  I can see that the customer's KYC to the U.S., right, and then

17  the TRM data where you're instructed, these entities are U.S.,

18  go find the transfers from them to 3BMEX.  Is that fair?

19  A   That's fair.

20  Q   Okay.  And so then it looks like you're saying U.S. sourced

21  deposits going to BitMEX?

22  A   Yes.

23  Q   Okay.  Did you look to see where those deposits landed at

24  BitMEX?

25  A   No.

OC3JHDR2                    Vasiliades - Cross

1    Q    So if you just bear with me, I live in New York.  Let's
2    just say I have a brother-in-law who lives in Mumbai, India and
3    he's an Indian citizen and he lives there, and he's got an
4    account at BitMEX and I've got an account at Coinbase.  And
5    let's say I send from New York five Bitcoin to my
6    brother-in-law at his account at BitMEX, and he's an Indian
7    citizen living in Mumbai.  My deposit would show up in your
8    chart if it came out of Coinbase, right?
9    A    Just so I understand the example, are you saying if you
10   sent your brother-in-law cryptocurrency, Bitcoin, from
11   Coinbase?
12   Q    Yes, from my account at Coinbase, which I don't have, but
13   let's assume I do.
14   A    So if you sent from Coinbase to BitMEX, would I be able to
15   see that transfer?
16   Q    And let's assume I was -- I had that Coinbase account in
17   June of 2020, so I showed up in that subpoena return.
18   A    Okay.
19   Q    With a New York address.
20   A    Okay.
21   Q    And I sent five Bitcoin to a 3BMEX wallet, so I show up in
22   this universe, right?
23   A    Okay.
24        THE COURT:  You're being asked if that's correct.
25   A    Oh, I'm sorry, sir.  What is your question?

1    Q    I'm just trying to get on the same page with you and then

2    I'm going to ask a question.  But my hypothetical to you is I,

3    in June 2020, with a Coinbase account and I'm in New York, and

4    I KYC to New York, I send five Bitcoin to my brother-in-law's

5    account at BitMEX, that transfer would be in this data, right?

6    A    I --

7    Q    Should be?

8    A    The only thing I can speak to is the grand jury material

9    itself.  And so that's --

10   Q    I'm --

11   A    I just -- if the information was in the grand jury subpoena

12   return and it was added, that's all I could really speak to.

13   I --

14   Q    I'm just trying to use an example to help explore your

15   testimony.  If --

16            THE COURT:  The question is if there is a U.S. user

17   who sends a Bitcoin to a foreign user in Mumbai, would that

18   show up as part of the Coinbase subpoena return?

19            THE WITNESS:  No.  No, sir.

20            THE COURT:  How would the Coinbase database reflect

21   the fact that the sender is located in the United States and

22   the recipient is located outside the United States?

23            THE WITNESS:  So the data would -- I would only have

24   insight for the United States based customer data from the

25   entity.  So Coinbase would give me the United States based

OC3JHDR2                        Vasiliades - Cross

1    information that's associated with their KYC, their address.

2    And all I'm seeing is a transfer to a 3BMX address.  I don't

3    know where, like, geographically-speaking that address occurs.

4    I'm just looking at it from the source that a 3BMX address is

5    linked to the entity BitMEX.  So I just -- geolocation is not a

6    part of, like, the review of the grand jury subpoena material.

7    I apologize.  I'm just confused with the --

8            MR. ESSEKS:  Judge, I'm happy to proceed.  Thank you.

9            THE COURT:  Go ahead.

10   BY MR. ESSEKS:

11   Q   So agent, that is helpful.  What you've described is you

12   looked at the grand jury return material from Coinbase and

13   Gemini, identified the senders who appeared to be U.S., and

14   tallied up all the transfers they made to apparently BitMEX

15   wallets, right?

16   A   Yes.

17   Q   Okay.  And you did not look at, because you weren't asked

18   to -- well, where did those deposits land and were they U.S.

19   users when they landed?  Or were they non-U.S. users -- did

20   they land in non-U.S. users' accounts?

21   A   I was asked to review the grand jury material and add it

22   up.

23   Q   But you didn't look at -- analyze where did it land?

24   A   I have no insight into that aspect of BitMEX or --

25   Q   The last thing I want to do with you on the subpoena return

1    category is you were asked about extrapolations, right, because

2    the data that you were given for Coinbase had a couple of

3    months of the stated time period that didn't exist, and the

4    Gemini data had — what, four months of the stated time period

5    where there was no data, so you were asked to extrapolate; is

6    that right?

7    A    I was asked to extrapolate to the September 2020 date.

8    Q    Do you know whether anyone in the government sought to get

9    the actual data from Coinbase or Gemini to close those gaps?

10   A    I do not know that.

11   Q    Did you ask them whether they tried to get that data?

12   A    Did not ask.

13   Q    Now, I want to move to the other bucket of U.S. source

14   transfers, and that's the Alameda, Cumberland, Genesis, Galaxy,

15   and the additional bits where you worked with this TRM tool

16   that you talked about.

17   A    Okay.

18   Q    And the first thing I want to ask you about is I think your

19   testimony was that you were instructed to look for transfers

20   from Alameda, Cumberland, Genesis, and Galaxy and instructed

21   that those were U.S. sources; is that right?  Do I have your

22   instructions right?

23   A    Yeah.  I was told to review all the transfers between

24   Alameda and BitMEX on TRM, Cumberland and BitMEX on TRM,

25   Genesis-BitMEX, Galaxy-BitMEX, and then to download the

OC3JHDR2                          Vasiliades - Cross

1   transfers between the two entities or -- yeah.

2   Q   And you were told those are all U.S. entities?

3   A   I was told by the case team that, yeah.

4   Q   Okay.

5   A   Yes.

6   Q   So I'm just confirming that I understand what your

7   instructions were.

8           Could we please pull up Government Exhibit 18.  Have

9   you offered this yet?  Are you going to offer?

10          MS. GREENWOOD:  I have not, and I think I have an

11  objection beyond the scope.  He made certain instructions.

12  He's not been asked by us to review any of the facts.  We're

13  happy to argue about it on the papers, but it's beyond the

14  scope.

15          MR. ESSEKS:  Your Honor, this is --

16          THE COURT:  Overruled.  Go ahead.

17          MR. ESSEKS:  Can we pull up Government Exhibit 18.

18  Q   Agent, we're showing on screen -- can we go to the top,

19  please.  This is a big spreadsheet that we got from the

20  prosecution that I hope is familiar to you because I think it's

21  some of the source data on which you were testifying today.  Do

22  you recognize it?

23  A   Yes.

24  Q   Okay.  And am I right that this is a spreadsheet of

25  information you got from this tool, TRM, about including

OC3JHDR2                         Vasiliades - Cross

1    Alameda-related wallets and transfers?

2    A    This looks like a spreadsheet, yeah, says Alameda Research,

3    BitMEX received, BitMEX sent, yeah.

4    Q    Okay.  And we're showing the tab "BitMEX received," which

5    means Alameda to BitMEX wallets?

6    A    Okay.  Yes.

7    Q    And I just want to work through what this is.  Where did

8    you get this information?

9    A    TRM.

10   Q    And TRM is -- you access that from your computer at the

11   bureau office; is that right?

12   A    Yes.

13   Q    And it's a subscription service?

14   A    Yes.

15   Q    And does the FBI have access to any greater detail from TRM

16   than, as far as you know, other subscribers do?

17   A    I don't know that.

18   Q    You don't know.

19          But what did you do in order to generate this, sitting

20   at the TRM screen?

21   A    Downloaded an Excel spreadsheet, and then I pretty much put

22   it in two tabs on a separate Excel spreadsheet.

23   Q    But to download, what were the instructions that you had to

24   put in?

25   A    To download what?

OC3JHDR2                        Vasiliades - Cross

1    Q   This.

2    A   This -- this document or the data in the document.

3    Q   The data in the document.  What did you have to type in?

4    A   Type in where.

5    Q   Sorry.

6    A   Type in where?

7    Q   To TRM.

8    A   To get the results of this information?

9    Q   Yes.

10   A   You put "Alameda Research" and "BitMEX."

11   Q   Just "Alameda Research" and "BitMEX" and the tool spits out

12   this?

13   A   So you can put in -- you put in both entities, and then you

14   review the transfers between them.  And then I separated them

15   between sent and received.

16   Q   Okay.  Thank you.

17          Am I right, that the information on here, except for

18   the sender, comes from the blockchain?

19   A   Except for the sender?

20   Q   Well, can you see the name "Alameda Research" on the

21   blockchain?

22   A   On the blockchain?

23   Q   Yes.

24   A   You cannot see the name "Alameda Research" on the

25   blockchain.  You can see the sending addresses.

OC3JHDR2                          Vasiliades - Cross

1   Q   And that's why I'm asking.  Am I right that the data in the

2   columns B, C, D, E, F, G, and maybe H are from the blockchain?

3   A   The data in the columns were provided from TRM.

4   Q   Okay.

5   A   And then the data is provided from TRM.  This is how I

6   used --

7   Q   In column F, receiving address, do you see that all of

8   those wallet addresses start with 3BMEX?

9   A   Yes.

10  Q   And you understand that that indicates that those are

11  BitMEX receiving wallets, correct?

12  A   Yes.

13  Q   The sending addresses are all quite different; is that fair

14  to say?

15  A   Yes.

16  Q   They don't have that same -- any similar prefix or suffix

17  that unites them?

18  A   Correct.

19  Q   And so the connecting of those sending addresses to Alameda

20  is something that's done by TRM; is that right?

21  A   No.

22  Q   How is it that all of those addresses are connected to

23  Alameda?

24  A   So I'm sorry.  I want to make sure I understand your

25  correction -- I'm sorry, your question correctly.  So the

OC3JHDR2                          Vasiliades - Cross

1    sending addresses listed in this data set are attributed to

2    Alameda.

3    Q    And I'm asking how.

4    A    By TRM.

5    Q    By TRM?

6    A    Correct.

7    Q    Fine.  And the usefulness to you of the TRM tool is it

8    makes that attribution that these wallet addresses are

9    connected to Alameda?

10    A    Correct.

11    Q    You don't know how they do that?

12    A    Correct.

13    Q    And you've used this tool in the past, right?

14    A    I have.

15    Q    And you said you found it accurate?

16    A    I do.

17    Q    And I've seen in the notes that we were provided from the

18    government that you described TRM as typically accurate?

19    A    I'd have to review that.  Is that what it says in my notes?

20    Q    That's what's in the notes that we were given of a meeting

21    with you --

22    A    That I said --

23    Q    -- describing TRM as typically accurate.

24    A    Okay.

25    Q    If those are your words, your understanding is it's not

OC3JHDR2                        Vasiliades - Cross

1    always accurate?

2    A    What I can speak to in my use of TRM, it's a tool that

3    assists in my investigations like other tools that you have

4    while doing investigations.  Whenever I use TRM to trace

5    specific cryptocurrencies regarding investigations that I am

6    conducting, almost all of the times I'm able to trace the

7    cryptocurrency to an entity or exchange that when I request

8    information to said entity, I receive information that helps

9    generate investigative leads for me to continue investigating.

10   I can't think of a time -- I honestly cannot think of a time

11   that I've use the TRM where it wasn't able to do that.

12   Q    But as you said, you don't know how they make the

13   attribution?

14   A    I don't work for TRM.  I don't know how they do it.  I use

15   a tool that is provided to me in my job as an investigator.  I

16   don't know how they do it.

17   Q    Do you know whether the TRM attributions are attributing

18   any particular sending addresses to the United States?

