UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x

UNITED STATES OF AMERICA                          :

      -v.-                                                              :       24 Cr. 424 (JGK)

HDR GLOBAL TRADING LIMITED,             :
    a/k/a/ "BitMEX,"
                                                                        :
               Defendant.
                                                                        :
-------------------------------------------------------------x

# THE GOVERNMENT'S RESPONSE TO
# BITMEX'S NEWLY RAISED GAIN ARGUMENT

                                                          EDWARD Y. KIM
                                                          Acting United States Attorney
                                                          Southern District of New York

Jessica Greenwood
Thane Rehn
Assistant United States Attorneys
Southern District of New York
    *- Of Counsel -*

Pursuant to the Court's order dated January 10, 2025, the Government respectfully submits the following response to the argument of HDR Global Trading Limited, a/k/a "BitMEX" (the "Company" or the "defendant"), raised for the first time in its post-*Fatico* reply brief, that the proper metric for measuring gain derived from the offense is U.S.-derived profit rather than revenue. (Dkt. No. 49 at 6). That argument should be rejected for two reasons. First, the plain text of the relevant Guideline states that an organizational defendant's pecuniary gain from the offense should be calculated based on "either additional revenue or cost savings" caused by the offense. U.S.S.G. § 8A1.2 Application Note 3(H). That language indicates that the gross effect of the crime on the defendant's revenue or costs, not the net profits from the offense, is the proper measurement. The cases cited by the defendant are inapposite and interpret different legal provisions. Second, even if the Court should consider net profit rather than revenue, the evidence shows that the best estimate of the Company's profit from the offense is the additional revenue it earned from its United States customers, and there is no evidence that there were any significant marginal costs associated with generating that additional revenue.

### A. U.S.S.G. § 8A1.2 Provides That Gain Is Measured by the Defendant's "Additional Revenue" from the Offense

First, as a matter of law, the defendant's argument is based on a misreading of the Guidelines. The defense notes that the relevant definition is found in U.S.S.G. § 8A1.2, Application Note 3(H), but fails to quote the full language of that note, as the Government did in its own brief. Specifically, the defense omits the Guideline's clarification that gain can "result from either additional revenue or cost savings." (*See* Gov't Post-*Fatico* Br., Dkt. No. 46, at 26). Here, U.S-source revenue is an appropriate measure of pecuniary gain derived by the Company from the offense because it is additional revenue that the Company would not have earned but for its illegal operation in the United States in violation of the Bank Secrecy Act's requirements.

The defendant's brief relies on two cases, but neither of them was interpreting U.S.S.G. § 8A1.2. The defense first cites *United States v. Anchor Foods, Inc.*, No. 18-CR-0522-SJF-SIL, 2020 WL 8167426, at *7 (E.D.N.Y. May 10, 2020), report and recommendation adopted, No. 18-CR-0522-SJF-SIL, 2021 WL 135751 (E.D.N.Y. Jan. 14, 2021), but that case interpreted the term "gain" as used in U.S.S.G. § 2B1.1, which does not include the language about "additional revenue" that is found in U.S.S.G. § 8A1.2. *See* U.S.S.G. § 2B1.1(b).[1]

Next, the defendant cites *United States v. Sanford Ltd.*, 878 F.Supp.2d 137, 150 (D.D.C. 2012), which interpreted the term "gross gain" in 18 U.S.C. § 3571(d) to mean "profits rather than revenues." But again, the court in *Sanford* was *not* interpreting U.S.SG. § 8A1.2, which specifically provides that for Guidelines purposes, the proper metric is "additional revenue." Moreover, even *Sanford* acknowledges that there is a division of authority among the district courts on how to interpret "gross gain" in Section 3571(d). *See* 878 F.Supp.2d at 149. Although the Court does not need to reach this issue in this case, the Government submits that *Sanford*'s interpretation of Section 3571(d) is unpersuasive, because Congress specifically used the term "*gross* gain" rather than a term such as "net gain" or "profit." The ordinary meaning of "gross gain" is the additional revenue obtained as a result of the offense, not the net profit after subtracting costs. The Government has not identified a case in this district specifically discussing the issue, but when courts have referenced this language in 18 U.S.C. § 3571(d), they have generally indicated that it refers to the total "gross proceeds" from the offense, without suggesting that these gross proceeds should be reduced by a defendant's costs. *See, e.g.*, *United States v. Rudaj*, No. 04 CR. 1110