19   A    I don't know how TRM does their attribution.  I use it as a

20   tool.

21   Q    Okay.  You just don't know if there's a geolocating aspect

22   to what they do?

23   A    To who does?

24   Q    What TRM does in attributing wallet addresses to a

25   particular entity, you don't -- am I right you don't know

OC3JHDR2                        Vasiliades - Cross

1    whether there's any geolocating aspect of that process?

2    A    I honestly do not know the techniques that TRM does to

3    attribute their data.  All I know is that I've used it.  I used

4    the tool and it's assisted me in conducting these

5    investigations.

6    Q    And do you know what legal entities are included by TRM in

7    the Alameda Research bucket that is represented in this

8    exhibit?

9    A    Legal entities?

10   Q    An Alameda entity organized in California, an Alameda

11   entity organized in Delaware, an Alameda entity organized in

12   the Cayman Islands, an Alameda entity organized in Hong Kong,

13   do you know whether there's any differentiation made by TRM in

14   this data about which entities are associated with these

15   Alameda --

16   A    All I know is that TRM is associating the sending addresses

17   listed in this data set to Alameda Research.  I don't know

18   anything further than that.

19   Q    If we could put up slide six of Government Exhibit 35,

20   please.  Now, you testified about this earlier.  This is an

21   excerpt of a TRM report that you pulled for BitMEX; is that

22   right?

23   A    This is a summary page on BitMEX, yes.  It's a excerpt from

24   the summary page on the exchange, BitMEX from TRM.

25   Q    And did you pull up a summary page like this for Alameda

OC3JHDR2                         Vasiliades - Cross

1    Research?

2    A    No, I don't think I did.  So there's two different features

3    in TRM.  One is they're like -- you can search an entity.  If I

4    did, I don't recall pulling up and reviewing that summary page

5    of Alameda.  So what I did was I put in Alameda -- BitMEX and

6    Alameda Research.  And then all I did was there's a transfer --

7    like, kind of looks like an arrow between the two entities, and

8    I just clicked the download button on a -- I don't recall

9    bringing up Alameda's summary page.

10   Q    Fine.  But as you understand TRM, you could access a

11   similar page, summary report page for Alameda?

12   A    I'm sure you could.

13   Q    In the same format that we see on the screen for BitMEX?

14   A    I believe you could, yeah.  I don't think -- yeah.  I

15   believe that is true, yes.

16   Q    Just looking at what's on the screen here, if we see over

17   on the left-hand side of this summary report under "about,"

18   there's a description of BitMEX.  And under that, there's a

19   listing of legal entities?

20   A    Yes.

21   Q    One is HDR Global Trading Seychelles, one is BXM services

22   SRL in Italy?

23   A    Yes.

24   Q    And it looks like this is TRM saying under BitMEX they

25   associate these particular legal entities.  That's what it

OC3JHDR2                     Vasiliades - Cross

1   looks like to me.  Is that how you read it?

2   A   So TRM's a blockchain investigative tool.  And so a lot of

3   the times with these exchanges, information like this will

4   assist investigators to request records from entities

5   associated with exchanges.  That's what I know of the

6   information.

7   Q   I appreciate that.  I'm just asking do you read this as

8   associating those legal entities with BitMEX?

9   A   I do read that as that, yes.

10  Q   And so presumably, if you pulled up a similar page at TRM

11  for Alameda, there would be a listing of legal entities that

12  TRM is associating into the Alameda bucket, presumably?

13  A   Yes.

14  Q   Okay.  But we don't know what legal entities TRM associates

15  with Alameda?

16  A   I do not know that.

17  Q   You don't know, okay.

18          And similarly if we went through the other entities,

19  Genesis and Galaxy and Cumberland, you don't know what legal

20  entities --

21  A   I do not.

22  Q   -- TRM associates with those entities?

23  A   You can definitely search it and see if it's there.  I'm

24  not sure if it would be there because I haven't done it.  But

25  I'm sure if you went on TRM, you could see if it's there -- if

OC3JHDR2                        Vasiliades - Cross

1    it exists.  I really do not know.

2    Q    Thank you.

3             MR. ESSEKS:  Nothing further, Judge.

4             THE COURT:  All right.

5             MS. GREENWOOD:  Just one moment, your Honor, just

6    confirming if we need any redirect.

7             Nothing further, your Honor.

8             THE COURT:  All right.  Witness is excused.  You may

9    step down.

10            (Witness excused)

11            MR. INGOGLIA:  Judge, our witness is in the hallway.

12            MS. GREENWOOD:  If I may just admit our exhibits.  If

13   we could, for avoidance of doubt, we've already admitted 35 and

14   92, but at this time we'd like to admit Government Exhibits 1

15   through 93 inclusive.

16            MR. ESSEKS:  No objection.

17            THE COURT:  Government Exhibits 1 through 93 received

18   in evidence.

19            (Government's Exhibit 1 through 93 received in

20   evidence)

21            MS. GREENWOOD:  Thank you, your Honor.  Nothing

22   further from the government at this time.

23            THE COURT:  Okay.  Defense may call its witness.

24            MR. INGOGLIA:  Judge, I will go to the hall and get

25   him.  I anticipate we'll be roughly the same length as what we

OC3JHDR2                          Vasiliades - Cross

1    just did.

2                THE COURT:  So let's take five minutes.

3                (Recess)

4                (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

OC3KHDR3                          Tilsner - Direct

```
 1                THE COURT:  All right.

 2                MR. INGOGLIA:  Okay.  Judge, may we proceed?

 3                THE COURT:  Yes, you may proceed.

 4                The defense should call its witness.

 5                MR. INGOGLIA:  The defense calls Jeremy Tilsner.

 6     JEREMY TILSNER,

 7           called as a witness by the Defendant,

 8           having been duly sworn, testified as follows:

 9                THE DEPUTY CLERK:  Please state your full name and

10     then spell your last name slowly for the record.

11                THE WITNESS:  Jeremy Tilsner, T-i-l-s-n-e-r.

12                THE DEPUTY CLERK:  Thank you.

13                THE COURT:  All right.  You may proceed.

14     DIRECT EXAMINATION

15     BY MR. INGOGLIA:

16     Q.  Mr. Tilsner, where do you work?

17     A.  I work for a consulting firm, Alvarez & Marsal,

18     M-a-r-s-a-l.

19     Q.  Are they sometimes known as A&M?

20     A.  They are.

21     Q.  How long have you worked at A&M?

22     A.  Almost 16 years.

23     Q.  What's your title there?

24     A.  Managing director.

25     Q.  What's your role?
```

OC3KHDR3                        Tilsner - Direct

1    A.  I provide advisory services to various parties engaged in

2    disputes and regulatory issues of a broad array.

3              THE COURT:  Please keep your voice up, use the

4    microphone.

5              THE WITNESS:  How is that?

6              MR. INGOGLIA:  Good.

7    BY MR. INGOGLIA:

8    Q.  In that role, do you sometimes conduct data analysis?

9    A.  I do, often.

10   Q.  Does the work sometimes involve analysis of large volumes

11   of data?

12   A.  It does.

13   Q.  Are there tools that you use in your practice to help you

14   analyze large quantities of data?

15   A.  Yes, there are many -- there's a broad array of tools we

16   use, but kind of the central tool that we use is a program

17   language known as Structured Query Language.  It's essentially

18   a programming language that enables you to interact with large

19   datasets to extract data from them, summarize it, analyze it.

20   Q.  Did there come a time when your services were engaged in

21   connection with this matter?

22   A.  There did.

23   Q.  Approximately when?

24   A.  Maybe end of October, early November, of this year.

25   Q.  Is that a paying engagement?

OC3KHDR3                    Tilsner - Direct

1   A.  It is.

2   Q.  Is your payment contingent on the result of the hearing?

3   A.  It is not.

4   Q.  At a high level, what were you engaged to do?

5   A.  I was engaged to analyze various data, some of which came

6   from the government, some of which was company data, to

7   analyze, essentially, its source.

8   Q.  Did others at A&M assist you in that process?

9   A.  Yes.

10          MR. INGOGLIA:  I'd like to put on the screen what's

11   been marked as Defense Exhibit 7.

12          You have a paper copy in front of you, I believe, but,

13   if not, I can bring you another one.

14          THE COURT:  Ah, yes.  Thank you.

15          MR. INGOGLIA:  And if we can turn to slide 2, the

16   second page.

17   BY MR. INGOGLIA:

18   Q.  Mr. Tilsner, in general, are you familiar with Defense

19   Exhibit 7?

20   A.  I am.

21   Q.  And, broadly, what is this?

22   A.  This is essentially a summary of data that I analyzed in

23   the course of the matter.

24   Q.  On slide 2, does this set forth some of the materials you

25   reviewed as part of your work?

OC3KHDR3                           Tilsner - Direct

1   A.  Yes.

2   Q.  Items 1, 2, and 3 appear to refer to government exhibits;

3   is that right?

4   A.  That's right.

5   Q.  And then it looks like you looked at declarations of

6   Mr. Lindsay?

7   A.  I did.

8   Q.  And a Guidehouse report related to BitMEX's controls; is

9   that right?

10  A.  That's correct.

11  Q.  Did you also, on occasion, review data, other data, of the

12  company?

13  A.  I did.  I was given access to a database, a couple of data

14  stores, housed by the company.  I and my colleagues were given

15  access to it.  That data contained, I would say, two kind of

16  broad areas of data.  There was customer data, essentially

17  customer lists, along with various details about the customers,

18  and transactional data, but most pertinent to my analysis were

19  records of deposits and withdrawals under the BitMEX platform

20  and records of trading on the platform, trading on the

21  exchange.

22  Q.  Was that data made available to you in the form of a

23  database of some kind?

24  A.  Yes.

25  Q.  And was that data from a particular period of time?

OC3KHDR3                    Tilsner - Direct

1    A.   Yes.  It was a snapshot.

2    Q.   It was a snapshot of company data from a particular date?

3    A.   Right.  So it wasn't kind of -- their data is changing all

4    the time, transactions are being added, customers are coming on

5    and off.  This was sort of a static moment-in-time snapshot of

6    their data.

7    Q.   Do you remember what the date of the snapshot was?

8    A.   I believe it was August of 2021.

9    Q.   Before we get into the detail of the work you did, let's

10   jump ahead for a minute and glance at where you ended up.

11   A.   Sure.

12   Q.   Are there slides as part of Defense Exhibit 7 that

13   summarize the conclusions of the work you did?

14   A.   There are.  They're the last two slides of this

15   presentation.

16          MR. INGOGLIA:  Can we look at slide 16, please.

17   Q.   So, do you have slide 16 in front of you?

18   A.   I do.

19   Q.   Is this one of the summary slides that you were referencing

20   a second ago?

21   A.   It is.

22   Q.   Do you see there's a column that says "Government Amount,"

23   and then a column next to it that says "HDR Amount"?

24   A.   Yep.

25   Q.   Can you tell us what those columns refer to?

OC3KHDR3                           Tilsner - Direct

 1   A.  Sure.

 2          So the "Government Amount" column is a summary of

 3   deposits that the government asserts were made onto the BitMEX

 4   platform from U.S.-related entities, and the "HDR Amount"

 5   column, to its immediate right, those are the results of my

 6   analysis for the same numbers.  So, just as an example, in the

 7   first line, where the government asserts an amount of

 8   approximately 676 million, the results of my analysis indicate

 9   an amount of about 506 million.