---

[1] Although not relevant here, the Government also notes that *Anchor Foods* seems to have misinterpreted the Second Circuit's decision in *United States v. Byors*, 586 F.3d 222, 226 (2d Cir. 2009), which held that U.S.S.G. § 2B1.1 "do[es] not require a loss to be offset by any legitimate expenditures" made by the defendant. The district court in *Anchor Foods* simply asserted that such offsets are appropriate when the calculation is based on the defendant's gain rather than the victim's loss, without identifying any textual basis in the Guidelines for that conclusion.

2

(DLC), 2006 WL 1876664, at *7 (S.D.N.Y. July 5, 2006) (characterizing Section 3571(d) as permitting a fine of up to "twice the gross profits or proceeds of the [criminal] activity").[2]

### B. The Evidence Supports the Use of U.S. Customer Revenue as the Measure of the Company's Profit from the Offense

As a factual matter, even if the Court were to use profit rather than revenue to measure gain from the offense, there would be no change to the ultimate outcome in this case. The facts established at the *Fatico* hearing—as described in detail in the Government's prior briefing—included that approximately 11.49% of BitMEX's overall deposits during the relevant period derived from U.S. sources, such that U.S.-source revenue totaled approximately $155 million. There are *no facts* in the record to suggest that BitMEX expended *any* funds specifically to obtain these U.S.-source deposits that it would not have otherwise expended in servicing the remaining 88.51% of its user base. If it were appropriate to offset revenues by costs to calculate gain, the burden of demonstrating those costs is on the defendant, just as in the analogous context of calculating loss amounts under Section 2B1.1. *See Anchor Foods*, 2020 WL 8167426 at *5 (explaining that once Government makes initial showing of loss amount, burden is on defendant to introduce evidence to support any offsets from that amount). Here, the defendant has made no attempt to do so. Instead, despite having a full opportunity to rebut the Government's proof as to pecuniary gain at the *Fatico* hearing, the Company now relies solely on a single paragraph of the PSR, in which the Company asserted that in 2020 it derived approximately $127 million in net profits from revenues of approximately $399 million, representing a net profit margin of 32%. (Dkt. No. 49 at 6; *see* PSR ¶ 61).

---

[2] The defendant also cites *United States v. Romano*, 794 F.3d 317, 337 (2d Cir. 2015), but the cited section of that case is simply a background description of the method used by the Government to calculate gain at a *Fatico* hearing in that particular case, which involved U.S.S.G. § 2B1.1. The Second Circuit did not purport to interpret the applicable Guideline in that case, much less the particular Guideline at issue in this case.

The financial information in the PSR indicates that the Company is underreporting how profitable it actually was, as it is sitting on more than $1.6 billion worth of crypto assets that its founders are free to liquidate as profits for themselves at any time. (PSR ¶ 60). But even taking the Company's claimed profit margin as true, the total corporate profit margin is plainly insufficient to suggest that BitMEX's U.S.-source revenue should be reduced by any amount, let alone by that percentage. The relevant question is the additional marginal cost, if any, associated with the additional revenue derived from the offense. Here, the Company has not introduced any records or testimony to show that, if BitMEX *had not* received the U.S.-source revenue identified from the Government, it would have had any incremental decrease in its operating costs or other expenses.

On the contrary, the nature of BitMEX's business strongly suggests that there were minimal if any additional marginal costs associated with servicing U.S. customers. BitMEX was an online cryptocurrency derivatives trading platform, accessible through a website with no KYC and virtually automatic signup. The Company needed to operate the exact same website for its other customers, regardless of whether it had U.S. customers, and the types of expenses incurred by BitMEX would include primarily fixed expenses such as labor, office overhead, and similar costs. There is simply *no information* in the record that would allow the Court to determine what portion of these expenses BitMEX would necessarily have incurred to service its approximately 88.5% of non-U.S. customers, versus *added* expenses to service approximately 11.5% of U.S.-based customers. Indeed, in light of the nature of its business operations and percentage of U.S. customers, the extra cost to service U.S. customers may well have been 0%. If anything, the Company's failure to implement KYC or AML programs or to take effective steps to prevent U.S. customers actually *reduced* its operating costs relative to what they would have been if it had complied with the law. On these facts, there is no basis to simply apply the Company's overall net