10   Q.  And under the column that's the source, there are several

11   rows.  Do those map with what you understand to be the

12   government's analysis --

13   A.  They do.

14   Q.  -- those categories?

15   A.  They do.

16          MR. INGOGLIA:  And if we can go to slide 17.

17   Q.  At the bottom, it says, "Total Percentage of Deposits

18   Attributable To U.S. Users:  4.4 Percent."

19          Is that the company's position as to what that

20   percentage, properly calculated, would be?

21   A.  It is.

22   Q.  And is that the result of the analysis that you did?

23   A.  It is.

24          MR. INGOGLIA:  Let's go to slide 3, please, in the

25   same exhibit.

OC3KHDR3                          Tilsner - Direct

1    Q.  So, do you recognize this slide?

2    A.  I do.

3    Q.  What does slide 3 show?

4    A.  This is a summary of data that I understand resulted from

5    subpoenas that the government served to Coinbase.  That data

6    contained two broad categories of information.  One was

7    blockchain transactions that they assert represent deposits on

8    the BitMEX platform, and, along with it, what we've been

9    referring to as KYC data, and, essentially, again, this comes

10   from Coinbase's systems, a customer list along with certain

11   details about those customers.

12   Q.  Got it.

13          And did you get that information from Government

14   Exhibit 11?  Is that what I'm seeing at the second line?

15   A.  That's right.

16   Q.  In the first line, there's a reference to Defense

17   Exhibit 1.

18          What is Defense Exhibit 1?

19   A.  Defense Exhibit 1 is a granular, sort of, transaction-level

20   output that I created that attempts to link the transactions,

21   the granular transaction data, in the government exhibit to the

22   same -- the BitMEX representations of that same data.  So it

23   attempts to take a transaction as represented in the Coinbase

24   data and match it to the transaction as represented within

25   BitMEX.

OC3KHDR3                          Tilsner - Direct

1   Q.  Within the company data?

2   A.  Yes.  And it's at the transaction-by-transaction level.

3   Q.  Got it.

4           And this slide we're looking at now summarizes that

5   work you did in Defense Exhibit 1?

6   A.  That's correct.

7   Q.  There is a --

8           THE COURT:  I'm sorry, you're referring to Defense

9   Exhibit -- I see, Defense Exhibit 1.

10          THE WITNESS:  Correct.

11          THE COURT:  Go ahead.

12  BY MR. INGOGLIA:

13  Q.  So, what is the meaning of the first line that says

14  "Deposits from Coinbase On GX 11"?

15  A.  GX 11, again, that's the government exhibit.  It asserts a

16  total amount of 875.809 million, meaning if I were just to take

17  all of those deposits and sum them up, that's the amount I

18  would get.

19  Q.  Underneath that, there's a bold word that says

20  "Exclusions," and then some rows underneath.

21          Can you tell us what those are?

22  A.  Sure.

23          So, broadly, the exclusions are -- they contain

24  categories of deposits that my analysis indicates cannot be

25  attributed to U.S. users.  So, in the first row, deposits

OC3KHDR3                        Tilsner - Direct

missing from Coinbase KYC data, I mentioned a second ago that
the Coinbase data contained two major pieces — transactions
themselves and then what we're referring to as KYC data,
essentially a customer list.  The transactions can be linked to
the customer list by, essentially, a customer number, so that
you can take a transaction and then look up the customer to
which that transaction can be -- that deposit can be
attributed.

          For deposits totaling the number you see there,
199.536 million, there was no -- when I attempted to look up
the customer relevant to that transaction, it didn't exist in
the KYC data.

Q.  So, there was a deposit?

A.  Yes.

Q.  But when you tried to track it back to the Coinbase
subpoena return data, you didn't see it there?

A.  That's correct.

Q.  What is the 199?

A.  That is the total, the sum total, of the deposits,
transactions, that fit into that category, that I could not
match back to the Coinbase KYC data.

Q.  Got it.

          What's the second line of exclusions?

A.  The second line?  So, within the data I was given to access
to within the company, there were trading records so I could

1    see evidence of trades that took place in the exchange.  From

2    that, I was able to say, on a by-account basis, whether or not

3    a given account had engaged in any trading at all.  I was able

4    to take the data in the subpoena return and link it back to,

5    again, the BitMEX internal representations of those

6    transactions.  And when I looked at the accounts relevant to

7    those transactions, those accounts never traded on the

8    platform.  So, that pertains to about $1.84 million worth of

9    deposits.  And the accounts that relate to those deposits never

10   did any trading on the platform, at least at the time of the

11   snapshot.

12   Q.  And then the third line, tell us what that is.

13   A.  I reviewed a declaration provided by Mr. Lindsay, and that

14   declaration included an exhibit that essentially was a list of

15   accounts with KYC information indicating whether or not they

16   were U.S. accounts.  So, when I did the linkage of the Coinbase

17   transactions to the BitMEX transactions, I found that many of

18   those transactions could be attributed to accounts that were

19   KYC to non-U.S. jurisdictions per BitMEX's data.  The

20   transactions that fit that category sum to 168.604 million.

21   Q.  When you say KYC, what are you referring to?  What does

22   that stand for?

23   A.  Know your customer.  It's kind of a term of art that refers

24   to the process by which you identify your customer, where they

25   live, in pertinent part here, and other details.

OC3KHDR3                    Tilsner - Direct

1   Q.  And then the last line here says "Remaining."

2              Is that just math?

3   A.  Yeah, that's just --

4   Q.  Tell me what you did with the math.

5   A.  It's just the remaining transactions that comprised the

6   875, 876 million in the top line, the top light gray line,

7   minus the dollar values in the subsequent three lines.

8              MR. INGOGLIA:  Let's look at slide 4, please.

9              THE COURT:  Could I just talk to you for a second?

10             MR. INGOGLIA:  Of course.

11             THE COURT:  When you referred to Government

12   Exhibit 11, the amount 875,809,000, right?

13             THE WITNESS:  Yes.

14             THE COURT:  When I go back to the government's current

15   exhibit, it appears that the documents from U.S. Coinbase

16   users, September 2015 to July 2020, is 676,000,274, plus the

17   extrapolated transfers of 33,973,000.  That seems to be about

18   $100 million less than the number that you started with.

19             THE WITNESS:  Yes, that's right.  I understand that

20   some portion of the 875 -- the 876 million, the government no

21   longer asserts that they're U.S.-based.

22             THE COURT:  So, about a hundred million?

23             THE WITNESS:  Correct.  That would be over and above

24   the three categories you see here.

25             THE COURT:  Okay.  Go ahead.

1              A hundred million, give or take?

2          THE WITNESS:  Yeah.

3    BY MR. INGOGLIA:

4    Q.  Mr. Tilsner, if you subtract 199 from the 875, don't you

5    get the top line number in Government Exhibit 11 then?

6    A.  Yeah, you're right.

7          THE WITNESS:  Excuse me, your Honor.

8          Yeah, so that is -- we're kind of representing that

9    net of the 199.536 million, that could not be found in the

10   Coinbase KYC data.  So the number you're talking about in that

11   column, the government amount, is the 875 minus the 199.

12         MR. INGOGLIA:  Your Honor, if we've answered your

13   question, we'll move on to slide 4?

14         THE COURT:  Yeah, go on.

15         MR. INGOGLIA:  Let's move on to slide 4.

16   BY MR. INGOGLIA:

17   Q.  Mr. Tilsner, what are we looking at here?

18   A.  This is another analysis, very much mimicking the structure

19   of the one we just went through.  This pertains to Government

20   Exhibit GX 16, this one from Gemini.  Again, we were provided

21   with data that includes transactional data and then what we're

22   calling KYC data from Gemini systems, as I understand it.  The

23   total value of the deposits represented in that data are

24   401.580 million, and then going through the three categories,

25   44.152 million of those deposits could not be found in the KYC

1  data provided by the government ostensibly coming from Gemini.

2  Then 16.554 million of those deposits within BitMEX pertained

3  to BitMEX accounts that never traded on the platform.

4          And, lastly, in the light green row, 97.342 million in

5  deposits are to non-U.S. accounts per KYC data in Mr. Lindsay's

6  declaration.

7  Q.  Got it.

8          And like in the previous exhibit, if you look at the

9  new top-line number on the Government Exhibit 16, is that

10 approximately $44,000 less -- 44 million less than the 401 that

11 we see on this exhibit?

12 A.  It is.

13 Q.  Did you do your analysis on multiple occasions?  Was it an

14 iterative process where the numbers changed a couple of times?

15 A.  Very much so, yes.

16         MR. INGOGLIA:  Let's move on to slide 5, please.

17 Q.  Mr. Tilsner, can you explain what we're looking at here?

18 A.  Sure.

19         So another broad category of data provided by the

20 government included blockchain data that they attribute to U.S.

21 customers and was extracted using TRM, which is kind of a

22 blockchain analysis tool.  It's a third-party, a website, that

23 allows you to analyze and extract data from the blockchain.

24         And very much like the previous two that we went

25 through, we took that data, and we attempted to link it to

1    internal BitMEX data.  And what we found was that not all of

2    that data appeared to pertain to accounts that were U.S.-based.

3    Q.  I see that there are — one, two — three different colors in

4    the rows going across.

5         Can you explain what those indicate?

6    A.  Sure.

7         So, the colors indicate, in the top row, these are --

8    this data overall pertains to Cumberland.  The top two accounts

9    are Cumberland accounts that, according to company records,

10   were Cayman Islands accounts.

11        The second color, the light -- the yellow, I guess it

12   would be, that account, the account number you see in the first

13   column there, 619706, according to Mr. Lindsay's declaration,

14   that account was kind of a BitMEX internal account that's used

15   for back office operations, transferring money around.  It's

16   not a bona fide, sort of, customer account and wouldn't engage

17   in any trading.  It's simply there for business management on

18   the part of BitMEX.

19        And then the light -- the blue at the bottom, these

20   are all accounts that, according to our analysis, don't appear

21   to be Cumberland accounts at all.

22        And, further, if I look at -- so, for lines 4 to 7,

23   those four accounts appear in Mr. Lindsay's declaration as

24   having KYC'd to non-U.S. locations.

25        And then 8, the row 8, is an account that underwent

OC3KHDR3                    Tilsner - Direct

a -- sort of a legacy process, where it was onboarded — not the
current KYC process, but a legacy process — and that process
indicates that this account is a Korean account.

          And then the final three, there is a data table, a
data store, within the database that we were given access to
that indicates two separate things.  One is a country that the
user says is their country when they sign up, and the other is
the GeoIP that you see at the top of that column.  The GeoIP,
it's a -- BitMEX would record the IP address that someone
connected to the platform from, and they can then go and make a
call on where that IP address originates from.  And in this
particular case, for all three of those accounts, those two
details indicate that these are non-U.S. accounts.

Q.  As you answered that, you anticipated some of my questions
about that column heading.

          But in the fourth column across, there's a reference
to Jumio.  Can you say what your understanding of what that is?

A.  Yeah.  Jumio, as I understand it, it's a third-party
identity verification platform.  So it's a third-party business
that BitMEX would have contracted with to help them understand
who their customers are and performed some function to verify
that.

Q.  What does the sum total represent on the bottom of this
slide?

A.  It's 223 million 416 -- the 223 million number that you

1    see, that is accounts -- that's the total of the deposits that

2    came from DX 3.

3    Q.   Is that the sum of rows 1 through 11?

4    A.   It is.

5           THE COURT:   Is the 223 million the amount of the

6    accounts attributed to Cumberland that should not be attributed

7    to Cumberland?

8           THE WITNESS:   No.   That's -- yes, I mean, in this

9    particular case.   Actually, if we can flip to -- I think

10   there's a summary slide that explains it in detail.