profit margin to the additional revenue it illegally obtained from its U.S. customers, as it suggests. Accordingly, *all* of BitMEX's U.S.-source revenue should be treated as additional revenue—or profit—to the Company resulting from the offense. Had BitMEX operated the same business without the U.S. customers, the most reasonable inference from the record is that it would have simply had 88.51% of the revenues that it actually generated, it would have had the same operating costs, and it would have had a slightly lower overall net profit margin.[3]

The lack of proof as to any additional costs incurred by BitMEX to service its 11.49% of U.S. customers distinguishes this case from the *Anchor Foods* case cited by the Company (which, as noted above, is legally inapposite in any event). In *Anchor Foods*, the record at sentencing included proof of specific, per-item costs that created a difference between the defendant's fraudulently obtained revenue and post-expense profit. *See Anchor Foods*, 2020 WL 8167426, at *7 (E.D.N.Y. May 10, 2020) (applying Section 2B1.1 of the Guidelines and reducing defendant's gain by specific costs involved in the sale of illegally mislabeled squid, which necessarily would be incurred for each illegal sale, including the purchase price, transportation costs, repackaging costs, labor, and insurance). In other words, *Anchor Foods* involved evidence of additional marginal costs incurred by the defendant as part of the illegal conduct, which otherwise would not have been expended. Under those circumstances, the court reduced the marginal revenue attributable to the offense by the additional marginal cost. Here, however, there is no evidence in the record to support the notion that BitMEX expended any additional costs in acquiring or

---

[3] Even with this reduction in revenue, BitMEX would still have been a wildly profitable company. Its self-reported net profit margin of 32% in 2020 was more than three times higher than the net profit margin for companies in the S&P 500 that year. *See* Josh Schafer, "Yahoo Finance Chartbook: 7 charts show why the S&P 500 is at a record high," Yahoo! Finance, Feb. 8, 2024, available at https://finance.yahoo.com/news/yahoo-finance-chartbook-7-charts-show-why-the-sp-500-is-at-a-record-high-210020091.html (chart showing that net profit margin for S&P 500 companies was 9.9% in 2020, and has never been higher than 12.6% in the past ten years).

servicing its U.S.-based customers and their resulting revenue that it *would not* have otherwise expended in operating its global user base. Similarly, in *Romano*, 794 F.3d at 337, the Second Circuit did not explain the precise methodology that was used by the district court to calculate profits attributable to the defendant; however, like *Anchor Foods, Romano* also involved the sale of fraudulent goods (coins) that had intrinsic value, including the cost incurred by the defendants to purchase the coins they later sold with fraudulent grading. Accordingly, even if these cases should be read as suggesting that profit is the appropriate metric for purposes of U.S.S.G. § 8A1.2, neither case supports the defendant's facile attempt to rely on its total net profit margin as a metric of its marginal costs.

      BitMEX has also waived any opportunity to introduce evidence about marginal costs at this stage, by raising this argument for the first time in its post-*Fatico* reply brief. Despite engaging in numerous rounds of briefing in connection with the original sentencing and the *Fatico* hearing, and despite knowing for many months that both the Government and the Probation Department were using revenue from U.S. customers to calculate gain, the Company never suggested until its reply brief after the *Fatico* hearing that this additional revenue is an improper method for determining the gain from the offense in this case. And the Company failed to submit evidence at the *Fatico* hearing that would give the Court any reasoned basis to determine that BitMEX's U.S.-source revenue must be reduced by any amount to reflect supposed costs incurred by BitMEX in connection with obtaining that revenue.

For the foregoing reasons, the Court should adopt the gain calculation advanced by the Government and conclude that the gain derived from the offense is approximately $155 million in U.S.-source revenue.

Dated: New York, New York
January 11, 2025

Respectfully submitted,

EDWARD Y. KIM
Acting United States Attorney

By:   *s/ Thane Rehn*
Jessica Greenwood
Thane Rehn
Assistant United States Attorneys
(212) 637-1090/2354