11          MR. INGOGLIA:   You can go to slide 6.

12          THE WITNESS:   This is yet a further summary of the

13   previous slide that we just saw.   You'll note the 223 million

14   amount at the top of this table.   So, if we think of the series

15   of accounts whose summaries we saw in the prior slide, they fit

16   into a handful of categories.   The first category is

17   represented in the light green.   These are accounts that KYC to

18   non-U.S., according to Mr. Lindsay's declaration.

19          The light yellow is deposits to that business account

20   that I mentioned a few moments ago.   It's not a customer

21   account.   It's an account used for back office management.

22          Then among the blue-colored accounts on the previous

23   slide, those kind of further break down into two categories.

24   All of them are non-Cumberland accounts.   So, when we looked

25   them up, they didn't appear to be Cumberland at all.   Some of

OC3KHDR3                          Tilsner - Direct

1    them, according to Mr. Lindsay's declaration, were non-U.S.

2    accounts, so they're KYC, and they were non-U.S. accounts.

3    Others we found indications that they were non-U.S. accounts

4    either via the user table that I talked about or that GeoIP,

5    the IP address.

6              THE COURT:  My question is:  223,416,000 is the amount

7    that should be subtracted from the amounts otherwise attributed

8    to Cumberland, right?

9              THE WITNESS:  I'm sorry, can you repeat that?

10             THE COURT:  Yes.

11             The 223,416,000 are all subtractions from amounts

12   otherwise attributed to Cumberland that shouldn't be attributed

13   to Cumberland because they're from non-U.S. users?

14             THE WITNESS:  I would put it slightly differently.

15   I'd say I think the government asserts that all 223 million of

16   those are U.S. and are Cumberland.  And what I found -- sorry.

17             THE COURT:  Right, but that's what I'm trying to

18   understand, because when I look at the government's summary,

19   the government says blockchain transfers from Cumberland,

20   173 million, and this says I should be subtracting -- from what

21   the government says, I should be subtracting 223 million.

22             THE WITNESS:  Yeah, I'd have to go back and look at

23   some of the underlying data.

24             THE COURT:  But this would essentially say no

25   transfers from Cumberland were from U.S. users?

OC3KHDR3                        Tilsner - Direct

1          THE WITNESS:  That's right.

2          THE COURT:  Was that your conclusion?

3          THE WITNESS:  That was my conclusion.

4          THE COURT:  Okay.

5          THE WITNESS:  Further, some of these didn't even

6   appear to be Cumberland at all.

7   BY MR. INGOGLIA:

8   Q.  Mr. Tilsner, on the government exhibit, did they back out

9   the business account, the 50-some-odd million business account?

10  A.  Yeah, we're looking at this now, and doing the math, I'm

11  reminded that that's what they did.

12          MR. INGOGLIA:  So that may account for some of the

13  discrepancy that the Judge sees.

14          THE COURT:  Okay.  Go ahead.

15          MR. INGOGLIA:  Let's go to slide 7, please.

16  BY MR. INGOGLIA:

17  Q.  Mr. Tilsner, tell us what's happening here on slide 7.

18  A.  Similar to the prior slide, my kind of starting point for

19  this one was blockchain data provided by the government as

20  extracted through TRM.  When I compared it to internal data, it

21  resolved to three BitMEX accounts, all three of which KYC'd to

22  non-U.S. locations, the U.K. in this particular case.  So, none

23  of these deposits were from U.S. customers.

24  Q.  If we go to slide 8, is that just a graphic depiction of

25  what you just told us?

OC3KHDR3                    Tilsner - Direct

1   A.  It is.

2           MR. INGOGLIA:  If we can go to slide 9, please.

3   Q.  Mr. Tilsner, what are we looking at here, on slide 9?

4   A.  On slide 9, again, the starting point was blockchain data

5   that I then compared to internal BitMEX data to figure out what

6   account it related to.  In the case of the first and seventh

7   rows, I could not demonstrate that these were not -- I could

8   not conclusively demonstrate that these were not U.S. accounts.

9           Rows 2 and 3, again, relate to that business account

10  that we've talked about a couple of times now.  That was from

11  Mr. Lindsay's exhibit.

12          And then rows 4 to 9 -- rather, starting with 4 to 6,

13  these three accounts were KYC'd to U.S. per Mr. Lindsay's

14  declaration.

15          And then 8 and 9, we see that the internal, kind of,

16  data, not from Mr. Lindsay's exhibit, but from internal BitMEX

17  data, indicate that these are non-U.S., both with respect to

18  what we call the user table, their self-reported country, and

19  the GeoIP, which is a geolocation of the IP address from which

20  they connect to the platform.

21  Q.  For line 7, that's at the bottom of the chart, is it your

22  understanding that the company is not contesting or not

23  challenging the government's position on the Profluent trading?

24  A.  Yes --

25  Q.  The email address listed in line 7?

OC3KHDR3                        Tilsner - Direct

1    A.   -- that's my understanding.

2    Q.   So, if we go to slide 10?

3    A.   This is a summary of the subsequent slide.  The total value

4    of deposits is 22.915 million.  Then if I exclude the three

5    categories of non-U.S. accounts — that's in the yellow and two

6    blue rows — and then the remaining amount, the 5.219, pertains

7    to the two gray rows you see on the prior slides, and those are

8    both accounts where the company doesn't contest that they're

9    non-U.S -- that they're U.S., excuse me.

10   Q.   Moving to slide 11?

11   A.   These are, again -- sorry?

12   Q.   No, go ahead.  Tell us what we're looking at.

13   A.   Again, blockchain data provided by the government.  They

14   assert that this pertains to Alameda.  I'll start by saying

15   Alameda had a lot of accounts, so the structure here is a

16   little bit different, but the first account is an Alameda

17   account.  It's row 1855560.  That is an account that KYC'd to

18   the British Virgin Islands.  So, non-U.S.

19          Then Mr. Lindsay provided as an exhibit, along with

20   his declaration, a large list of BitMEX accounts that sort of

21   have a main account, subaccount, structure, where there's a

22   main account, and then all the subaccounts kind of roll up to

23   that account.  What I found is that there's a group of

24   accounts, according to that data, that roll up to kind of our

25   subaccounts to the account in line 1, and because the KYC that

OC3KHDR3                        Tilsner - Direct

1    applies to that main account would apply to its subaccounts, I

2    was able to determine, in row 2, that all of those linked

3    Alameda accounts are also KYC'd to the British Virgin Islands,

4    not in the U.S.

5    Q.  And line 2 is an example of where this slide is different

6    than the ones we've looked at previously --

7    A.  It is.

8    Q.  -- because more than one account is referenced in line 2?

9    A.  Right.  So -- and part of the reason is, there would be so

10   many accounts, it's for ease of reference here.

11   Q.  Can you move on to line 3, and tell us what you saw there?

12   A.  Sure.

13        So line 3 resolves to a user email address Gary Wang

14   Trading.  I understand that the company collected a number of

15   documents that indicate that that account is in the British

16   Virgin Islands and Ireland and is not a U.S. account.

17   Q.  That's based on the user table country field and the GeoIP

18   indicated?

19   A.  It is.  And also on documents that I understand the company

20   collected in the course of evaluating that account, 427289.

21   Q.  The last line of that color is line 4.

22        Can you tell us what's there?

23   A.  I can.

24        So, there were a number of other accounts that had the

25   alamedaresearch.com email address associated with them.  So, I

OC3KHDR3                          Tilsner - Direct

1   thought it was being fair to assume that those are Alameda

2   accounts.  All of those accounts — and I don't recall the

3   number of them off the top of my head — were non-U.S. accounts,

4   according to the user table and GeoIP.  And that summed to a

5   total of about 67 million dollars in deposits.

6   Q.  Is the detail of some of the work you did on this slide

7   found in Defense Exhibit 6?

8   A.  It is.

9   Q.  As indicated at the top?

10  A.  It is.

11  Q.  And then tell us what happened with line 5, which is a

12  different color.

13  A.  Line 5 is, again, that HDR business account that we've seen

14  a few times.  Again, an account that's strictly used for back

15  office management, not kind of a bona fide customer trading

16  account that would be trading on the platform.

17  Q.  And how about line 6?  We've got a new color for line 6.

18  A.  Yeah.  So, for line 6, there was a large group of

19  additional accounts that didn't appear necessarily to be

20  Alameda accounts based on the details that I found in the

21  company data, and they were all non-U.S. accounts, according to

22  the user table and GeoIP.

23  Q.  What was the total associated with those?

24  A.  That total is 15 million, 15.8 million.

25  Q.  And then, finally, line 7?

OC3KHDR3                          Tilsner - Direct

1   A.  That's the remainder of the accounts, and some of these

2   accounts -- these accounts did have a U.S.-based GeoIP, so that

3   the company concedes that these are U.S.-based deposits,

4   just --

5   Q.  So you're not excluding them?

6   A.  Correct.  Those would not be excluded from the U.S.

7   deposits.

8            MR. INGOGLIA:  If we move to the next slide, slide 12.

9   Q.  Is this a summary of what we just looked at --

10  A.  It is.

11  Q.  -- in graphic and tabular form?

12  A.  That's right.

13  Q.  What is the number that you end up with at the bottom?

14  A.  Just over a million dollars.

15  Q.  And, just to be clear, that number, even though it appears

16  twice on this chart, that's a coincidence, the deposits to the

17  HDR business account line and the deposits to the BitMEX

18  non-Alameda accounts with U.S. GeoIP happen to have the same

19  routed number associated with them, but they are not the same

20  line item?  Is that right?

21  A.  That's correct.

22           MR. INGOGLIA:  Let's move on to slide 13, please.

23  Q.  So, tell us what we're looking at on slide 13.

24           THE COURT:  Just to be clear, so your analysis says

25  that with respect to all of the transfers in to BitMEX from

1    Alameda-associated accounts, the only amount that should be

2    included is 1,011,000?

3              THE WITNESS:  That's right.

4              THE COURT:  And none of that analysis depends upon

5    whether the Alameda entity was Alameda located in Bermuda or

6    offshore or anything like that?  It all comes from the separate

7    analysis that you did with respect to the individual Alameda

8    accounts at BitMEX?

9              THE WITNESS:  Right, right.  So I'm relying on -- to

10   determine whether or not a given account is U.S. or non-U.S.,

11   I'm relying on BitMEX data and on Mr. Lindsay's declaration,

12   which also includes BitMEX data.

13   BY MR. INGOGLIA:

14   Q.  And do you know, do you remember, whether that data

15   distinguished between different Alameda entities?

16   A.  It did -- well, actually, I can't say that it distinguished

17   between different Alameda.  There's multiple accounts.

18             THE COURT:  I'm not sure I understand that answer.

19             THE WITNESS:  I guess I'd say I didn't do an analysis

20   that distinguished -- that sought to look at multiple legal

21   entities.  I wouldn't even know.  All I looked at was an

22   account that had an account number, and I made a determination

23   as to whether or not that account was U.S. or non-U.S., based

24   on the data available to me.

25             THE COURT:  Okay.

OC3KHDR3                          Tilsner - Direct

BY MR. INGOGLIA:

Q.  My question was just, to the extent you're relying on the declaration, do you know, one way or the other, whether the basis for Mr. Lindsay's declaration, in part, turned on the name or geography of a particular entity?

A.  Mr. Lindsay's declaration included KYC data at the account level, and I was able to determine the location based on that.

MR. INGOGLIA:  Let's move to slide 13, please.

Q.  So now, what have we here, Mr. Tilsner?

A.  This is a summary of analyses that I performed pertaining to Government Exhibit 74 that was essentially another long list of transactions that I understand the government asserts are deposits from the U.S.  I performed a very similar analysis to the previous ones where I attempted to link those individual transactions to transactions -- to the sort of BitMEX representation of those transactions.  By doing that, was able to understand the account they're associated with within BitMEX's system.

So if I look at rows 1 to 7, that set of accounts, according to Mr. Lindsay's declaration, are KYC'd to non-U.S. locations.  If I look at the next four rows, 8 to 11, according to the -- sort of an earlier iteration of their customer verification, of BitMEX's customer verification process, those also resolve to non-U.S. locations.

And, lastly, on line 12, that account within the data

OC3KHDR3                          Tilsner - Direct

1    I had access to within the company has a location of the

2    British Virgin Islands, and it's -- the location from which

3    users of that account connected to the platform is listed as

4    Ireland, so also non-U.S.

5    Q.   There's no entity name associated with line 5 and 7.

6             Why is that?

7    A.   That is because the government asserted those are Hudson

8    River Trading -- Hudson River accounts, but the data that I

9    looked at did not indicate that those were Hudson accounts.

10   Q.   Then I notice that at the top, it says there are 22 BitMEX

11   accounts that received deposits.  Adding up the number of

12   accounts on slide 13, under the BitMEX accounts, we don't get

13   to 22.

14            Is that because the balance were on the next slide?

15   A.   No.  I think their account -- I'd have to go back to the

16   underlying data to remember.  I think there were certain data

17   contained in GX 74 that had already been looked at in previous

18   data, particularly with Coinbase and Gemini, so we didn't

19   analyze that data.  That explains the 22.

20            MR. INGOGLIA:  Let's look at slide 14.

21   Q.   I notice that if I am just adding account numbers, if I add

22   1, 2, 3, 4, 5, 6, 7 from this page — there are 15 on the other

23   page — is this the other 7 for the 22?

24   A.   Yes.

25   Q.   What does this slide depict?

1   A.  This is a summary of accounts contained in GX 74 that the

2   company does not contest they were non-U.S.

3   Q.  And that total is about 75 million?

4   A.  Correct.

5            MR. INGOGLIA:  Let's go to slide 15, please.

6   Q.  Is this slide a summary of the prior two?

7   A.  It is.

8   Q.  And is the 75 million I just asked you about reflected on

9   the last line of this --

10  A.  It is.

11  Q.  -- chart?

12           So, according to this, of the 766 million on the top

13  line that the government contended were deposits attributed to

14  U.S. entities, you concluded, in the bottom line, that

15  75 million were attributable to U.S. entities where the company

16  wasn't contesting that they were for purposes of this hearing?

17  A.  Yes.

18           THE COURT:  Keep your voice up, please.

19           THE WITNESS:  Yes, that's correct.

20           THE COURT:  Fine.

21           The questioner, not --

22           THE WITNESS:  I'll keep mine up, too.

23           THE COURT:  Go ahead.

24           MR. INGOGLIA:  Just one second.

25

OC3KHDR3                          Tilsner - Direct

1   BY MR. INGOGLIA:

2   Q.  Mr. Tilsner, one of the exclusions on slide 15 totals about

3   313 million.

4           Do you see that one?

5   A.  I do.

6   Q.  Those are deposits reflected in Defense Exhibit 1 through

7   Defense Exhibit 6?

8   A.  Yes.

9   Q.  Has that amount been backed out of the government's total,

10  and so the government's total won't show 766, but, rather, 766

11  minus the 313?

12  A.  Yes.  That data was contained in -- the data pertaining to

13  that 313 million was in data we'd already received and,

14  therefore, had analyzed in the subsequent slides.

15  Q.  Understood.

16          MR. INGOGLIA:  If we can go to slide 16, please.

17          THE WITNESS:  Sorry, the previous slides.

18  BY MR. INGOGLIA:

19  Q.  So now we're back to where we started, which is our summary

20  slides; is that right?

21  A.  It is.

22  Q.  The sort of final summary of the work you did?

23  A.  Mm-hmm.

24  Q.  Can you just walk us through where you landed?

25  A.  So, if you see at the far right, that is my analysis of the

1    deposits attributable to U.S. customers.  And the total of

2    those deposits is 831 million, seen at the far bottom right.

3    Q.  Got it.

4            On the pie chart, where is that 831 -- where does that

5    show up on the pie chart?

6    A.  It is in the -- the kind of the non-green portion, the very

7    small sliver, broken down among a bunch of different

8    categories.

9            MR. INGOGLIA:  If we go to the last slide, slide 17.

10   Q.  Is this the same pie chart, but with the percentage

11   calculated at the bottom?

12   A.  It is.  So, the same pie chart.  The total -- the total

13   that I determined to be a U.S. source is 831 million.  The

14   total overall is 18.64 billion.  831 million is 4.4 percent of

15   that number.

16           MR. INGOGLIA:  The defense offers Defense Exhibit 7,

17   and then the underlying exhibits that Mr. Tilsner relied on,

18   which are 1 through 6 and 8 and 9, and then 9 and 107, which

19   are the declarations he referred to.

20           MR. REHN:  No objection.

21           THE COURT:  Defense Exhibits 1 through 8 and 9 and 107

22   received in evidence.

23           (Defendant's Exhibits 1 through 9 and 107 received in

24   evidence)

25           MR. INGOGLIA:  We, like the government, have a

OC3KHDR3                    Tilsner - Cross

1   collection of other exhibits, which I guess we'll offer now,

2   which would mean, in all, Exhibits 1 through 109.

3             MR. REHN:  No objection.

4             THE COURT:  Defense Exhibits 1 through 109 received in

5   evidence.

6             (Defendant's Exhibits 1 through 109 received in

7   evidence)

8             MR. INGOGLIA:  No further questions from the defense.

9             THE COURT:  Okay.  Thank you.

10            Mr. Rehn, you may examine.

11            MR. REHN:  Thank you, your Honor.

12  CROSS-EXAMINATION

13  BY MR. REHN:

14  Q.  Good morning, Mr. Tilsner.

15  A.  Good morning.

16            MR. REHN:  If we could pull up Defense Exhibit 7,

17  which is the slide show we've been looking at.

18            And if we could go to slide 2 of Defense Exhibit 7.

19  Q.  So, Mr. Tilsner, these are the materials that you reviewed

20  in preparation for your testimony today?

21  A.  They are.

22  Q.  So, looking at this, am I correct to understand that you

23  did not interview anyone at BitMEX?

24  A.  I did not.

25  Q.  And you did not interview anyone at any of the trading

OC3KHDR3                    Tilsner - Cross

1    firms that the government has identified as U.S.-based?

2    A.  I did not.

3    Q.  Basically, you took some exhibits that were provided to you

4    by BitMEX's attorneys, correct?

5    A.  And data that I was given access to by people at the

6    company.  I guess I should point out, I did have some

7    interactions with IT personal at the company to help us get

8    access and to orient us as to where we could find the data that

9    we were analyzing.

10   Q.  But you didn't interview anybody with knowledge of the

11   underlying facts regarding BitMEX's relationship with these

12   customers; is that right?

13   A.  I did not.

14   Q.  Jumping ahead to slide 17, your bottom line is that

15   4.4 percent of all deposits into BitMEX during the charged time

16   period are attributable to U.S. users, correct?

17   A.  That's what my analysis indicates, yes.

18   Q.  And that is calculated by taking the sum of apparent U.S.

19   sources and dividing that by the total number of deposits,

20   correct?

21   A.  Correct.

22   Q.  And at least that basic method for doing this calculation

23   is consistent with the method that the government used in the

24   exhibits you reviewed; is that right?

25   A.  Yes.

OC3KHDR3                    Tilsner - Cross

1    Q.  And you just calculated different numbers -- quite

2    different numbers for the numerator, the number above the line,

3    and then a slightly different number for the denominator, the

4    number before the line; is that right?

5    A.  Right.

6    Q.  So I'm just going to go into some of the assumptions you

7    made in making those calculations.

8              MR. REHN:  If we could go to slide 3.

9    Q.  To situate us, this is the slide that's talking about the

10   Coinbase subpoena returns; is that right?

11   A.  That's right.

12   Q.  And you noted that on the Coinbase subpoena returns, there

13   were $875 million worth of deposits; is that right?

14   A.  That's right.

15   Q.  And then the first line underneath that says that, of that,

16   around 199 million are not included in the Coinbase KYC data?

17   A.  That's correct.

18             MR. REHN:  Now, if we could just jump ahead to

19   slide 16.

20   Q.  Do you see the government amount for this, which is the top

21   line here, is 676 million?  Do you see that?

22   A.  I do.

23   Q.  So, in other words, the government number already took out

24   that 199 million; is that right?

25   A.  That's right.

OC3KHDR3                    Tilsner - Cross

1   Q.  So, in terms of evaluating the dispute between the parties,

2   that line is irrelevant, we just cross that out, fair to say?

3   A.  Sorry, I'm not sure I understand the question.

4   Q.  Both parties agree that 199 million is not relevant to the

5   analysis?

6   A.  Yes.

7   Q.  And so the government's analysis attributed 676 million to

8   U.S. sources here, and your analysis attributed around

9   505 million to U.S. sources; is that right?

10  A.  That's right.

11              (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

OC3JHDR4                        Tilsner - Cross

1    Q   So for this category, the difference is about 170 million?

2    A   Yep.

3    Q   So let's go back to slide three.

4            THE COURT:  Hold on a second.  Is that right?  Does

5    your chart include the entire period September 2015 to

6    September 2020?

7            MR. REHN:  Your Honor, we're just looking at the first

8    line, September 2015 to July 2020.  These are the transactions

9    that are actually in the subpoena returns.  I will cover the

10   next line, which is the extrapolation we did through

11   September 2020.

12           THE COURT:  I just want to make sure that

13   Mr. Tilsner --

14           THE WITNESS:  He's talking about the difference

15   between the 676 and the 505 in that first row.

16           THE COURT:  Right.  Okay.

17           THE WITNESS:  Is that --

18   Q   Yes.  What I'm asking you to just confirm is that for

19   purposes of this first piece of the data, the difference

20   between the two parties is around 170 million, a little more

21   than 170 million?

22   A   That's correct.

23   Q   So if we go to slide three, that 170 million is captured in

24   the two lines that say BitMEX accounts with no trade history

25   and BitMEX accounts that — to quote your term — KYC to

OC3JHDR4                          Tilsner - Cross

1    non-U.S.; is that right?

2    A   That's right.

3    Q   So you took those out of the Coinbase subpoena number to

4    get to your number?

5    A   I did.

6    Q   And the lion's share of that difference comes from the

7    BitMEX accounts that KYC to non-U.S., that's almost all of

8    that; is that right?

9    A   Of the 170, yeah.

10   Q   So even though the second line is really where all the

11   action is, I just want to ask a couple questions about that

12   first one, the BitMEX accounts with no trade history.  So how

13   do you know that these were deposits to BitMEX accounts that

14   happened -- how do you know that these deposits were into

15   BitMEX accounts with no trading history?

16   A   I had access to trading records.  So the -- one of the

17   first things I and my team did was to look at those trading

18   records and kind of, in effect, create a list of accounts that

19   did some trading.  And the accounts that pertained to this line

20   did no trading.

21   Q   So you had access to trading data that the company provided

22   you with?

23   A   I did.

24   Q   And your theory is if we are going to calculate the

25   percentage of BitMEX deposits that are attributable to U.S.

OC3JHDR4                          Tilsner - Cross

1   sources to estimate trading revenue, we should not include

2   deposits for accounts that had no trading history?

3   A   I was asked to do an analysis that in part excluded the --

4   the accounts that did not trade.

5   Q   And so you removed that number from the numerator from the

6   top of the line of the percentage?

7   A   Yes.

8   Q   Did you remove this 1.8 million from the denominator?

9   A   No.

10  Q   So these deposits went into BitMEX addresses and they would

11  be included in the total number of deposits to BitMEX, right?

12  A   Yes.

13  Q   But you have removed them from the numerator and not the

14  denominator?

15  A   Correct.

16  Q   And so that would mean that if you had also removed them

17  from the denominator, the 4.4 percent number you calculated

18  would be actually higher?

19  A   Oh, I'm sorry.  No, I did not remove them from the -- yes,

20  they weren't removed from the denominator of the -- I thought

21  you meant on the -- that single summary line at the top.

22          The 18.6-whatever-million, that's the full amount

23  included in the government in GX-25, I believe.

24  Q   I'm looking at just the BitMEX accounts with no trade

25  history, 1.84 million.

1           THE COURT:  For the benefit of the court reporter I

2    think you're both going to have to go a bit slower.

3    A   Can you flip to the last slide?  Is that okay?

4    Q   Yes.

5    A   The 18.684 billion is simply the full amount taken from the

6    Government Exhibits -- Exhibit 25, I believe.

7    Q   So that's the total of all deposits into BitMEX?

8    A   Right.

9    Q   And I'm sometimes referring to that as the denominator

10   because to get 4.4 percent, would you divide the U.S. sources

11   by that number; is that fair to say?

12   A   Divide, yes.

13   Q   And so the -- and then the colored slice of that circle are

14   the deposits that you have attributed to U.S. sources?

15   A   Uh-huh.  Yes.

16   Q   And to do that, you removed deposits that went into

17   nontrading accounts from the Coinbase data?

18   A   Correct.

19   Q   But you did not remove those deposits from the total?

20   A   No.

21   Q   If you had removed those deposits from the total, the

22   percentage reflected on this screen would be higher, correct?

23   A   That's right.

24   Q   And we agree -- it seems that you're saying that deposits

25   for nontrading accounts shouldn't be included.

OC3JHDR4                        Tilsner - Cross

1    A    I was asked to remove them to do an analysis that excluded

2    accounts that didn't trade.

3    Q    Only from the number above the line?

4    A    Yes, essentially.

5              THE COURT:  Why would you be removing them from the

6    total amount of the accounts if you're trying to get a

7    percentage of the total amount of the accounts that are

8    represented by U.S. based deposits?

9              THE WITNESS:  The goal of the percentage is just to

10   say that the -- of the total inflows that the government

11   asserts writ large across the all those exhibits.

12             THE COURT:  18.684 billion.

13             THE WITNESS:  What we're trying to estimate, what

14   share of those deposits are traded and are U.S. based.

15             THE COURT:  Thank you.

16   BY MR. REHN:

17   Q    Let's go back to slide three.

18             Now, this 1.84 million number reflects deposits from

19   Coinbase accounts that went into BitMEX accounts with no trade

20   history, correct?

21   A    I can't say whether or not they're Coinbase accounts.  They

22   originated with Coinbase.  They could be coming from a Coinbase

23   customer.

24   Q    Deposits from customers of Coinbase who have been KYC'd as

25   U.S. by Coinbase and going into BitMEX.

OC3JHDR4                          Tilsner - Cross

1   A    Yes.

2   Q    That's the universe that's in this --

3   A    Yes.

4   Q    -- this data here?

5         But if we wanted to exclude deposits to nontrading

6   accounts, we would also want to consider all the deposits that

7   went to nontrading accounts to BitMEX?

8   A    I was asked to calculate that as a share of the total

9   number of deposits.

10  Q    So for example, you were not asked to look at the total

11  number of deposits to BitMEX that went into nontrading

12  accounts?

13  A    Sorry.  Can you repeat the question.

14  Q    So this number here reflects deposits that went from

15  Coinbase to BitMEX accounts with no trade history, correct?

16  A    Correct.

17  Q    You were not asked to look at the total number of deposits

18  into BitMEX accounts with no trading history for all BitMEX

19  accounts?

20  A    You're saying because I excluded the 199?

21  Q    No, I'm saying setting aside the Coinbase data, you were

22  never asked to look at all BitMEX accounts that had no trading

23  history?

24  A    No.  You're saying outside of the data that the government

25  provided, no, I didn't do --

OC3JHDR4                    Tilsner - Cross

1    Q    That the company provided.

2    A    I did not do an overall analysis of the company data to

3    identify every account that did not trade.

4    Q    So if there were additional deposits into nontrading BitMEX

5    accounts from non-U.S. sources, those would still be included

6    in your total BitMEX deposits account amount?

7    A    I think -- so I think your question is among the 18684 less

8    8301, is it possible to that are other deposits to BitMEX

9    accounts that never traded?  Yeah, that's entirely possible.

10   That's not something I analyzed.

11   Q    So the company asked you to remove Coinbase data from the

12   numerator of your percentage?

13   A    Yes.

14   Q    But the company did not ask you to remove all similar data

15   from the denominator in your percentage?

16   A    No.

17   Q    So in other words, they gave you data that could be used to

18   lower the percentage, but they didn't give you data that would

19   be used to increase the percentage?

20   A    I apologize.  They gave me data that they asked me to

21   remove accounts from GX-11 that had no trade history and the

22   other government exhibits.  They did not ask me to do what

23   you're describing, which I think is removing from the 18.684

24   all accounts that never traded.  I was not asked to do that,

25   no.

OC3JHDR4                        Tilsner - Cross

1   Q   In other words, the data they gave you could only be used

2   to lower the percentage, and they didn't give you similar data

3   that might have been used to increase the percentage?

4                   MR. INGOGLIA:   Objection.

5                   THE COURT:   Sustained.

6                   Is there any dispute as to the total of

7   $18.472 billion in total deposits?

8                   MR. REHN:   Your Honor, the company is suggesting

9   through the slide that we should remove deposits to accounts

10  with no trading --

11                  THE COURT:   I know exactly what the suggestion is, but

12  my question is is there any dispute that the total of

13  $18.472 billion in total deposits is somehow wrong or

14  overstated?

15                  MR. REHN:   I don't believe there's any question that

16  it's not overstated.   The company has never suggested that.

17  What my line of questioning is intended to suggest is that it

18  may be substantially understated because the company has

19  removed nontrading sources from the top line but not from the

20  total.

21                  THE COURT:   So the question is is there any dispute

22  that that was the total amount of the deposits?

23                  MR. REHN:   I don't believe there is, your Honor.   But

24  there is a -- the company has never produced to the government

25  data to show the total number of deposits that went into

OC3JHDR4                          Tilsner - Cross

1    nontrading accounts.

2              THE COURT:  Okay.

3              MR. REHN:  And if they did so, what my understanding

4    is from this line of questioning is that would increase the

5    percentage attributable to U.S. users relative to what's been

6    calculated here.

7              THE COURT:  Go ahead.

8    BY MR. REHN:

9    Q    So going back to slide three, let's focus on the second

10   source of the difference between the government's number and

11   the number you calculated.

12             So what you list here is BitMEX accounts that KYC'd to

13   non-U.S.; is that right?

14   A    Correct.

15   Q    Can you explain what you mean by "KYC'd to non-U.S."?

16   A    What I mean is that as an exhibit to Mr. Lindsay's

17   declaration, he provided a list of accounts and the -- their

18   location per BitMEX's KYC process, and it indicated that the

19   accounts that I analyzed there as a part of the 168.6 million

20   were not U.S. accounts.

21   Q    And so you're relying for this number on BitMEX's KYC

22   information for these users; is that right?

23   A    That's right.

24   Q    And just to be clear, all of these are deposits from

25   accounts that Coinbase KYC'd as U.S. users?

OC3JHDR4                        Tilsner - Cross

1   A    That's my understanding.

2   Q    So this number, 168, represents deposits from users that

3   were identified by Coinbase using its KYC procedures as U.S.?

4   A    Correct.

5   Q    But BitMEX, using whatever procedures it was using,

6   identified as non-U.S.?

7   A    Correct.

8   Q    Are you aware that BitMEX entered a guilty plea to not

9   having a compliant KYC program from 2013 to 2020?

10  A    I'm not.

11  Q    Are you aware that BitMEX advertised during that time

12  period that customers could sign up with no personal

13  information?

14  A    I'm not.

15  Q    But for your analysis you decided to accept whatever

16  procedures BitMEX had in place to identify its customers

17  instead of the Coinbase procedures that had identified these as

18  U.S. persons?

19  A    I was asked to do an analysis of company data, and that's

20  what I did.

21  Q    Are you aware that Coinbase is a registered United States

22  cryptocurrency exchange purporting to have KYC procedures that

23  comply with U.S. law?

24  A    I'm not.

25  Q    If the Coinbase procedures are more reliable than the

OC3JHDR4                         Tilsner - Cross

1    BitMEX procedures, then it would be appropriate to include

2    these deposits as being attributable to U.S. users, correct?

3    A    I have no view on that.

4    Q    Well, your removal of them is based only on BitMEX's

5    procedures?

6    A    I performed analysis of company data to establish the

7    location.

8    Q    Let's take a look at those BitMEX procedures.  Can we pull

9    up the declaration of Allen Scott Lindsay and go to paragraph 5

10   on page 2.  If could you just -- this is the wrong one.  The

11   original declaration, there's two declarations.

12           So according to this declaration, when did BitMEX

13   institute its "comprehensive KYC"?

14   A    The end of December 2020.

15   Q    And so that's after the charged time period; is that right?

16   A    It is.

17   Q    So to the extent that the data you're relying on came from

18   this -- the KYC procedures described here, it wouldn't apply to

19   the status of these customers prior to December 2020; is that

20   fair to say?

21   A    I don't have an opinion as to whether or not it would

22   apply.  I mean, that would be, I would think, a call that --

23   that company compliance personnel would make.

24   Q    Okay.  Let's go to paragraph 10.  So according to

25   paragraph 10, the exhibit B to this declaration is a copy of

OC3JHDR4                          Tilsner - Cross

 1   accounts pulled from company data showings KYC status.  Do you

 2   see that?

 3   A    Yes.

 4   Q    Was this the list of accounts that you used to remove

 5   certain accounts from Coinbase data in your analysis?

 6   A    It's one of them, yeah.  Yes.

 7   Q    So these would be the people who were KYC'd as U.S. persons

 8   by Coinbase or Gemini but who BitMEX says that KYC'd as

 9   non-U.S. people?

10            MR. INGOGLIA:  Objection.

11   Q    That's what the list in Exhibit B is, correct?

12   A    The list in Exhibit B is the list of accounts and the

13   KYC -- and their location resulting from this KYC procedure.

14   Q    And because BitMEX identified the accounts in this Exhibit

15   B as non-U.S., you removed those from the analysis in your

16   Defense Exhibit 7, correct?

17   A    I did correct.

18   Q    All right.  Could you please pull up Exhibit B to the

19   Lindsay declaration.  Can you go to page 99.

20            So I just want to -- this is a 300-page exhibit.

21   We're not going to go through every line.  But let's focus on

22   the first line of page 99 as an example.  So you see here the

23   first line on page 99 is for account number 971987?

24   A    Yes.

25   Q    And this is an account for the email address

OC3JHDR4                          Tilsner - Cross

1    perry.fitz@coloradocollege.edu, correct?

2    A    That's what it looks like.

3    Q    This says that BitMEX KYC'd this account as being in

4    Belgium, correct?

5    A    That's what it says.

6    Q    Do you happen to know where Colorado College is?

7    A    I'm going to assert that's in Colorado.

8    Q    So what was the date of BitMEX's KYC for this account?

9    A    Looks like November 25, 2020.

10   Q    So BitMEX conducted its KYC on this account in November of

11   2020?

12   A    Correct.

13   Q    And that was after the charged time period in this case,

14   correct?

15   A    Correct.

16   Q    And the Coinbase subpoena returns include deposits from

17   September 2015 through July 2020?

18   A    That's right.

19   Q    And in that Coinbase data, this would be an example of a

20   user who was KYC'd as being in the U.S., correct?

21   A    That's what seems to be implied by the data, yes.

22   Q    So even if BitMEX's KYC process were accurate, that would

23   not tell us whether this particular user was in the U.S. when

24   he used Coinbase to fund his account prior to July 2020,

25   correct?

OC3JHDR4                          Tilsner - Cross

1    A    That would be a call that someone at the company would have

2    to make.

3    Q    Well, in other words, it's possible to reconcile the

4    Coinbase data with the BitMEX data if this person moved from

5    the U.S. to Belgium at some point between July and

6    November 2020?

7    A    I don't know whether or not Coinbase compliance personnel

8    consider the KYC information mere to apply retroactively.  This

9    wasn't part of my analysis.

10   Q    Well, all of the data that you used from this Exhibit B

11   involves KYC procedures done by BitMEX after the time period of

12   the Coinbase and Gemini subpoena returns; isn't that right?

13   A    That's right.

14   Q    And so the information we have about where these users were

15   located when they were actually funding their BitMEX accounts

16   would be the information from Coinbase and Gemini, right?

17   A    I don't know.

18   Q    Well, I think you said earlier that these were accounts

19   that were KYC'd as U.S. persons by Coinbase and Gemini,

20   correct?

21   A    Yes.  According to the government data, yes.

22   Q    And all the BitMEX data you've used to take these people

23   out of the analysis comes from months or even years after the

24   fact; is that right?

25   A    That's when that -- yes.

OC3JHDR4                        Tilsner - Cross

1    Q   Could we go back to slide three of Defense Exhibit 7.

2         So that line of BitMEX accounts that KYC'd to

3    non-U.S., the 186 million that you took out of the analysis --

4    A   Yes.

5    Q   Again, these are all users who were contemporaneously with

6    the deposits KYC'd by Coinbase and Gemini as being in the U.S.,

7    correct?  Or in this case Coinbase?

8    A   That's what the Coinbase data would indicate.

9    Q   What you did is you looked at a sum BitMEX process that

10   took place months later to decide that they weren't in the U.S.

11   at that point in time?

12   A   Yes, the process took place later.  I can't tell you what

13   period that data applies to.  That would have to be someone in

14   the company would have to answer that question.

15   Q   But we know the date that the company conducted what was

16   called a KYC process?

17   A   Yes.

18   Q   All right.  Let's go to slide four.  So I don't think we

19   need to make all the same points for slide four.  Is it fair to

20   say you took the same categories out of slide four that you

21   took out of the Coinbase data?

22   A   It is.

23   Q   And so again, that first line, deposits missing from Gemini

24   KYC data, that's a number that both parties agree shouldn't be

25   included?

1   A   That's my understanding.

2   Q   So we can cross that one out.

3            And then for the BitMEX accounts with no trade

4   history, it was the same analysis you did for Coinbase,

5   correct?

6   A   Correct.

7   Q   And for the BitMEX accounts that KYC'd to non-U.S. that was

8   the same analysis you did for Coinbase, correct?

9   A   That's correct.

10  Q   So again, this was all based on BitMEX data that was

11  compiled in some manner months or even years after these

12  deposits were actually made, correct?

13  A   Yes.

14  Q   Okay.  Could we go to slide 16.  So we've looked at

15  lines one and three and examined the difference between the

16  government's number and the number that you've proposed.  I

17  want to focus on lines two and four, the lines titled

18  "extrapolated transfers."

19  A   Yes.

20  Q   So basically, what you have done here is just taken the

21  government's numbers and zeroed them out, correct?

22  A   That's correct.

23  Q   Now, you reviewed the Coinbase subpoena returns, right?

24  A   I did.

25  Q   And you saw that the Coinbase subpoena returns only

OC3JHDR4                          Tilsner - Cross

1    produced data through July 2020?

2    A   That's right.

3    Q   And so there are two months missing from those subpoena

4    returns to get us to the end of the charged time period,

5    correct?

6    A   Correct.

7    Q   And in your review -- did you review the Gemini subpoena

8    returns?

9    A   I did.

10   Q   And in your review of the Gemini subpoena returns, you saw

11   that the Gemini data runs through March of 2020, correct?

12   A   Correct.

13   Q   So there are six months missing there to get to the end of

14   the charged time period, correct?

15   A   That's correct.

16   Q   Do you have any reason to believe that Coinbase users would

17   have abruptly stopped making deposits into BitMEX accounts in

18   July 2020?

19   A   No.

20   Q   Do you have any reason to believe that Gemini users would

21   have abruptly stopped making deposits into BitMEX accounts in

22   March 2020?

23   A   I don't.

24   Q   Is your analysis in getting to zero here based on any

25   actual analysis of what was happening with the deposits from

OC3JHDR4                          Tilsner - Cross

1    these U.S. exchanges?

2    A    Sorry.  Can you elaborate -- actual analysis of what was

3    happening?

4    Q    Did you do anything besides just zero out and assume a zero

5    number for these missing months?

6    A    I established that I couldn't -- I had not transactional --

7    these numbers are not based on any -- as I understand it, based

8    on any actual transactional data.  It's just sort of a math

9    trick.  So I -- there's no transactional data for me to tie to

10   BitMEX systems.  Therefore, I couldn't perform the same

11   analysis related to KYC and customer location.

12   Q    If the deposits from these exchanges continued at a level

13   consistent with the prior activity, then the government's

14   numbers would be more accurate than just entering zero here,

15   correct?

16   A    A number above zero would make sense.  I have no insight

17   into the extrapolation methodology that is employed here.  That

18   type of an estimate can -- in my experience, can cover a broad

19   range of values.

20   Q    If the deposits from these exchanges continued consistent

21   with their prior activity, then the number zero here would be

22   wrong, right?

23   A    Yes.

24   Q    And the result of increasing that number would be to

25   increase the percentage that you've calculated on slide 17,

1    correct?

2    A    Sorry.  Just to clarify, if you're saying that the

3    appropriate extrapolation methodology would simply be one

4    that's proportional over time, with that agreed, then yes,

5    you're right.  I have no -- I put no work into attempting to

6    extrapolate what -- how many additional deposits would have

7    been made in that time period that was not actually covered by

8    the data.

9    Q    Right.  You just entered zero?

10   A    Because I had no transactional data to compare to BitMEX

11   systems.

12   Q    You agree that if deposits were consistent with the prior

13   activity, then zero would be incorrect?

14           MR. ESSEKS:  Objection.  Asked and answered.

15           THE COURT:  Overruled.

16   A    Consistent -- if your definition of consistent is some

17   dollar volume of deposits happens proportionally over time and

18   that would be the way to estimate that, then sort of

19   circularly, my answer would be yes.

20   Q    And the result of that would be to increase the percentage

21   calculated on slide 17?

22   A    That's correct.

23   Q    Let's go to slide five of Defense Exhibit 7.  So this lists

24   the transfers to BitMEX from Cumberland that were identified by

25   the government.  And then you've proposed reducing those

OC3JHDR4                        Tilsner - Cross

1    numbers by certain categories, correct?

2    A    Correct.

3    Q    And so I think first off, just to clarify one point on

4    line 3, this reflects transfers that were made into a HDR

5    business account?

6    A    That's right.

7    Q    And is it your understanding that account was not used for

8    trading activity?

9    A    It is.

10   Q    So that was just some HDR business transaction with

11   Cumberland is what that 50 million represents?

12   A    That's what I would assume based on Mr. Lindsay's

13   declaration, yes.

14   Q    And so deposits going into an HDR business account should

15   not be included in the analysis if we were trying to identify

16   trading deposits?

17   A    Trading -- sorry, trading -- I mean --

18   Q    You said we should take the 50 million out; is that right?

19   A    I did.

20   Q    And that's because that's not for trading purposes?

21   A    That's right.

22   Q    And what you're saying is deposits going into nontrading

23   accounts should not be included?

24   A    I'm saying that the deposits associated with this account

25   simply weren't trading accounts, weren't deposits used for

OC3JHDR4                          Tilsner - Cross

1   trading.

2   Q   These are business accounts?

3   A   Correct.

4   Q   So if we go back to slide 17, I see there's an asterisk by

5   the number by the total.  Do you see that?

6   A   I do.

7   Q   Could you actually expand the text accompanying the

8   asterisk at the bottom of the page.

9           So for the total amount, you left in those deposits to

10  business accounts right?

11  A   Yes.

12  Q   And you didn't -- even though you took them out of the top

13  line, you left them in the bottom line, correct?

14  A   Yes.

15  Q   And if you were to take out business deposits from the

16  total, that would have the effect of increasing the percentage,

17  correct?

18  A   It would.

19  Q   But you chose to leave those deposits in?

20  A   I was asked to remove them as a part of this analysis.

21  Q   To remove them from the top line?

22  A   Yes.

23  Q   But to keep them in the bottom line?

24  A   The bottom line is the -- all deposits.

25  Q   All right.  Can we go back to slide five.

1          So getting rid of that 50 million, we're left with

2     around -- so the bottom number is the total of everything in

3     that column, correct?

4     A    Correct.

5     Q    And so if we get rid of the 50 million, we get around

6     173 million?

7     A    Correct.

8     Q    And that was the number the government identified as

9     Cumberland deposits, correct?

10    A    Correct.

11    Q    And you have identified none of that as attributable to

12    U.S. sources?

13    A    Correct.

14    Q    And out of that 173 million, 168 million or almost all of

15    that, you've tied to this Cayman Islands account on the first

16    line, correct?

17    A    I have.

18    Q    Do you have any knowledge of where the trading for

19    Cumberland was being conducted during the relevant time period?

20    A    Only based on the information from BitMEX.

21    Q    And what you looked at in terms of the information from

22    BitMEX was the corporate onboarding documents for this company;

23    is that right?

24    A    Yes.

25    Q    So when BitMEX onboarded this account, it onboarded it as a

OC3JHDR4                        Tilsner - Cross

```
 1   Cayman Islands entity; is that right?
 2   A   I can't recall the specific document for this particular
 3   one, but that's what this would indicate.
 4   Q   But do you have any knowledge of where their actual trading
 5   floors were located?
 6   A   No.
 7   Q   You have any knowledge of where the headquarters of
 8   Cumberland are located?
 9   A   Personal knowledge, I don't.
10   Q   Can we bring up Government Exhibit 93.
11            Could I ask you to read the first two lines of this
12   press release.
13   A   The Securities and Exchange Commission today charged
14   Chicago-based Cumberland DRW LLC with operating as an
15   unregistered dealer in more than $2 million of crypto assets
16   offered and sold as securities.
17   Q   Where did the SEC allege Cumberland was based?
18   A   Chicago.
19   Q   Do you know who Arthur Hayes is?
20   A   Yes.
21   Q   Who is he?
22   A   He's one of the founders of BitMEX.
23   Q   Can we pull up Government Exhibit 1.
24            Do you see that this is an email that Arthur Hayes
25   sent to Samuel Reed and Ben Delo, and that Ben Delo then
```

OC3JHDR4                          Tilsner - Cross

1   forwarded to somebody else?

2   A    Yes.

3   Q    Could we go to page 2 and expand the paragraph under the

4   word "Cumberland."

5            Can I just ask you to read the sentence beginning

6   "they have."

7   A    They have a trader in Chicago and New York and London.

8   Q    Do you have any reason to think Mr. Hayes was mistaken in

9   that description of Cumberland's operations?

10  A    I don't.

11  Q    You can bring that down.

12           Did that email mention any operations in the Cayman

13  Islands?

14  A    I didn't read the whole email.

15  Q    If you could bring it back up and expand that same

16  paragraph again.

17  A    This particular paragraph doesn't mention anything about

18  the Caymans.

19  Q    So aside from the BitMEX onboarding documents that list

20  this as a Cayman Islands entity, do you have any information

21  that suggests that Cumberland had any operations in the Cayman

22  Islands?

23  A    I don't.

24  Q    We don't have to walk through this for every entity on

25  here, but whenever we see the information in your presentation

OC3JHDR4                         Tilsner - Cross

1   that a particular firm was "KYC'd to a non-U.S. country,"

2   you're relying on those onboarding documents; is that right?

3   A   Onboarding documents and data in the company's systems.

4   Q   But the data relates to how the company was identified

5   inside of BitMEX's systems?

6   A   Correct.

7   Q   In other words, there's nothing in there about where the

8   actual operations were?

9   A   I'll put it like this, it lists a country.  It doesn't

10  distinguish operations, legal, domicile.  Wasn't part of the

11  analysis I performed.

12  Q   You didn't perform any information about where these

13  trading firms were actually headquartered?

14  A   I did not research.  I relied on BitMEX information.

15  Q   And you didn't conduct any analysis of where these crypto

16  trading firms were actually conducting their trading?

17  A   I did not.

18  Q   Could we pull up Defense Exhibit 7 again and go to slide

19  13.

20          And so this lists a number of other entities that

21  you've removed from the total of U.S. sources based on similar

22  BitMEX onboarding documents; is that right?

23  A   That's correct.

24  Q   And so the first three there are Akuna, something called

25  Access Limited or CMT, and then something called TS

OC3JHDR4                        Tilsner - Cross

1    International, but all the email addresses are Jump Trading; is

2    that right?

3    A    Correct.

4    Q    Could we go to Government Exhibit 76, please.  And we could

5    go to page 4.  And if you could expand the message from Greg in

6    the middle, it's like the fourth message down.

7            Could I ask you to read this message from Greg.

8    A    Sure, add me in.  I'll stick it on mute if anything.  So

9    Amy and I are going to hit Chicago next Monday/Tuesday and try

10   to meet some clients there.  So far we got DRW, Jump, TT, CMT

11   Digital, Nomad, Akuna Capital, Hehmeyer Trading.  Anyone else

12   you can think of that I may be missing?

13   Q    DRW, we looked at that press release earlier.  That's

14   Cumberland; is that right?

15   A    Yes.

16   Q    And Jump was one of the companies you excluded from your

17   analysis we just looked at; is that right?

18   A    They didn't appear as such in the data, but I agree that

19   Jump is part of the email address, yes.

20   Q    And then CMT was another one of those that you excluded?

21   A    It was part of the name of one of the companies I analyzed.

22   Q    And Akuna Capital was another one you excluded?

23   A    That's right.

24   Q    Do you have any reason to doubt the description from Greg

25   here that these were clients in Chicago?

1    A    I have no idea what he was doing in Chicago or why they

2    were there.  I'm sorry.  I just can't answer that question.

3    Q    If we can go to Defense Exhibit 7 and go to slide 16.

4            So the bottom line here is that you've taken all of

5    these crypto trading firms, and if we look at the bottom half

6    of this chart, either zeroed them out or included a number

7    that's substantially lower than the number the government

8    identified; is that right?

9    A    Yes.

10   Q    So if the Court were to determine that these companies

11   should be attributed to the U.S., that would increase all of

12   these zeros and small numbers; is that right?

13   A    Yes.

14   Q    And the result of that would be that the percentage you

15   calculated in slide 17 would increase substantially, as well,

16   correct?

17   A    That's right.

18            MR. REHN:  Nothing further.

19            MR. INGOGLIA:  Can we see slide three please.

20   REDIRECT EXAMINATION

21   BY MR. INGOGLIA:

22   Q    Mr. Tilsner, Mr. Rehn asked you a lot of questions about

23   slide three.  Do you recall that?

24   A    Yes.

25   Q    These were questions about Coinbase users making deposits

1    into a BitMEX account.  Do you recall those questions?

2    A   Yes.

3    Q   Do you know, could a person or entity with a Coinbase

4    account deposit onto BitMEX into an account associated with a

5    different person or entity, say -- that's all.

6    A   Meaning if I were a Coinbase customer, could I take my

7    money or crypto off of Coinbase and deposit it into somebody

8    else's account on BitMEX?

9    Q   Yes.

10   A   I would presume that's possible, yes.

11   Q   So for example, could a person from New York have a

12   Coinbase account and transfer those funds, say, to his

13   Mumbai-based brother-in-law on BitMEX?

14   A   Yes.

15           MR. INGOGLIA:  No further questions.

16           MR. REHN:  Nothing further, your Honor.

17           THE COURT:  All right.  Mr. Tilsner, you're excused.

18   You may step down.

19           (Witness excused)

20           THE COURT:  All right.  So parties have indicated that

21   they wanted to make supplemental submissions, right?

22           MS. GREENWOOD:  Yes, your Honor.

23           THE COURT:  Could I ask a question.  Assuming that the

24   government's estimate of 11.6 is correct, what would the gain

25   be?  And assuming that the defendant's calculation of

1    4.4 percent would be correct, what would the gain be?

2              MS. GREENWOOD:  Your Honor, it would be in the range

3    of about $150 million would be the gain under the government's

4    calculation and approximately $50 million under the defense

5    calculation.

6              THE COURT:  Okay.

7              MR. ESSEKS:  Judge, could I -- if I could just add to

8    that, prosecutor has done the math on 4.4 percent.  But just to

9    be clear, our position is that 4.4 percent of the deposits

10   being U.S. sourced does not map to 4.4 percent of revenue.  And

11   so our position to be expanded upon in our post-hearing

12   submission will be that the government has not established a

13   basis for gain beyond the $30 million agreed to by the

14   individual defendants.  Just to be clear, our view is just

15   that.

16             THE COURT:  Okay.  All right.  What do the parties

17   want to submit now?

18             MS. GREENWOOD:  So I think we set a briefing schedule

19   last time we were here, your Honor.  So I believe our initial

20   briefs are due in a week, and then there's a short reply

21   schedule, I think, two days later.  And that's the briefing

22   schedule.

23             THE COURT:  Okay.  Which would bring us to about the

24   third week in December or so.  I'll review all of the

25   submissions and set a sentencing date for January.  Did I set a

1   sentencing date?

2          MS. GREENWOOD:  You did, your Honor.  Obviously we

3   defer to the Court if the Court would like more time to review

4   the submissions.  But we did set a date last time we were here

5   of the 17th.

6          THE COURT:  What was the date?

7          MR. ESSEKS:  I think it's the 18th.

8          MS. GREENWOOD:  The 18th at 2:30 p.m., your Honor, is

9   the sentencing date.

10          THE COURT:  January 18?

11          MS. GREENWOOD:  December.  Your Honor wanted a very

12   quick turnaround from this proceeding.  So our briefs would be

13   due, your Honor, next week, the 10th, the opening briefs, the

14   response due on the 12th, and then sentencing the 18th was your

15   Honor's schedule.

16          MR. ESSEKS:  Judge, that is the schedule that the

17   Court set.  We're in the Court's hands about when it wants to

18   do this.

19          THE COURT:  I'll check the calendar, but doesn't make

20   as much sense to me now as when I set it.

21          MS. GREENWOOD:  We all acknowledge your Honor made

22   that schedule without the benefit of the hearing.

23          THE COURT:  Okay.  So December 9 sentence adjourned

24   until December 9 at 10:00 a.m.

25          MS. GREENWOOD:  To clarify your Honor, do you mean

OC3JHDR4                        Tilsner - Redirect

1    January 9 at 10:00 a.m. rather than December 9?

2            THE COURT:  Yes, thank you.  January 9, 2025,

3    10:00 a.m.  I'll check the calendar, but I should be able to

4    clear any conflicts at that point.  Okay.

5            Anything else for me today?

6            MR. ESSEKS:  Your Honor, I'm sorry.  If we can have

7    just a minute to confer about -- in light of the changed

8    sentencing date, we're conferring about orchestrating the

9    briefing, if the Court could indulge us for a moment.

10           THE COURT:  Yes.

11           MR. ESSEKS:  Thank you.

12           THE COURT:  But the purpose of putting over the

13   sentencing date is to give me the opportunity to consider all

14   of your submissions.  If you cut into the time of making the

15   submissions, that's not helpful.

16           MR. ESSEKS:  Understood, Judge.  We may have a

17   proposal.  Bear with us a second.

18           (Counsel conferred)

19           MR. ESSEKS:  Your Honor, we have no alternative

20   schedule to propose.  So our responding brief -- our briefs

21   will be due on the 10th with replies two days later.  And the

22   9th of January should be fine, Judge.  If you'll just give us

23   overnight to check with the client who's based in Hong Kong to

24   confirm that works, but we assume that it does.

25           THE COURT:  Sure.  Thank you all.

OC3JHDR4                        Tilsner - Redirect

1           Is there going to be another delivery to me of all the

2     exhibits which I've entered into evidence?

3           MS. GREENWOOD:  Yes, your Honor.  We can deliver

4     copies to chambers.

5           THE COURT:  I don't think that the exhibit book that

6     you gave me includes all of the exhibits, and I know that the

7     defense didn't give me all of the exhibits.

8           MR. ESSEKS:  We will do that, Judge.

9           MS. GREENWOOD:  The binders that you have have

10    everything that is not in native Excel format.  And so you do

11    have all the Government Exhibits in the binders we provided,

12    save the native Excels, which we provided an electronic copy.

13          THE COURT:  You previously gave me a computer insert.

14    Does that include all of the Excel spreadsheets and everything?

15          MS. GREENWOOD:  Yes, it should, your Honor.  We can

16    update it because I think we've added maybe two exhibits since

17    the last time we provided it to you, so we can update it with

18    those two.  What you have has everything, I think, other than

19    Exhibits 92 and 93.

20          THE COURT:  Okay.  Thank you.

21          (Adjourned)

22

23

24

25

<pre>
1                     INDEX OF EXAMINATION

2    Examination of:                           Page

3    ALEXANDER VASILIADES

4    Direct By Ms. Greenwood . . . . . . . . . . .12

5    Cross By Mr. Esseks  . . . . . . . . . . . . .45

6    JEREMY TILSNER

7    Direct By Mr. Ingoglia . . . . . . . . . . . .65

8    Cross By Mr. Rehn  . . . . . . . . . . . . . .94

9    Redirect By Mr. Ingoglia . . . . . . . . . . 124

10                    GOVERNMENT EXHIBITS

11   Exhibit No.                             Received

12    35    . . . . . . . . . . . . . . . . . . .15

13    92    . . . . . . . . . . . . . . . . . . .45

14    1 through 93   . . . . . . . . . . . . . . .63

15                    DEFENDANT EXHIBITS

16   Exhibit No.                             Received

17    1 through 9 and 107  . . . . . . . . . . . .93

18    1 through 109  . . . . . . . . . . . . . . .94

19

20

21

22

23

24

25
</pre>