P1FKHDRS

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4                    v.                          24 CR 424 ( JGK)

5   HDR GLOBAL TRADING LIMITED,
    a/k/a "BitMEX,"
6                                               Sentence
                    Defendant.
7
    ------------------------------x
8
                                                New York, N.Y.
9                                               January 15, 2025
                                                10:00 a.m.
10

11  Before:

12                      HON. JOHN G. KOELTL,

13                                              District Judge

14                          APPEARANCES

15  EDWARD Y. KIM
         Acting United States Attorney for the
16       Southern District of New York
    NATHAN REHN
17  JESSICA GREENWOOD
         Assistant United States Attorneys
18
    A&O SHEARMAN
19       Attorneys for Defendant
    BY:  DAVID C. ESSEKS
20       EUGENE EDWARD INGOGLIA
         MEGAN SHARKEY
21       MELINDA BOTHE

22
    Also Present:
23
    Elizabeth Kudirka, FBI, Special Agent
24  Peter Wilkinson, KDR Global, General Counsel

25

P1FKHDRS

1          (Case called)

2          MR. REHN:  Good morning, your Honor.  Thane Rehn and

3    Jessica Greenwood, for the United States.  And we're joined at

4    counsel's table today by Special Agent Elizabeth Kudirka, from

5    the Federal Bureau of Investigation.

6          MR. ESSEKS:  Good morning, your Honor.  For the

7    defendant, HDR Global, David Esseks, Gene Ingoglia,

8    Megan Sharkey, and Melinda Bothe, A&O Shearman.  We're joined

9    by the general counsel of the defendant, Peter Wilkinson.

10          THE COURT:  All right.  Good morning, all.

11          I've reviewed the presentence report, prepared

12   August 27, 2024, revised September 30, 2024.  I've reviewed all

13   of the numerous submissions by counsel for the defendant and

14   the government.  I held a *Fatico* hearing on December 3, 2024,

15   and reviewed post-*Fatico* submissions.

16          At the outset, the Court will set out the Court's

17   findings with respect to the guideline calculations for the

18   appropriate fine.  The parties can then make all of their

19   objections to the presentence report, the Court's findings, as

20   well as their arguments with respect to what the appropriate

21   fine should be.

22          The Court also notes, initially, that there were

23   several objections to the presentence report that were

24   unresolved, as discussed at pages 23 to 26 of the presentence

25   report.

P1FKHDRS

1          Having considered the parties' positions and the

2     probation department's response, the Court overrules the

3     objections to paragraphs 16, 17, and 19 to the presentence

4     report, but agrees with the defendant that the conduct

5     involving the Hong Kong Bank is too tangential to be considered

6     for purposes of sentencing, and will strike paragraph 22 of the

7     presentence report and not consider it for purposes of

8     sentencing.

9          Now the Court will turn to the parties' disagreements

10    with respect to the guideline calculation of the appropriate

11    fine range.

12         The Court must begin all sentencing proceedings by

13    correctly calculating the applicable guideline range.  *Gall v.*

14    *United States*, 552 U.S. 38, 49 (2007).  In this case, the

15    guideline range is for the defendant's fine.  But, as the Court

16    has repeatedly advised the parties, the calculation of the

17    guidelines is only the first step in the process because the

18    guidelines are not binding on the Court.  See *Id.* at 46.

19         The Court must ultimately determine a sentence that is

20    sufficient, but no greater than necessary, to comply with the

21    purposes set forth in 18, U.S.C., Section 3553(a)(2).  And

22    numerous courts have noted that the guidelines with respect to

23    economic offenses are particularly unreliable because they are

24    not based on any empirical evidence.  See, for example, *United*

25    *States v. Johnson*, 16 CR 457, 2018 WL 1997975, at *3-4 (E.D.N.Y

P1FKHDRS

1 Apr. 27, 2018).

2   The critical issue for determining the guideline fine

3 range is a determination of the pecuniary gain from the

4 offense.  See U.S. Sentencing Guideline Section 8A1.2.

5 Application Note 3(h) to Section 8A1.2 states, "Pecuniary gain

6 is derived from 18, U.S.C., Section 3571(d) and means the

7 additional before-tax profit to the defendant resulting from

8 the relevant conduct of the offense.  Gain can result from

9 either additional revenue or cost savings."  U.S. Sentencing

10 Guidelines Manual Section 8A1.2, comment 3(h.)  (Hereafter

11 "Application Note 3(h)).

12   For the first time, defendant argued in its responsive

13 brief, after the *Fatico* hearing, that the amount of revenue

14 derived from United States sources should be reduced by the

15 cost of obtaining that revenue in order to arrive at a profit.

16 The defendant says that it's always taken that position, but

17 all of the subsequent filings never attempted to reduce gain to

18 profit.  In other words, the defendant, in reply, now argues

19 that gross profit is the proper standard for calculating

20 pecuniary gain under United States Sentencing Guideline

21 Section 8A1.2.  And the defendant argues that gross profit is

22 the total profit, which means the total revenue minus the cost

23 of obtaining the revenue.

24   The government responds that the proper standard is

25 "additional revenue," not profit, and notes that, in any event,

P1FKHDRS

1    the defendant has introduced no reliable evidence of the

2    variable costs associated with the relevant revenue from the

3    relevant conduct of the offense.

4         Section 8A1.2, Application Note 3(h), is ambiguous,

5    and there is no clear authority that has interpreted whether

6    "pecuniary gain" means profits or revenues.  Application

7    Note 3(h) explains that "pecuniary gain" is "derived from

8    18, U.S.C., Section 3751(d)," and defines the term to mean "the

9    additional before-tax profit to the defendant resulting from

10   the relevant conduct of the offense."

11        The note then goes on to state:  "Gain can result from

12   either additional revenue or cost savings."  Id.  Thus, on its

13   face, Application Note 3(h) defines pecuniary gain using both

14   "profit," which suggests a net figure, and "additional revenue"

15   which suggests a gross revenue figure before the subtraction of

16   costs.  And in interpreting the term "gross gain" in 18 U.S.C.

17   3571(d), which is cross-referenced by Application Note 3(h),

18   courts have disagreed on whether "gross gain means gross

19   marginal revenues or marginal revenues net of marginal costs."

20   See *United States v. Sanford Ltd.*, 878 F.Supp.2d 137, 148-50

21   (D.D.C. 2012).

22        In this case, it is unnecessary to decide whether the

23   proper standard of pecuniary gain requires the calculation of

24   profits or simply additional revenue derived from the offense.

25   For purposes of this sentencing, the two are one and the same.

P1FKHDRS

1          After extensive briefing and a *Fatico* hearing, because

2     the defendants have not introduced any evidence concerning the

3     variable costs associated with the revenue from United States

4     sources, there is no evidence of the marginal costs associated

5     with the relevant conduct of the offense, and, therefore, no

6     evidence of an appropriate deduction.  See Application

7     Note 3(h).

8          There is no evidence that the Defendant's overall

9     profit rate can simply be applied to the additional revenues

10    generated from United States sources.  Indeed, the defendant's

11    own expert did not even seek to make such a deduction.

12          Although the defendant has introduced its overall

13    profit margin from a paragraph in the presentence report that

14    it provided to the probation department, the defendant has not

15    explained why it would be proper to deduct fixed costs from the

16    revenues resulting from the relevant conduct of the offense.

17    The defendant's overall profit margin, even if credited, does

18    not reflect the marginal cost of obtaining the United

19    States-related income.  Accordingly, no deduction should or can

20    be made.  Therefore, the pecuniary gain in this case is the

21    additional revenue that the defendant obtained from the offense

22    of conviction, namely, the violation of the Bank Secrecy Act.

23    In other words, the pecuniary gain is the additional revenue

24    from United States sources that the defendant received during

25    the time period of the offense, September 1, 2015, to

P1FKHDRS

September 30, 2020, that the defendant was prohibited from

receiving because the defendant did not have proper anti-money

laundering and know-your-customer procedures in place.

        The pecuniary gain, the additional revenue from United

States sources, cannot be determined readily from the

defendant's records because the essence of the offense was that

the defendant knew it was not permitted under the Bank Secrecy

Act to effect transactions for United States customers without

a compliant anti-money laundering program, but did so anyway.

As a result, its onboarding documents were unreliable because

they did not accurately reflect the U.S. sources of the

deposits.  In measuring economic gain or loss under analogous

provisions of the sentencing guidelines, such as Section 2B1.1,

courts have made it clear that a court is not required to make

a finding of economic gain or loss "with certainty or

precision."  See *United States v. Moseley*, 980 F.3d 9 (2d Cir.

2020)."  Indeed, Application Note 3(b) to Section 2B1.1, the

applicable guideline for many economic offenses, states that,

"The Court need only make a reasonable estimate of the loss."

*United States v. Kumar*, 617 F.3d 612, 632 (2d Cir. 2010).

Under Section 2B1.1, courts "use the gain that resulted from

the offense as an alternative measure of loss only if there is

a loss, but it reasonably cannot be determined."  U.S.

Sentencing Guideline Section 2B1.1(b)(1)(B).  Without precise

records in analogous sentencing contexts, courts have used

P1FKHDRS

various methods for calculating loss, including estimates of
the amounts of prohibited transactions.  See, for example,
*Moseley*, 980 F.3d at 29; *United States v. Uddin*, 551 F.3d 176,
180 (2d Cir. 2009).

        In this case, the defense argues that the proper
measure of the pecuniary gain from the offense is the
$30 million in total fines that the three principal owners of
the defendant paid as part of their sentences for their
individual convictions in their individual cases.

        However, the government credibly responds that the
$30 million — namely, $10 million per defendant — was based on
a share of the dividends that the individual defendants
received and not the total pecuniary gain to HDR.  ECF No. 18
at 14-15.  And the Court never determined the total pecuniary
gain to HDR in connection with the sentencing of the three
principals of HDR.

        Finally, there is no credible argument that the
government or the Court is bound with respect to the present
sentence for HDR by the sentences that the Court imposed on the
three principal owners.  Indeed, HDR's argument that
$30 million appropriately measures the pecuniary gain to HDR is
completely unrealistic.  HDR's own expert, Jeremy Tilsner,
calculated that during the relevant period, HDR received
$831.411 million in deposits from United States sources,
comprising 4.4 percent of HDR's total deposits.  During the

P1FKHDRS

relevant period, HDR's revenues totaled $1.355 billion.

Applying the percentage determined by HDR's own expert to the

total revenue figure yields approximately $60 million.  In

short, even according to HDR's own expert, HDR's pecuniary gain

totaled approximately $60 million.  As explained below, even

that figure is too low, based on the credible testimony of

Alexander Vasiliades that the percentage of deposits from

United States users totaled in excess of 11 percent.

Even before reaching the testimony of the expert

witnesses, the government has submitted evidence from HDR's

internal files that supports the government's higher estimate.

Greg Dwyer, one of the individual defendants who pleaded guilty

to his role in the offense, prepared for HDR an analytics

report about the first quarter of 2017.  Government Exhibit 34.

The first quarter of 2017 covers a period in the middle of the

relevant period.  In his analytics report, at page 17, Dwyer

noted, "United States remains as the most popular country by

visits and average number of active users per day.  "U.S.

increased" -- I'm sorry.  Dwyer noted, "United States remains

as the most popular country by visits and average number of

active users per day.  U.S. increased dominance from quarter 4

to quarter 1 (19 percent (increased to) 22 percent.  It has

shrunk in April and May 2017."  The chart indicates that for

April and May 2017, the number of United States users decreased

to 16 percent of all users.  That figure was still nearly

P1FKHDRS

double the next largest group of users, namely, the users from

Russia, who represented 9 percent of users.  Therefore, HDR's

own corporate document provides strong support for finding a

revenue percentage from United States users well in excess of

even the 11.49 percent reached by the detailed analysis of the

government's expert.

In two filings, the defense attempted to belittle the

company's own analytics report, arguing that the document shows

only that "the active users in the United States in May 2017

were 2.6 percent of the total."  ECF No. 22 at 15-16 and ECF

No. 49 at 9-10.  After the defense made this argument on

September 25, 2024, the government responded in its letter

dated October 1, 2024.  ECF No. 27 at 4.  In its December 12,

2024 filing, however, the defense simply ignored the

government's response, and repeated the earlier defense

argument.  ECF No. 49 at 9-10.

The government's response deserves repeating:

"Finally, the company challenges the relevance of its internal

reports from 2017, showing that the U.S. was the biggest source

of visitors and active users, i.e., traders, at the time."  The

report plainly states that the U.S. was generating 16 percent

of visits to the website in May 2017, and that this was

actually down from 22 percent of traffic in the first quarter

of that year.  The company's reply submission argues that

because the report shows an average of 277 active users from

P1FKHDRS

1   the U.S. per day in May 2017, and a total number of active

2   users for the month of 10,442, this means that only 2.6 percent

3   of users were from the U.S.  That is plainly wrong, however,

4   because the company is trying to compare a daily rate to a

5   monthly total.  For example, if each U.S. user visited the

6   website just once a month, then 277 users per day would be over

7   8,000 users per month, or 80 percent of the total number of

8   users.  More realistically, if each U.S. user visited five

9   times a month, then 277 users per day would work out to around

10   1,717 total active U.S. users for the month, or slightly more

11   than 16 percent of the company's total.  If there were 1,717

12   active users from the U.S., and each visited five times

13   per-month, that would be 8,585 visits from the U.S. per month.

14   In a 31-day month, that would be an average of 277 active

15   users' visits per day from the U.S., which is the average daily

16   number in the company's report.  That estimate is consistent

17   with the report, which says, on the very same page, that U.S.

18   users also made up 16 percent of the total traffic to the

19   website.  The company's argument to the contrary rests on

20   misrepresenting its own report."  ECF No. 27 at 4 (citations

21   omitted).

22        HDR has not responded to the government's explanation

23   and simply repeated its original argument.  As explained by the

24   government, the defendant's attempt to belittle the company's

25   own report misconstrues the plain meaning of the report.

P1FKHDRS

|1| According to the report, the United States was the most popular

|2| country by visits and average number of active users,

|3| accounting for 16 percent of total website traffic.  That is

|4| significant because the percentage of page visits and active

|5| users attributable to the United States reasonably estimates

|6| the total revenue attributed to United States users.  Thus,

|7| without some countervailing explanation by the defense, which

|8| it has failed to produce, the report provides strong support to

|9| the government's contention that at least 11.49 percent of

|10| total revenue was attributable to United States users.

|11|       The Court has carefully evaluated the expert testimony

|12| by the government's expert, Special Agent Vasiliades of the

|13| FBI, and HDR's expert, Jeremy Tilsner.  The Court concludes

|14| that the testimony of Agent Vasiliades is credible and well

|15| supported.  Agent Vasiliades analyzed the available records and

|16| concluded that there were total deposits of $18.472 billion in

|17| two BitMEX trading accounts during the relevant period.

|18| Hearing transcript 24-25; Government Exhibit 35.

|19|       In the first part of his analysis, the deposits came

|20| from known and extrapolated deposits by United States users of

|21| United States-based exchanges Coinbase and Gemini, which

|22| amounted to approximately $1.201 billion.  In the second part,

|23| the deposits came from known and extrapolated deposits by

|24| United States trading firms, which amounted to approximately

|25| $922 million.  Thus, the total resulting amount of total BitMEX

P1FKHDRS

deposits attributable to United States users is approximately
$2.123 billion.

The resulting percentage of total BitMEX deposits
attributable to United States users is about 11.49 percent.
This percentage is slightly lower than the figure that
Agent Vasiliades testified to because the government has
removed United States deposits into nontrading accounts,
resulting in a slightly lower number.

HDR makes several arguments in response.  None are
persuasive.

First, the defendant objects to the inclusion of about
$184 million of extrapolated deposits from Coinbase and Gemini
users, but the extrapolation was used to bring the statistics
for Coinbase users and Gemini users to September 30, 2020, the
end date of the indictment period.  The subpoena returns from
Coinbase and Gemini were otherwise incomplete.  There is no
basis for rejecting the extrapolation because there is no basis
for believing that the Coinbase users and the Gemini users
stopped using BitMEX on the date that the subpoena returns
ended.  And the extrapolation method was generally reliable;
the defendant has failed to show otherwise.

Second, HDR argues that the amounts attributed to some
individual customers should not be included because there is
insufficient evidence that they were United States users.
However, Agent Vasiliades carefully reviewed the documentation,

P1FKHDRS

including documentation from Coinbase and Gemini.  Such

documentation established that the customers were based in the

United States during the relevant period.

          By contrast, relying on its own know-your-customer

records, HDR argues that the customers were not, in fact, based

in the United States, but HDR's records are unreliable.  HDR

was professing to be closed to United States customers and,

thus, had every reason to encourage records that showed the

customers were not based in the United States.  While the

defense also points to records for the period after the period

at issue, those records do not refute the records relating to

the period at issue.  The records after the period covered by

the indictment simply showed that in the period after the

indictment, the company established a compliance program to

eliminate United States users, in order to satisfy the

requirements of the CFTC and FinCEN.

          Third, the defense argues that deposits do not

necessarily map to revenue.  Therefore, according to HDR,

applying the 11.49 percent figure derived from deposits to

revenue does not yield a reasonably accurate estimate of

pecuniary gain, namely, increased revenue from United States

sources during the relevant period.  However, in calculating

the 11.49 percent figure, the government removed the nontrading

accounts from the calculation and left in only trading

accounts.  Therefore, the 11.49 percent figure reasonably

P1FKHDRS

1   approximated HDR's revenues from United States users.  There is

2   no dispute that the defendant earned revenue by charging

3   commissions on the trading accounts.  Moreover, the defendant

4   has presented no evidence that the users of BitMEX trading

5   accounts were using those accounts simply to bank their

6   Bitcoins.  BitMEX advertised itself as a "crypto-products

7   trading platform," not as a crypto currency bank.  See, for

8   example, Government Exhibits 31 and 32.

9          Hence, by a preponderance of the evidence, the

10  government has supported its reasonable estimate that during

11  the relevant time period, 11.49 percent of HDR's total revenues

12  was attributable to United States users.  Applying that

13  percentage to HDR's total revenues of $1.355 billion, the

14  resulting revenue attributable to United States customers

15  during the relevant period is $155 million.  Accordingly, the

16  pecuniary gain from the offense is $155 million.

17          Next, it is necessary to determine the culpability

18  score pursuant to United States Sentencing Guideline Section

19  8C2.5.  The culpability score begins at 5.  See Section

20  8C2.5(a).  The government argues for an addition of three

21  points pursuant to 8C2.5(b)(3)., a provision that applies when,

22  in relevant part, "the organization had 200 or more employees."

23  It is undisputed, however, that the company never had 200 or

24  more actual employees.  For about five months out of the

25  five-year relevant period, the defendant had sufficient

P1FKHDRS

contractors to bring the approximate total to over 200

personnel.  But those personnel were not employees.  Moreover,

HDR's total headcount, including nonemployees, exceeded 200 for

only about five months out of the five-year relevant period.

The additional three points pursuant to Section 8C2.5 are,

therefore, unwarranted.  Accordingly, two points should be

added pursuant to Section 8C2.5(b)(4), bringing the total to

seven.

Pursuant to Section 8C2.5(g)(3), one point should be

subtracted because the HDR has demonstrated recognition and

affirmative acceptance of responsibility for its criminal

conduct by pleading guilty.  A guilty plea prior to the

commencement of trial, together with truthful admission of

involvement in the offense and related conduct, ordinarily

constitutes significant acceptance of responsibility.  U.S.

Sentencing Guidelines Section 8C2.5, Application Note 14.

Hence, the culpability score is brought down to six.

Pursuant to Section 8C2.6, a culpability score of six

results in a guideline multiplier of 1.2 to 2.4.  Accordingly,

pursuant to Section 8C2.7, the guideline fine range is 186 to

372 million dollars.

Pursuant to Section 8C2.9, the amount of the guideline

fine should be increased by "any gain to the organization from

the offense that has not, and will not, be paid as restitution

or by way of other remedial measures," that is, the amount of

P1FKHDRS

disgorgement.  In this case, the amount of disgorgement is the

$155 million of gain less the $80 million that HDR paid to the

CFTC and FinCEN.  Hence, $155 million less $80 million, or

$75 million, should be added to the fine.

Pursuant to Section 8C3.4, this amount is then offset

by the fines paid by the three principals, namely, $30 million,

which results in an addition to the fine of $45 million.

Accordingly, the guideline range in this case becomes 231 to

417 million dollars.

But, of course, despite its complexity, this is only

the beginning of the sentencing process.  The Court is required

to calculate the guideline range, but the guideline range is

not binding on the Court.  The Court must determine the

appropriate sentence taking all of the appropriate sentencing

factors into account and impose a sentence that is sufficient,

but no greater than necessary, to accomplish the purposes set

forth in 18, U.S.C., Section 3553(a).

The Court will listen to the parties with respect to

any objections to the presentence report that have not been

resolved.  The Court will also listen to the parties as to

their contentions of the appropriate fine that is sufficient,

but no greater than necessary, to accomplish the purposes of

sentencing set forth in 18, U.S.C., Section 3553(a)(2).  The

parties are also free to make any other objections that they

have.  The parties should also address the conditions of

P1FKHDRS

 1  probation, which the parties have not addressed in their

 2  papers, including any appropriate payment schedule and the

 3  appointment of a monitor.

 4            So ordered.

 5            Mr. Esseks, have you reviewed the presentence report,

 6  the recommendation, and the addendum, and discussed them with

 7  the defendant?

 8            MR. ESSEKS:  Yes, I have, Judge.

 9            THE COURT:  Other than I have already resolved, do you

10  have any objections?

11            MR. ESSEKS:  No further objections that are unresolved

12  to the PSR, your Honor.

13            THE COURT:  Okay.

14            I'll listen to you for anything you would like to tell

15  me in connection with sentence.

16            MR. ESSEKS:  Thank you very much, Judge.

17            May I just have a moment to consult with Mr. Wilkinson

18  in light of the Court's ruling just now?

19            THE COURT:  Sure.

20            MR. ESSEKS:  Thank you very much.  It won't take long.

21            THE COURT:  I would take a break if you want to.  I'll

22  take five minutes.

23            MR. ESSEKS:  Five minutes, yes, please.  Thank you,

24  Judge.

25            (Recess)

P1FKHDRS

1          MR. ESSEKS:  Judge, thank you very much for that

2     break.  And your Honor's ruling is clear.

3          All I'll say -- ruling on gain is clear.

4          The Court will not be surprised to hear that there are

5     a number of points about your Honor's ruling with which we

6     disagree.  I'm not going to belabor that.  I simply want to

7     say, your Honor's observation at the opening today that the

8     guidelines are not only a starting point, but, in their

9     economically driven calculations, imprecise and often not a

10     good starting point.  Our submission is that the calculations

11     that your Honor has made, which we accept because the Court has

12     ruled, very, very, very significantly overstated the

13     significance of the matter before the Court and the size of the

14     appropriate penalty.  But what I want to address today are all

15     of the factors about the case other than the calculation of

16     gain.  I'm simply saying we think what the Court has done,

17     which we understand, is very substantially overstated.

18          So, it is my very great pleasure to address the Court

19     this morning on behalf of this company.  I and my colleagues

20     have been helping take care of it since 2019.  It has been a

21     very long road.  Mr. Wilkinson, the general counsel of the

22     company, is here with us, and he's been on that road with us

23     throughout, and he will, with the permission of the Court,

24     address the Court on behalf of the defendant shortly.

25          THE COURT:  Sure.

P1FKHDRS

1        MR. ESSEKS:  Our submission, Judge, is that, taken as

2   a whole, the enforcement efforts by the United States regarding

3   this company's Bank Secrecy Act violations already, today, this

4   morning before the Court imposes sentence, meet all the goals

5   of sentencing.  And we, therefore, submit that no additional

6   penalty, beyond what has been imposed so far, is required.

7   And, therefore, we suggest no additional fine, and I will

8   elaborate on why our position is.  No probationary term or

9   monitor is required either because the company has

10  demonstrated, as I will detail, its good faith and effective

11  exit from the United States and its lack of being a threat in

12  any way, shape, or form to the American public.

13        Now, Judge, the company does embrace its

14  responsibility for this crime.  It fully remediated its

15  failures more than four years ago.  It has long committed to

16  lawful operation here and around the world, and, as we will

17  detail, the company has paid a very significant price already

18  in fines, reputational damage, and injury, very significant

19  injury, to its business.  We're not complaining, Judge, we're

20  observing.

21        And our submission, again, is simply that, taken as a

22  whole, all of that together, what has happened to date,

23  including this prosecution up till today, is sufficient to meet

24  the interests and goals of sentencing.

25        In my remarks this morning, I'm going to address some

P1FKHDRS

1    particular points.  I'm going to spend some time on the nature

2    and seriousness of the offense, and its juxtaposition with the

3    requirement for just punishment, and I'm going to spend some

4    time on the question of deterrence, and general deterrence in

5    particular, because it is a point on which the government has

6    placed special emphasis.

7            Our position, Judge, is not that the government should

8    not have brought this prosecution.  We did argue to the

9    government at great length that it was not necessary for them

10   to do so, but we do not say they should not have brought it, we

11   simply say they did bring it, and the company has embraced it,

12   and pled guilty, and is here to be sentenced.  And we submit

13   that this is an additional factor before the Court, the effect

14   of the prosecution of the company today, that weighs in the

15   balance.

16           Let me work through the 3553(a) factors.

17           Some of them, I submit, are quite straightforward.

18   One that's perhaps most straightforward is the goal to protect

19   the public from further crimes of the defendant.

20           HDR is no threat to the public, full stop.  It is

21   entirely outside the United States to the satisfaction of the

22   United States Government.  Its controls are robust.  It poses

23   no threat to the American public.

24           Another 3553(a) factor that I submit is

25   straightforward in application here, is the sentence designed

P1FKHDRS

```
1    to or necessary to promote respect for the law.  This
2    prosecution, Judge — and by this prosecution, I mean not just
3    the prosecution of HDR before the Court now, but the
4    prosecution of its founders starting in 2020, again before your
5    Honor — that prosecution, this prosecution, was the first ever
6    criminal prosecution of individuals for willful failure to
7    adopt BSA-compliant AML and KYC programs.
8              THE COURT:  Initials, AML and KYC.
9              MR. ESSEKS:  Thank you, Judge.  It's a complicated
10   sentencing.
11             The result of that prosecution, Judge, has been a
12   very, very clear message to the public, the market, the legal
13   community.  Everyone sat up and took notice when this case was
14   initially brought.  And it was a groundbreaking, and is a
15   groundbreaking, prosecution, and it was extremely well executed
16   by this office.  It made a very big difference in the market.
17   It was very scary for our client's owners, and it was
18   recognized very significantly in the market.  And we cited in
19   our papers various examples of this.  I want to comment on one
20   in particular.
21             In October of 2021, shortly after the indictments were
22   brought against the individuals, the CEO of Binance, a
23   competitor platform, Changpeng Zhao, was quoted in the press
24   saying he was surprised to learn that the federal prosecutors
25   had taken on BitMEX, and he said that the indictment is a
```

P1FKHDRS

1  wakeup call for the rest of the players to be more cautious to

2  be fully compliant.

3          Now, Judge, I pondered whether I should use that

4  example because --

5          THE COURT:  Indeed.

6          MR. ESSEKS:  Indeed.

7          -- because that CEO was later prosecuted for doing the

8  very same thing, and much, much more, but doing the very same

9  thing that BitMEX did.

10          THE COURT:  And a much greater penalty.

11          MR. ESSEKS:  And a much greater penalty, and I will

12  come to that, Judge, I will come to that.

13          But why did I pick that example?  Because this

14  prosecution in October of 2020 made an impression on Mr. Zhao

15  and his colleagues.  Now, not a sufficient impression to keep

16  him from the things that he did, but, Judge, he saw it, he

17  noted it, he said it publicly, and his prosecution thereafter

18  for not paying attention to the message that was very, very

19  clearly sent to the market by this prosecution made his

20  prosecution much easier.  And I point this out, Judge, because

21  this is, I think, clear evidence that the message got out —

22  promoting respect for the law.  It's not necessary for everyone

23  who hears about the prosecution to abide by it for this to be

24  an example of the message getting out.  And the follow-on

25  efforts by the United States Government to prosecute this kind

P1FKHDRS

```
1    of crime have succeeded in promoting respect for the law.  And
2    I suggest that, taken together, this prosecution and follow-on
3    prosecutions, mean that a further sentence and further penalty
4    today is not necessary to promote respect for the law.
5            I will come, then, Judge, to seriousness of the
6    offense and just punishment for the offense.  And I take these
7    together; they're in the statute together, and they naturally
8    go together.  They're a bit of a balance, I'd suggest.  On the
9    one hand, well, what is the violation and what is its harm and
10   how should we think about its seriousness, and on the other
11   hand, okay, weighed against that, what is just punishment for
12   the offense?  What's required for that?  And I'd like to
13   address that balance today.
14           So, what's the violation?  The violation is the
15   purposeful failure to comply with the AML and KYC obligations
16   of the Bank Secrecy Act.  And the company has acknowledged that
17   willful violation.  We have a disagreement with the government
18   about the degree and the scope of that violation, but we
19   certainly agree, willful failure to set up a BSA-compliant
20   program.
21           That BSA violation, Judge, however, is not the same as
22   money laundering, sanctions violations, terrorist financing, or
23   any of the other things that the government talks about as
24   relevant to sentencing today.  Suspicious transactions happened
25   on the platform.  They happen on every platform, but they
```

P1FKHDRS

1    happened on this platform, and failing to prevent them and

2    identify them is the violation here.

3         To comply with this law, HDR was required to either

4    stay out of the United States or to comply with the BSA

5    obligations to have proper KYC and AML filters.  Its failure to

6    do that meant, among other things, that FinCEN did not get the

7    benefit of suspicious activity reports, or SARs, filed by HDR

8    concerning activity on its platform.  That's one of the

9    concrete things that didn't happen because of this violation.

10        We know the consequences of that metric, of the

11   violation by that metric, because as part of its settlement

12   with FinCEN, the company gave its transaction data to an

13   outside consultant, blessed by FinCEN, and that outside

14   consultant went through all its transactions, deposits and

15   withdrawals, all its transactions, back to the beginning, back

16   to November of 2014.  And the consultant identified all of the

17   suspicious activity reports that should have been filed, and

18   then HDR filed them.  Late, late, but filed all of them.

19   FinCEN, as part of the settlement, wanted that data, and it has

20   that data.  So, we know, by this metric, the quantum of harm at

21   issue.

22        Across the six years of the violation, there were 378

23   SARs that were required to be filed.  They were filed.  And

24   they encompassed $85 million in transactions.  To be clear,

25   these were suspicious transactions, transactions meeting the

P1FKHDRS

definition that FinCEN has for reporting such things.  But they
were not necessarily unlawful transactions; they're simply the
kinds of transactions that warrant alerts and notification to
law enforcement.

We put those failures in context, and they were
failures, but we put those failures in context.  378 SARs,
$85 million in transactions that were suspicious.  In the same
six-year period, the platform had over 5 million transactions,
deposits and withdrawals covering over $36 billion in value.
That's from Government Exhibit 25.

The transactions resulting in a SAR filing, therefore,
represent less than 0.2 percent of the value of all the
transactions on the platform.  A violation, to be sure, but
when we're trying to assess what is the significance of the
failure here, one data point we have is the SARs that weren't
filed, the value of the transactions, and the percentage that
they represent of the activity on the platform.

To be sure, as I noted, these SAR reports were not
filed on time, and FinCEN got the data late, but we point to
this as an indication of the relative size and seriousness of
the violation.

There's a related question on this topic of
seriousness of the violation that I wanted to address.  The
government, at various times in its papers, appears to contend
that HDR was a criminal business.  And we reject that notion.

P1FKHDRS

What you have before your Honor is a legitimate company that
committed a crime.  It's not a criminal operation, it's not a
criminal business; it's a legitimate company that failed to
comply with this particular obligation of U.S. law in a willful
manner, and it admits that violation, but it is not a criminal
business.

        The data backs that up, Judge.  The Court has just
found, agreeing with the government, that 11.49 percent of the
company's revenue over time came from U.S. users, but the
embodiment of the violation here.  Again, we think the number
should be smaller, but we'll take that as a high-water mark,
11.49 percent.  What does that tell us about the significance
of this violation to the business?  It's not a driver --

        THE COURT:  I'm sorry, not?

        MR. ESSEKS:  It is not a driver of the success of the
business.  It is a meaningful, but small part of the operation
of the business.  And the government, I submit, cannot, and I
think does not, dispute that the success of this platform was
driven by innovation.

        This platform invented something called the perpetual
swap contract, a financial instrument, that is now -- that's
widespread across the market.  Every significant crypto
exchange has this product, they have copied it from the product
originated by HDR, and those products are the locus of the
vast, vast majority of the liquidity in this market globally.

P1FKHDRS

This market -- this company created that, and its marketing

outside the United States are what drove its enormous success

in 2018, '19, and into '20, not the minor part of the business,

even at the high-water mark of the government's argument that

was presented.

     So, this is a legitimate business that committed a

crime, needs to be sentenced, but it is not, as the government

has argued in various ways along the way, a criminal business.

And we ask the Court to keep that distinction in mind as it

imposes sentence.

     I'll then move to the other side of the balance —

That's the harm and the nature of the violation.  What's needed

to provide just punishment for this offense?  And we submit the

following analysis for the Court's consideration:

     First, the sentence should ensure that the company has

addressed the cause of its failing.  That has been done.

     The founders have been punished themselves, and they

are chastened, as the Court saw, directly when it sentenced

them in 2022.

     The business has been fixed.  It put full KYC in place

by the end of 2020.  Those controls have been thoroughly tested

twice by an independent consultant approved by FinCEN, and the

reports of those testings were given to FinCEN.  The consultant

said that the company passed very well, both times.  There has

been no complaint or cause for concern from FinCEN.  The

P1FKHDRS

business has been safely out of the United States for more than
four years, to the satisfaction of FinCEN, of the Department of
the Treasury, and, I submit, of the United States Government.

Second, the sentence should ensure, to the extent,
possible that the harm caused by the offense has been
mitigated.  To the extent possible, that has been done, and it
has been done by the SAR look-back that was part of the FinCEN
settlement.  All of those suspicious activity reports were
identified and filed, and FinCEN has the benefit of that data.

We do not suggest those filings eliminate all the
effects of the violation, but they mitigate a key effect, and
they are the clearest thing that the company can do, and has
done, to mitigate the effects of its violation.

Third, in considering just punishment, we suggest that
the sentence should ensure that the defendant has not profited
from the offense.  And we submit that that is already the case.

That brings us to gain, and we, again, have a
difference of view on gain, but even at the gain finding that
the Court has made, I submit that this crime has not paid.
This crime has not paid.  The company has already paid
$80 million that the Court has recognized to civil authorities.
Its founders have paid $30 million to the United States
Treasury.  It has spent $20 million upgrading its compliance
program.  And it has paid a very, very considerable amount to
lawyers, many lawyers, to manage the very substantial range of

P1FKHDRS

problems that it has confronted as a result of this crime.

Now, Judge, I'm not asking for sympathy about large legal bills.  I'm simply saying if the question is, has this company made money from this violation or lost money from this violation, it's an easy question.  It is way, way, way in the red on this crime already, very substantially more than even the finding of gain that your Honor has made today.  No matter the ruling -- even with that ruling, the founders and the company have not profited from this offense already.

I want to turn to deterrence.  And, of course, we break this down between specific and general deterrence.

Specific deterrence, I submit, is also quite straightforward.  There is no reason for concern that this company will violate U.S. law again.  The founders themselves have learned their lesson.  The company has demonstrated over the past five years that it is intent on and effectively staying out of the United States entirely, and thereby steering clear of any violation of U.S. law.  We submit that specific deterrence has been accomplished well and truly already.

On general deterrence:  In the first instance, we agree with the Court's sentiments expressed at the sentencing of Mr. Hayes, that, in general, a sentence that is sufficient for the individual will serve general deterrence purposes, and that the deterrence analysis should be focused principally, we suggest, on specific deterrence and not general.

P1FKHDRS

```
1              The government has argued very substantially about
2    general deterrence and the need to send a message to other
3    companies that crime does not pay.  I've addressed this to a
4    degree already, but I want to unpack it more because our
5    submission, your Honor, is that it is not necessary for there
6    to be a significant additional penalty in order to send a
7    message to the market.  The government has gone so far as to
8    suggest that a big penalty is needed here because crime did not
9    stop in the crypto world.  I'll give them some rhetorical
10   license, but it is an overstatement.  That is not the test.
11   But more to the point, this crime, as I want to elaborate
12   slightly more, did not pay.  Let me detail the ways.
13              This crime has resulted in the company's founders
14   being investigated, prosecuted, convicted, and sentenced.  This
15   crime has risked jail for each of those founders.  This crime
16   has cost 30 million in criminal fines.  It's cost 80 million in
17   civil enforcement penalties.  It has driven customers away from
18   the BitMEX platform in droves, starting in October of 2020 and
19   continuing, as Mr. Wilkinson will elaborate, until today.  It
20   has resulted in the company's guilty plea and the company's
21   reputational damage.  It has hindered the company's ability to
22   operate its business outside the United States — outside the
23   United States — in ways that Mr. Wilkinson will elaborate on
24   shortly.
25              The effect of this crime on HDR's business is plain to
```

P1FKHDRS

the market.  It's plain to its competitors.  No business will

think that HDR got away with something if the penalty for this

offense is measured this morning and not this afternoon.  There

is no general deterrence need for an additional penalty here.

Judge, I'll address probation, the probation question,

now, and then I have a bit that I want to do that I hope will

pull some of these factors together.

On probation:  The Court is quite right, the parties

haven't addressed that.  Probation did make a recommendation.

Our submission, consistent with what I've said, is

that oversight of this business, which is not in the United

States, is not necessary.  The civil enforcement authorities

that are close to this matter have already, long since, years

ago, made their own judgments about what is necessary.  In

settling with the CFTC, they did not impose any ongoing

obligation whatsoever.  They could have done; they chose not to

in their judgment.  No continuing obligation, no oversight, no

monitor, no reporting.  They did not ask for it.

FinCEN did ask, and the company agreed, to a one-year

period where an independent consultant would be hired by the

company, blessed by FinCEN, and in that period, the company had

to do two things.  It had to do this SAR look-back process that

I've described and give the data to the independent consultant.

The independent consultant identified all the SARs that should

have been filed; the company filed them.  That was done.

P1FKHDRS

1          The other obligation from the FinCEN settlement in

2     that year was that that independent consultant, twice,

3     scrutinized the company's U.S. person controls, the controls to

4     keep it out of the United States.  And FinCEN, in its judgment,

5     determined that a one-year period, with two assessments by that

6     independent consultant, was sufficient to ensure that the

7     company was safely out of the United States.

8          The company passed those tests in '22.  Both reports,

9     I think, have been submitted to the Court, but both reports

10    were submitted to FinCEN, with very good passing grades.  And

11    FinCEN has been satisfied that the company is out of the

12    country.

13         So, we submit probation is not required by the

14    guidelines, and it's not necessary.  And this is a particularly

15    odd request, I submit, where what the Court has before it is an

16    entity that's not here.

17         Now, we're here, in the court, in the jurisdiction of

18    the court, we're not arguing about that, but there's no

19    probation officer in Hong Kong.  There's a profound operational

20    question of what is that a probation officer would do with

21    respect to this company.  So, with all respect to the probation

22    office, it is not designed to oversee the operations of a

23    company like this and ensure that it's staying out of the

24    United States --

25         THE COURT:  But I imposed supervised release on the

P1FKHDRS

1    principals, despite the lack of a probation officer in

2    Hong Kong.

3              MR. ESSEKS:  You did, Judge, you did, and I certainly

4    see the analogy.  But probation is well equipped to supervise,

5    even for remote defendants, their conduct --

6              THE COURT:  But isn't the answer to that simply

7    unsupervised probation, in the same way as unsupervised

8    supervised release for someone abroad, so that if there were a

9    violation, the company is responsible for a violation of

10   probation?

11             MR. ESSEKS:  Judge, that would be better.  That would

12   certainly be better.  And while I still ask the Court to not

13   impose that, I agree with the Court that that would be better.

14             And, look, the company -- I don't want to beat around

15   the bush — the company is fully and entirely committed to

16   staying out of the United States.  It has done everything it

17   can to stay out of the United States.  It intends to keep doing

18   that.

19             THE COURT:  The one problem, which you know, with that

20   argument is, for five years, the company represented that it

21   was not in the United States, that it couldn't be in the United

22   States, and acknowledges that for five years, it was, and

23   internally represented that the United States sources were its

24   principal source.

25             I know you disagree with that --

P1FKHDRS

1            MR. ESSEKS:  That one, in particular, we really do,

2       the analytics report, but I'll save my point.

3            THE COURT:  Okay.

4            MR. ESSEKS:  Judge, I hear the Court, but you know the

5       response.  That was then; this is now.  It is a different

6       company now.  It is a company that has gone through this

7       process.  It is licking its wounds.  Its founders are licking

8       their wounds and thanking their lucky stars that they were not

9       in jail.  It's entirely different, it's entirely different.

10            THE COURT:  Okay.

11            And the other consideration is, not only history, but

12       the U.S. market is certainly potentially a huge market for

13       any — any — trading company.

14            MR. ESSEKS:  Yes, Judge.

15            THE COURT:  So, the temptation, if you will, to return

16       to the U.S. market, despite the fact that the company

17       represents it's not in the U.S. market, that it's agreed not to

18       be in the U.S. market, is a consideration.

19            MR. ESSEKS:  I understand the point entirely, Judge.

20       This record and the public press is full of examples of

21       companies purporting to be outside the United States and

22       dipping their toe in, or more, and the market is big and

23       tempting.  Understood and accepted.  And, as Mr. Wilkinson is

24       going to elaborate on, this business is in dire straits because

25       it is staying out of the United States, and because the effect

P1FKHDRS

of the prosecution already has made operating the business with
these owners prohibitive and well near impossible.  This is a
business that has learned its lesson and has been tested.

        If the Court wants to impose a, we hope, modest term
of unsupervised probation, I will not argue strenuously against
it, but our underlying point is, this is an entirely different
institution than it was when it was small and growing, had no
legal function for much of the time that this was happening,
and was not run by folks who were paying sufficient attention
to this issue.  And it is now run by folks, including the
founders, who are laser focused on staying out of this kind of
trouble, and the history of this prosecution and the civil
enforcement activities to date demonstrate how the company has
responded and the risks already present for the company if it
were to transgress again.

        But certainly, Judge, a monitor is not required.
FinCEN didn't ask for a monitor.  The CFTC didn't ask for a
monitor.  The company is safely out of the United States.  A
monitor -- I think no one is suggesting that other than
probation, and we submit that is not a well-founded request.

        In particular, Judge, we ask that if the Court does
impose probation, that it not impose probation's second,
fourth, and fifth conditions, and those are -- the second is a
requirement that the company develop a particular kind of
compliance and ethics program.  The company has, as we detailed

P1FKHDRS

1    in our papers, done an enormous revamp of its compliance

2    program and, in particular, the provisions, to keep out of the

3    United States.  Those have been tested.  There is not a need

4    for this ex U.S. company to change its already robust

5    compliance program as a result of this prosecution because it's

6    already done so, and I think this is an artificial test that's

7    not properly applicable here.

8          The fourth is submitting to unannounced examinations

9    of its books and records.  That ongoing supervision, we

10    suggest, is not necessary.

11          And the fifth is the imposition of a monitor --

12          THE COURT:  Sorry, hold on one second.

13          MR. ESSEKS:  Yes.

14          (Pause)

15          THE COURT:  Okay.  Go ahead.

16          MR. ESSEKS:  So our submission, Judge, is, if there is

17    to be probation, that it be unsupervised, and that it be as

18    short a term as the Court is comfortable with.  We suggest that

19    no more than a year is required because the company has already

20    been tested by FinCEN long since.

21          In closing, Judge, I want to turn to the example of

22    Binance.  The government refers to the Binance prosecution as

23    an analogue and a useful reference point.  And we agree that it

24    is a useful reference.  I think we disagree about the lessons

25    to be taken from it, but we certainly agree that that is a

P1FKHDRS

1    useful comparison and a useful prosecution for it and sentence

2    for the Court to look to here.

3              As the Court knows, Binance became a market leader,

4    the market leader, in the crypto derivative exchange and the

5    crypto exchange space, and it was rising to prominence as

6    BitMEX was falling.  It became bigger by any and every measure.

7    Its volumes were multiples of BitMEX's, its user base was

8    multiples of BitMEX's, and its crimes were orders of magnitude

9    larger than the BSA violation before your Honor today.

10              And I want to, for context, just point out some facts

11   about the Binance situation, and I'm pulling principally from

12   the United States' sentencing submission in that case.  And the

13   United States described to the court in Seattle that Binance

14   grew quickly after its launch in 2017 to dominate the

15   cryptocurrency space by targeting the lucrative U.S. market, as

16   we've been discussing, particularly five high-volume customers

17   to whom Binance gave VIP status.  It chose to continue to

18   violate U.S. laws by creating a new U.S. exchange, purportedly

19   compliant, but keeping U.S. users on the non-U.S. exchange on

20   purpose, in order to continue profiting from the U.S. market.

21              According to the United States, Binance.com's

22   approximately 11,000 VIP customers accounted for 70 percent of

23   its trading revenue --

24              THE COURT:  I'm sorry, how much percent?

25              MR. ESSEKS:  70.

P1FKHDRS

1          -- and of that 70 percent, a third were U.S. persons.

2     According to the United States, by early 2018, Binance had at

3     least 3 million U.S. users, more than a third of its user base

4     at the time.

5          So, the scope of the conduct there was very

6     significantly larger than that here, and the U.S. user

7     contribution to profit was quantified clearly in that case.

8          That company pled guilty to a conspiracy with the BSA

9     object, but also to unlicensed money-transmitting and to

10    willful violations of the sanctions laws.

11         THE COURT:  Willful violations of the?

12         MR. ESSEKS:  The sanctions laws, Judge, trade

13    sanctions, Iran and so forth, crimes not charged before, not

14    before this Court.

15         Indeed, embedded in that sentencing is conduct, the

16    sanctions conduct, that was described by the United States that

17    between 2018 and 2022, Binance caused at least 1.1 million

18    transactions, in violation of the sanctions laws between

19    customers in the United States and customers resident in Iran,

20    with an aggregate transaction value of just shy of

21    $900 million.  And according to Binance's own records, U.S.

22    users conducted trillions of dollars in transactions on

23    Binance.com in the relevant period, which is '17 to '22, that

24    generated approximately 1.6 billion in profit for Binance.  And

25    the word used in the submissions and the arguments is "profit"

P1FKHDRS

 1   there.  And Binance was sentenced to a fine of over

 2   $1.8 billion and forfeiture of 2-1/2 billion.

 3           The government has argued that the Binance prosecution

 4   is instructive because its failure to have an adequate AML

 5   policy was analogous to BitMEX's conduct and formed a

 6   substantial part of the conduct for which that fine was

 7   imposed.

 8           THE COURT:  By the way, was there any probation

 9   imposed on --

10           MR. ESSEKS:  Judge, as I stand here, I don't know, but

11   we're going to figure that out for you.

12           I think there were a couple of monitors, so there must

13   have been probation.  So, yes.

14           I understand the government's reference to and analogy

15   to Binance because it's a major competitor, it was a major

16   competitor, of BitMEX, certainly wildly overtook BitMEX in

17   terms of success, and the violations overlap to a degree, but

18   there are enormous, enormous differences in the scope of

19   conduct and the significance of the conduct that drive, I

20   think, quite a different lesson from this prosecution than the

21   government seems to take.

22           Binance admitted having approximately 3 million U.S.

23   users in 2018, and at some point later — the record is

24   unclear — they admitted having more than a million U.S. retail

25   users.  In the charged period, BitMEX never had a million

P1FKHDRS

1    users, ever.  And while the record is unclear about exactly how

2    many U.S. users it had, that number is a small portion of the

3    less than a million users all told.  So the scale is wildly

4    different.

5              In addition, the United States argued to the district

6    court in Washington that the BSA violations at issue in that

7    case, in the Binance case, for Mr. Zhao were approximately 170

8    times more severe than those committed by Mr. Hayes at BitMEX.

9    That's the United States arguing about the comparison between

10   this case and the Binance case.  In that case, 170 times more

11   severe than the BitMEX case.

12             Now, that's on one metric, Judge, and that's comparing

13   numbers of suspicious transactions for which SARs should be

14   filed.

15             The government continued:  Nor did the BitMEX case

16   present anywhere near the harm to national security caused by

17   Binance's failure to implement adequate compliance controls and

18   the sanctions of Binance that resulted.

19             Judge, as we wrote to the Court previously, we agree

20   with the United States.  We agree that this is an appropriate

21   case to look to in judging the seriousness of this offense.

22   And we agree that this offense is a small fraction of the

23   seriousness of that one.  One-170th is a fine bit of division

24   to do.  If we do the division on a 1.8 billion, we get to about

25   $10.5 million.  And the numerator there is much too big, it's

P1FKHDRS

1    much too big, because it includes fines for all this other

2    conduct that was not committed by this defendant, not before

3    this Court, so we submit that, taking the government at its

4    word and simply backing out the math, we get to a clear view

5    that the penalty here, not only should not be on the order of

6    magnitude of what it was in Binance, but the company has

7    already, in various ways, through its founders and through

8    settlements with civil authorities, paid as much or more than

9    what this suggests is needed.

10       The other bit that I point to, from the Binance

11    settlement -- prosecution, is the systematic offset of civil

12    enforcement penalties against criminal penalties.  The United

13    States, by its conduct in this case and in that case, has made

14    clear that it thinks that is an appropriate thing to do.  The

15    Court blessed that in this case two years ago.  And, yes, it

16    did so where the parties had agreed.  But it also, of course,

17    did so in its judicial function, determining that that was an

18    appropriate thing to do in a criminal case, and the Court has

19    the power to do it under 3553(a).

20       And we suggest that when we take this all together,

21    this company violated the law.  It's a legitimate company

22    operating a legitimate business, a small part of the business

23    was here, and it did not handle that business appropriately at

24    all, and, for that, it has paid in fines, in penalties, in

25    representational damage over the course of coming on

P1FKHDRS

1    five years.  It has entirely reconstituted its business, it has

2    revamped and stood up to the market-leading compliance

3    programs, and it is safely outside the United States.

4         We agree that the crime is something that is

5    significant and needs to be addressed.  We submit that it has

6    been addressed.  We submit that, in comparison to the Binance

7    facts, we don't stack up at all, and no new money is needed in

8    that case.  Out of 1.8 billion in fines, the only new money on

9    the criminal fine was $5-1/2 million, or 0.3 percent of the

10   overall penalty.  The only 0.3 percent of the overall penalty

11   was new money on the fine.  The message to the market was

12   perfectly clear.  The message to anyone watching from this

13   sentence will not be blunted if the consequences that the

14   company has paid already are accepted as sufficient for justice

15   to be done.  And we submit, Judge, that all of the goals of

16   sentencing have been met, and we suggest that justice is done

17   with the penalty of $110 million or less and a finding of no

18   probation or an unsupervised probationary period.

19        If the Court will hear him, I'd ask Mr. Wilkinson to

20   address the Court.

21        THE COURT:  Sure.

22        I welcome Mr. Wilkinson to address the Court.  I'm

23   required to allow a representative of the defendant to address

24   the Court.

25        MR. ESSEKS:  Very good.  Thank you, Judge.

P1FKHDRS

1          THE COURT:  Mr. Wilkinson, have you reviewed the

2     presentence report, the recommendation, and the addendum, and

3     discussed them with your lawyer?

4          MR. WILKINSON:  I have, your Honor.

5          THE COURT:  Other than your lawyer has already pointed

6     out, do you have any objections on behalf of HDR Global

7     Trading?

8          MR. WILKINSON:  No, I do not, your Honor.

9          THE COURT:  I'll listen to you for anything you would

10    like to tell me in connection with sentence, any statement

11    you'd like to make, anything at all you'd like to tell me.

12          MR. WILKINSON:  Thank you, your Honor.

13          I am Peter Wilkinson, and I am the group general

14    counsel at HDR Global Trading Ltd., the company that owns and

15    operates BitMEX.  Thank you for the opportunity to address the

16    Court on behalf of the company.

17          The company has authorized me to act on its behalf in

18    this proceeding by a resolution of the company's board of

19    directors.

20          The company takes full responsibility for and deeply

21    regrets its criminal activity.  The founders of the company

22    expressed their own regret for their conduct when they pled

23    guilty and were sentenced in 2022, and on behalf of the

24    company, I express the same sentiment today.

25          I joined the company as a member of the in-house legal

P1FKHDRS

team in December 2019, after working at Jones Day and the U.K.

insurance company Prudential.  I became group general counsel

at the end of 2023.

        In my five years at the company, I have seen its

commitment to compliance, and I've seen its efforts both to

rebuild the business after the indictment of its founders and

the challenges that their prosecution and the prosecution of

the company itself have posed for the business.  I would like

to expand on those points today.

        As general counsel, I have observed firsthand the

company's genuine and effective commitment to compliance.  The

company's sentencing submissions discuss HDR's compliance

program in detail.  I can tell the Court that I see the

compliance team carrying out the program diligently on a daily

basis to minimize risk to HDR and its customers, and to prevent

any further violations of U.S. law.

        Because the company does not operate in the U.S., its

program is not fully BSA-compliant, but the program is top of

the industry.  It keeps us out of jurisdictions where we do not

intend to do business, and prevents our being used for money

laundering or transactions with sanctioned individuals and

entities.  And it has been audited twice, as explained earlier

by Mr. Esseks, by an external auditor precisely to ensure our

controls are effective at keeping United States users off the

platform.

P1FKHDRS

1          We at HDR are proud of our compliance efforts, and we

2     respectfully ask the Court to consider the strength and

3     effectiveness of HDR's compliance program in place today when

4     assessing the appropriate penalty.

5          I have also seen vividly the effects of the

6     prosecution of our founders and of the company itself on the

7     business.  When the charges against HDR's founders were

8     unsealed in October 2020, BitMEX was a leader in the crypto

9     derivatives market, measured in both volume and market share.

10    In 2019, BitMEX had approximately 30 percent of all trading

11    volume in Bitcoin perpetual contracts worldwide, and while

12    other exchanges gained ground, BitMEX remained one of the top

13    derivative exchanges in 2020.  Following the indictments,

14    clients fled the platform, trading volumes dropped

15    precipitously, and BitMEX's market share plummeted.

16         By the middle of 2021, the company had withdrawn

17    entirely from the United States and settled the inquiries by

18    the CFTC and by FinCEN.  While our founders were preparing for

19    trial in this courthouse, our goal was to rebuild the business

20    wholly outside the United States, compliant with all of the

21    rules.

22         After years of effort, our market share today remains

23    below 1 percent.  Our revenue is less than 10 percent of what

24    it was in 2019, and we struggle to engage new clients.

25         Why have we failed?  Principally because of the

P1FKHDRS

founders and the company's criminal conduct.  Let me illustrate
the effects:

        The company wants to be licensed.  It has sought
licenses in many jurisdictions around the world.  But again and
again, as we have spoken with regulators and submitted
applications, the criminal records of our founders, and now of
the company itself, have derailed those license applications.
This has blocked our licensing ambitions over ten IOSCO-member
jurisdictions.  And for the Court, IOSCO is the association of
reputable securities regulators across the globe.

        Further, we have struggled just to maintain any
banking relationships because of the founders and the company's
guilty pleas.  We struggle to engage reputable audit firms for
the same reason.

        We find it hard to keep much of the talent we already
had, and we struggle to attract new talent.  And across the
globe, customers, particularly institutional customers, largely
stay away.

        All of that is driven by the founders and the
company's past criminal conduct and the resulting convictions.
And on top of that, just the investigations and then the
charges pending against the founders prior to their convictions
took their and the broader management team's attention away
from the business in 2019 and onward with the result that the
company did not keep up in the hypercompetitive and quickly

P1FKHDRS

|    | |
|----|---|
| 1  | evolving crypto derivatives market.  Together, all these |
| 2  | factors have snowballed into a virtual death-knell for the |
| 3  | business. |
| 4  | I'm not here to complain about this, your Honor. |
| 5  | Rather, I simply wanted to bear witness for the Court to the |
| 6  | effect that the prosecutions of our founders and now of the |
| 7  | company have already had on the business of HDR. |
| 8  | I thank you again for the opportunity to speak to the |
| 9  | Court on these points. |
| 10 | THE COURT:  Thank you, Mr. Wilkinson. |
| 11 | MR. ESSEKS:  Your Honor, just one -- sorry, on the |
| 12 | question of probation and Binance, it was a three-year term. |
| 13 | THE COURT:  I have another related question. |
| 14 | The compliance program that was required was required |
| 15 | by FinCEN or CFTC, or both? |
| 16 | MR. ESSEKS:  FinCEN, Judge. |
| 17 | THE COURT:  And that was a compliance program for a |
| 18 | year? |
| 19 | MR. ESSEKS:  Judge, it's a -- |
| 20 | THE COURT:  It required that money be spent to |
| 21 | establish a compliance program, and two outside organizations |
| 22 | were hired to establish the compliance program? |
| 23 | MR. ESSEKS:  Not quite, not quite, Judge.  The |
| 24 | requirement was, thou shalt stay out of the United States.  The |
| 25 | company had, by the time we were negotiating and organizing the |

P1FKHDRS

parameter of that settlement, already built a fully sufficient

program, which was in effect at the end of 2020, so a couple of

months after the indictment.  Three months after the

indictment, that was already built and continued to be refined

and improved.  The FinCEN requirement was stay out, and hire an

independent consultant who will test the sufficiency and

effectivenesses of the U.S. person controls, the controls

keeping BitMEX out of the country, out of this country.  And,

so, there's a year term of oversight with two tests by the

independent consultant, testing the effectiveness of the

program put in place by BitMEX.  And that was done, and it

passed with flying colors both times.

There is a continuing injunction, if you will — I'm

not sure it's formally an injunction, but a continuing

requirement — to stay out.  There are penalties that if it were

to reenter without permission, that would be a violation of the

settlement itself.

THE COURT:  For what period of time?

MR. ESSEKS:  I think it has no end date, Judge.  It's

a thou shalt, and that's consistent with the law, right, but

it's a settlement and an undertaking.  We're going to stay out

until such time as we ask for permission to come back.  And

that has not happened.

THE COURT:  What were the conditions of the Binance

probation?

P1FKHDRS

1          MR. ESSEKS:  Bear with me, Judge?

2          (Pause)

3          MR. ESSEKS:  So, Judge, looking at the plea agreement,

4    the Binance plea agreement, it was a (c)(1)(C) plea, and the

5    plea agreement says that the parties agree to request that the

6    Court impose on the defendant a term of probation to be

7    three years from the date on which the monitor is selected, and

8    I think there are two monitors in the case.  I think one is

9    from the Court and Justice Department, and one is elsewhere.

10   So, a three-year term with a monitor.

11          THE COURT:  Okay.  Thank you.

12          MR. ESSEKS:  Sorry, Judge.  Mr. Wilkinson points out

13   that one practical difference, perhaps, here is that in

14   Binance, there is a U.S. operating entity that is, I think,

15   maybe this judgment is not only against it, but that is a

16   quite, I submit, significant difference operationally because

17   we're not here and they are.

18          Thank you, Judge.

19          THE COURT:  Okay.

20          I'll listen to the government, Mr. Rehn.

21          Has the government reviewed the presentence report,

22   the recommendation, and the addendum?

23          MR. REHN:  Yes, your Honor.

24          THE COURT:  Does the government have any objections

25   that I haven't already dealt with?

P1FKHDRS

1         MR. REHN:  No objections other than the issues the

2    Court has already addressed today.

3         THE COURT:  Other than what?

4         MR. REHN:  The issues the Court has already addressed

5    today.

6         THE COURT:  I'll listen to you for anything the

7    government wishes to tell me in connection with sentence.

8         MR. REHN:  Thank you, your Honor.

9         I'll just make a few points.  I'll be brief because I

10   think we have addressed many of the issues in our extensive

11   written submissions, and we also appreciate that this Court has

12   had long familiarity with this case, dating back now to 2020.

13        But I did want to respond to some of the things that

14   we've just heard from defense counsel.

15        I guess I'll start with one thing that we heard from

16   defense counsel that the government agrees with.  It's

17   incredibly important that, in imposing a punishment in this

18   case, we assure that the company has not profited from the

19   offense.

20        I understand the Court to have highlighted the fact

21   that the guidelines for economic offenses are often not

22   reliable and a number of cases have so recognized that.  But we

23   would submit that there is a reason that for organizational

24   defendants, when we're attempting to impose a fine that

25   reflects the gain to the organization from the offense, those

P1FKHDRS

economic guidelines that are set forth in Sentencing Guideline

Section 8 generally are a little bit different from some of the

guidelines where courts have raised questions.  And that's

because, at the end of the day, an organization cannot be

imprisoned, it doesn't suffer any sort of significant effects

from a criminal conviction aside from the financial penalty

that the Court imposes.  And for-profit corporations care about

the bottom line.  And they need to know that the costs of

violating the law exceed the potential benefits of violating

the law.

          So that's why the guidelines are structured the way

that they are for organizational defendants in particular.  And

that is why, for example, the offset for the regulatory

penalties for an organizational defendant are specifically

accounted for in the guidelines.  After the Court calculates

the revenue from the offense, the appropriate multiplier for

the fine range, and then adds the revenue from the offense

again for disgorgement purposes, only then do you include the

offset.  That's why it's different from the individual

defendants.

          The reason for that is the fine has to not just equal

the amount that the company gained from the offense, it has to

exceed that amount, because enforcement cannot be 100 percent.

Companies are calculating the cost of complying with the law

times, essentially, the likelihood of being apprehended when

P1FKHDRS

1    they violate the law.  So not only do we have to assure that

2    this particular company has not profited from this particular

3    offense, but that the appropriate incentives are in place to

4    ensure both that HDR and that other companies who are closely

5    watching this prosecution internalize that there will be costs

6    if they don't comply with the law.  And that's an incredibly

7    important reason why the guidelines range that the Court has

8    calculated in this case of 231 to 417 million dollars is the

9    appropriate starting point for the Court's analysis, as the

10   Supreme Court has recognized.

11            In our sentencing submission, we have --

12            THE COURT:  I'm sorry, as the?  Oh, you're

13   extrapolating from the general principle of the guidelines, to

14   refer to that as the starting point?

15            MR. ESSEKS:  Yes.  Well, that is the guidelines range

16   that the Court has calculated.  We're saying that should be the

17   starting point, and that should really be driving -- the

18   anchor, as the Supreme Court says in *Gall*, of where the Court

19   should end up in terms of the fine that it imposes in this

20   case.

21            So I'll talk about some of the reasons why the 3553(a)

22   factors fully support a sentence within that range and, as we

23   have submitted, a sentence at the high end of that range, and

24   respond to some of the points made by the defense.

25            So, to start with the seriousness of the offense:  It

P1FKHDRS

is true, as the defense counsel has said many times now, that
the company itself is not guilty of money laundering or
sanctions violations.  But it is not being punished as a money
launderer or a sanctions violator.  If it had committed those
offenses, the financial penalties we'd be talking about would
be at least an order of magnitude higher than what we're
talking about, including forfeiture of all property involved in
the offense.  And that's why the fine and the related
forfeiture in the Binance case was more than an order of
magnitude over even the high end of the guidelines range in
this case.

          So, we aren't contending that the Binance fine is the
appropriate reference.  What we're saying is, the guidelines
here are warranted because of the nature of this offense.  What
makes this offense serious?  Well, it's true that the company
itself wasn't a money launderer, but why do these regulations
exist?  Why do we have rules in the United States financial
system that make it the deepest and safest financial market in
the world?  We have those rules to protect U.S. customers from
fraud, to protect the financial system from being used to
launder criminal proceeds, to protect the U.S. financial system
from being used to finance terrorist activities.  If companies
don't have effective controls in place, anti-money laundering
programs, it's not just about knowing your customer, that's
step one that this company failed at, you also have to have an

P1FKHDRS

anti-money laundering program that highlights risks and
addresses them.  And the company completely failed to do
anything along those lines.

And so the financial system and U.S. participants in
the financial system were exposed to those risks.  And that's
something that needs to be taken seriously.

Notably, there is a huge contrast between what the
company is saying in court today and what it says in public
about these regulations.  To take just one example, in 2023, in
November of 2023, when the prosecution of Binance became
public, Arthur Hayes said, "The prosecution was absurd."  This
is what the company actually thinks about U.S. regulatory
efforts.  It's here saying all of these efforts are
appropriate, and it has learned its lesson, but in the public,
it's mocking these regulatory efforts.  And there's no reason
to believe that the company does not pose a risk of recidivism,
because the company's corporate culture really has not changed.
It has only been reluctantly forced to acknowledge its own
prior criminal behavior in both this prosecution and in the
related regulatory enforcement actions.

THE COURT:  I'm sorry, in the related?

MR. REHN:  The regulatory enforcement actions, as
well, which I'll get to later when I discuss the probation
issue.

And, similarly, for the same reason, when we're

P1FKHDRS

talking about promoting respect for the law, the Court should
look not just to what the company says here on the day of its
sentencing, but what it's been saying publicly all along, and
it has not shown respect for the law.  It's shown the opposite.

One thing that is important about this case that makes
this case a criminal offense — what is the difference between a
criminal offense and a regulatory offense?  Willfulness.  The
government has to prove willfulness beyond a reasonable doubt.
And the Court knew that the company had willfully violated the
law because of its founders' and executives' guilty pleas, but
now that the Court has seen the exhibits that were presented in
connection with the Fatico hearing, you have a better sense of
just what that willfulness looked like.  Look at the chats.
Look at the company's own executives, its highest ranking
people, its founders, its owners specifically counseling
high-dollar value clients on how to evade the restrictions on
how to trade in the United States.  Look at how the company's
leading employees were telling people, well, if you want to
trade from the United States, you have to have an overseas
entity which we'll use to onboard your account.  This wasn't
just a regulatory slipup.  It was a willful and deliberate
targeting of the United States market in contravention of
regulations that the company, from its top executives down,
knew applied to it.

So, there needs to be a punishment for the offense,

P1FKHDRS

1    not just pay back the illicit gains.  The company needs to be

2    punished.  3553(a) factors call for that.

3                And then the next factor, the issue of deterrence:  In

4    a sense, this is really where the rub hits the road because, as

5    everybody here agrees, the industry is watching this case.

6    There are many cryptocurrency exchanges in the world, some of

7    which are incurring a lot of cost to comply with United States

8    regulations and serve United States customers.  And that's what

9    we want.  We want U.S. customers to have access to these new

10   markets, provided that the companies comply with the same

11   regulations that apply to financial institutions in the

12   traditional financial sector.  In order to get those companies

13   to make the decision to do that, there needs to be an

14   understanding that if they don't, if they violate those

15   regulations, the consequences will outstrip the benefits.  And

16   the way to do that is when a company is caught, as in this

17   case, not just violating those regulations, but willfully,

18   criminally violating them, deliberately marketing itself and

19   helping U.S. customers participate in trading on the platform

20   in large volumes, to earn more than $150 million in revenue,

21   the company pays a serious financial consequence for that

22   action.  It's the only way to deter not just other companies,

23   but this company in the future from reengaging in the same

24   conduct, and to protect the public from these types of

25   offenses.

P1FKHDRS

1          I want to talk a little bit about specific deterrence

2     and the sort of effect on the company from these prosecutions,

3     because I think there are two ways of looking at what the

4     company has just presented to the Court.  What the company has

5     said is that, oh, we've been punished enough because look how

6     much our revenue has declined after our founders were charged

7     and then the company was charged.  But another way of looking

8     at that is it just shows how lucrative the U.S. market is and

9     was for the company.  That once it could no longer serve those

10    high-volume, high-profile crypto trading firms in the United

11    States that made up such a big part of its revenue, it wasn't

12    just the 11 percent, but it had add-on effects because

13    exchanges need to be able to serve the U.S. market in order to

14    be successful exchanges.  And if that's the way we interpret

15    that, then there's a huge temptation for this company to

16    reoffend.

17         The U.S. markets are the deepest, richest, and

18    thickest financial markets in the world.  And cryptocurrency

19    exchanges recognize that.  They want the U.S. market.  There's

20    a cost to participating in the U.S. market.  It's those

21    regulations that are in place to protect the financial system

22    from being misused by criminal actors.  And if companies think

23    they can access the market without complying with those

24    regulations, we have a real problem.  And this company, as well

25    as every other cryptocurrency exchange, is going to be making

P1FKHDRS

that decision in corporate boardrooms, and they're going to be

looking at cases like this when they make that decision.

So, for all of these reasons, the 3553(a) factors

weigh in favor of a substantial financial penalty in this case,

and the government submits not just that a guidelines penalty

within the guidelines range the Court has calculated is

warranted, but towards the higher end of the guidelines range,

and that's why we've proposed a sentence of $417 million.  But,

certainly, a within guidelines range sentence is warranted.

Unless the Court has any questions about the financial

issues, I'll just touch briefly on the probation issues before

I sit down.

THE COURT:  No, go ahead.

MR. REHN:  So, on the issue of probation, the

government does not disagree with the company, that a

monitor -- we don't believe a monitor is warranted here.  We

think it would be well within the Court's discretion to decide

to appoint a monitor.  Just by way of background, the company

did go through a process of an independent consultant analyzing

new procedures they put in place in connection with the FinCEN

settlement.  And the most recent monitor report detailing those

U.S. person controls was in 2022.  What we would submit is the

Court should impose a three-year term of probation, which is

what's recommended in the PSR and which is what is similar to

other cases, and the Court should require the company at the

P1FKHDRS

1    outset of probation to provide both the probation office and

2    the government with its current U.S. person controls,

3    highlighting anything that may have changed since the 2022

4    report.  And then over the course of the three-year probation

5    term, to alert both the probation office and the government to

6    any changes in those U.S. person controls that will allow the

7    probation office, with the assistance of the government, to

8    flag any issues that may warrant additional investigation or

9    additional requests for information from the company, to ensure

10   that it's not attempting to illegally reenter the U.S. market,

11   and that would ensure that the procedures that were put in

12   place to resolve the FinCEN cases aren't simply being abandoned

13   as soon as the company is sort of off the hook legally, which

14   is, obviously, a very serious concern in this case that we want

15   to avoid.  So that would be the way that the government would

16   propose structuring the probation period in this case.

17           One final point — I missed this in my notes — but just

18   to go back briefly to the issue of the Binance settlement:

19   That was around 4-1/2 billion total, counting both the

20   individual and the corporate punishment and forfeiture.  So,

21   anything we're talking about here is already an order of

22   magnitude below where that was.  But I would direct the Court

23   to the other reference points in the government's sentencing

24   submission, which we think are sort of more helpful for the

25   Court and, in particular, the Commerzbank, which was a BSA

P1FKHDRS

 1   prosecution in this district that itemized the BSA fine at

 2   300 million.  That was actually a much less serious offense

 3   than this offense because it was basically an individualized

 4   violation of policy rather than a systemic failure of the

 5   institution to have any policy at all, which is what we have

 6   here.

 7              So, again, a guideline sentence here is well within

 8   that reference point.  We also cite the U.S. Bank Corp. case,

 9   where the BSA-specific penalty was around 450 million.  And,

10   again, tied to the specific slipup at issue in that case, not a

11   programmatic issue like we have here.  So, if anything, the

12   conduct here is more serious, but it just illustrates that

13   sentences in those ranges have been imposed for BSA-specific

14   offenses, and those are helpful reference points.  It's not

15   just the crypto industry that sometimes violates the BSA, and

16   those reference points should help the Court in formulating its

17   sentence.

18              Unless the Court has any further questions, we'll rest

19   on our papers.

20              THE COURT:  No, thank you.

21              MR. ESSEKS:  May I, Judge?

22              THE COURT:  Yes.

23              MR. ESSEKS:  I, of course, understand the prosecutor's

24   perspective regarding a message needing to be sent, and we

25   agree that a significant function of prosecutions like this is

P1FKHDRS

 1    to send a message.  We submit, however, that a message has been

 2    sent.  The prosecution --

 3              THE COURT:  You know my views previously.  The

 4    question is whether the sentence is just for the individual

 5    defendants in this case, the corporation.  And if the sentence

 6    is just for the individual defendant, it follows that general

 7    deterrence will also be complied with.  You don't increase an

 8    individual sentence to a position that is itself unjust because

 9    you shouldn't use individual defendants simply to send a

10    message to other people.  You have to impose a sentence that is

11    just for the individual defendant.

12              Go ahead.

13              MR. ESSEKS:  Thank you, your Honor.

14              We certainly agree with that proposition, and we

15    submit that this investigation and prosecution, the experience

16    over the last five years, as Mr. Wilkinson has explained, have

17    laid waste to this enterprise outside the United States.  And,

18    again, we're not complaining about it, we're observing it, and

19    we think that that is well seen by anyone observing.  The

20    disappearance of BitMEX as an effective part of the market is

21    plain, and the cause of it is plain.  The government said,

22    well, that must be because the business was really dependent on

23    U.S. user revenue.  The Court has just gone through a long,

24    detailed process of determining, as best it can, the portion of

25    the revenue of the business that came from the United States,

P1FKHDRS

1    and it's 11.49 percent.  The disappearance of that does not

2    account in any way, shape, or form for the transformation of

3    the business.  Yes, there are connected effects, but the

4    reputational damage to the platform has crippled it over time,

5    and it's been enhanced by the fact that the company itself had

6    to plead guilty.

7            So, the prosecution has laid waste to the company, and

8    we think that that is specific deterrence.  Yes, of course, as

9    your Honor and I spoke about a little while ago, the U.S.

10   market is big and tempting — of course, it is — the company has

11   stayed out.  I cannot give the Court any more context than the

12   quote that the prosecutor attributed to Mr. Hayes.  What I can

13   say simply is he is a shareholder in the company.  He is, as

14   the Court saw, chastened, and while he speaks his mind often,

15   the conduct that the Court can see is this company has stayed

16   out of the United States to date.

17           So, we think that deterrence, specific, is fully

18   accomplished.

19           We've addressed in our papers the distinctions to be

20   drawn to the Commerzbank case and various others, but none of

21   them are apt comparisons here.  The harms are different in kind

22   and in quantity than the significant, but small harm here.  We

23   admit willfulness, but we don't say that that turns this into a

24   bigger violation than described.

25           THE COURT:  The government agrees that a monitor isn't

P1FKHDRS

1    a necessary condition of probation.

2            I take it, from what the government has said, that

3    they don't think that any of the conditions of probation are

4    necessary.  They would substitute for the conditions of

5    probation a report on the current compliance program of the

6    company to stay out of the U.S. market, first; and, second, to

7    report to the probation department and the government any

8    significant change in the compliance program during the period

9    of probation.

10            What would the company's position be?

11            MR. ESSEKS:  Your Honor, we can accept that, Judge.  I

12   will say that I think that the audience, the recipients of

13   those reports, are not well necessarily suited to it, but if

14   that's what the government wants.  And what I suggest is that

15   it not need to be a three-year term, but can we give a report

16   now about the state of the controls?  Sure.  And can we commit

17   to notifying the government and probation of changes to it over

18   time, over, let's say, a one- or two-year period?  Sure.

19            THE COURT:  Probation had also recommended, in the

20   penultimate condition, that the company notify the Court or

21   probation officer of certain changes in financial condition.

22   It's the penultimate condition on page 31.

23            MR. ESSEKS:  I see that, Judge.  I submit that, given

24   the nature of the circumstance, the company is outside the

25   United States, candidly, Judge, I'm not sure what interest that

P1FKHDRS

1    is serving, of the Court or probation.  The operative bit here

2    is are we staying out of this jurisdiction, and we're happy

3    to --

4            THE COURT:  Okay.

5            MR. ESSEKS:  -- clarify that and represent it.

6            THE COURT:  No, no.  Okay.

7            Does the government want to be heard on that?

8            MR. REHN:  Your Honor, as with the monitor, it's not

9    our view that's a necessary condition.

10            THE COURT:  Okay.  I agree.

11            MR. ESSEKS:  Judge, sorry to interrupt.  Just on the

12    term of probation, my colleagues rightly point out that we'd

13    ask the Court to take into consideration in determining the

14    length of probation, the fact that the company has already

15    served effectively a year of supervision by FinCEN.  So, if the

16    starting point is three, we're down to two, we submit, and we'd

17    ask the Court to consider whether two is really necessary, but

18    we're happy to very shortly provide a description of the state

19    of the controls now.

20            THE COURT:  Okay.  Fine.

21            MR. ESSEKS:  Thank you, Judge.  That's what I have.

22            THE COURT:  All right.

23            I will place the presentence report, the

24    recommendation, and the addendum, along with all of the

25    parties' submissions, in the record under seal.  The parties

P1FKHDRS

should make sure that the submissions are placed in the record
not under seal, after redacting any confidential information.

I adopt the findings of fact in the presentence report
except as I've already noted, including striking paragraph 22
and adopting new calculations of the guideline fine range.
Therefore, I conclude that the guideline fine sentencing range
is 231 to 417 million dollars.

I appreciate that the guidelines are only advisory,
and that the Court must consider the various sentencing factors
in 18, U.S.C., Section 3553(a), and impose a sentence that is
sufficient, but no greater than necessary, to comply with the
purposes set forth in Section 3553(a)(2).

The offense in this case is very serious.  HDR
violated the Bank Secrecy Act for a period of five years.  The
offense was a violation of criminal law and was willful.  It
failed to comply with the requirements of the Bank Secrecy Act
by failing to establish an anti-money laundering program that
included know-your-customer procedures.

While the company purported not to accept transactions
from U.S. customers, the evidence in connection with the
sentencing procedure indicated that U.S. customers were, in
fact, the largest source of customers for the firm, and that
such customers were encouraged to trade on BitMEX.

HDR says that it has already paid $80 million in fines
to the CFTC and FinCEN to settle similar charges brought by

P1FKHDRS

those regulators.  Its three principals have also paid

$30 million in fines.  HDR has also set up a compliance system,

which is satisfactory to its regulators, to ensure that it has

ceased to do any business with U.S. users.

            HDR contends that is sufficient to accomplish all of

the relevant purposes of sentencing, and, therefore, the Court

should impose no further fine.

            The government, on the other hand, asks the Court to

impose a fine of at least $293 million and more.

            After considering all of the evidence, the Court has

determined that a fine of $100 million is sufficient, but no

greater than necessary, to accomplish all of the relevant

purposes of sentencing.

            The offense is very serious.  The company willfully

violated the Bank Secrecy Act for five years, and disguised

what it was doing.  While HDR has settled with the CFTC and

FinCEN, it has not paid any penalty to resolve the criminal

liability for the violation of the Bank Secrecy Act.

            To fail to pay a significant, but reasonable fine for

the criminal violation of the Bank Secrecy Act would allow that

criminal violation to go unpunished despite the significance of

the criminal violation of law.  A significant fine for the

criminal violation is necessary to recognize the seriousness of

the criminal violation and to accomplish deterrence.

            While HDR no longer operates in the United States, and

P1FKHDRS

1   has a compliance program, HDR has a history that it has

2   violated the law, and has demonstrated that it is possible to

3   circumvent procedures, and the temptation to tap the U.S. user

4   market is enormous.

5          On the other hand, the government's requested fine is

6   greater than necessary to accomplish the appropriate purposes

7   of sentencing.  It fails to take into account the penalties

8   that HDR has already paid and the fact that HDR has a

9   compliance program and currently no longer operates in the

10  United States.

11         It's necessary to balance all of those considerations

12  to arrive at a sentence that is sufficient, but no greater than

13  necessary, to accomplish the relevant purposes of sentencing.

14         A fine of $100 million recognizes the seriousness of

15  the violation of United States criminal law and is

16  appropriately geared to the gain from the offense while taking

17  into account the other penalties that HDR has paid.

18         So, on balance, in this case, the Court intends to

19  impose a sentence of two years of probation, with the

20  conditions that HDR will report, within 30 days of the date of

21  the judgment, its current compliance program.

22         HDR will thereafter report within 30 days of any

23  significant change in its compliance program during the period

24  of probation.

25         The two years of probation is otherwise unsupervised.

P1FKHDRS

```
1           The defendant shall pay the fine within 60 days of the
2   date of the judgment.
3           The Court will impose a $400 special assessment.
4           The sentence is consistent with the factors in
5   Section 3553(a) and is sufficient, but no greater than
6   necessary, to comply with the purposes of Section 3553(a)(2).
7           I have explained the reasons for the sentence.
8           Before I actually impose the sentence, Mr. Esseks,
9   I'll recognize you for anything you wish to tell me.
10          MR. ESSEKS:  So, Judge, there's just one point of
11  clarification and, I hope, modification.
12          THE COURT:  Sure.
13          MR. ESSEKS:  On the probation condition, the Court has
14  articulated it as the company will report the current state of
15  its compliance program, I think are the words that your Honor
16  used.
17          We're trying to pull up the FinCEN language because
18  what I propose is that we effectively mirror what was done
19  there, which is that they turn on, I believe, U.S. person
20  controls, and so what we're -- I think what we're talking about
21  is the element of the company's compliance apparatus that is
22  designed to keep it out of the United States, as opposed to
23  other things that might come within the umbrella of compliance,
24  which might be important, but are quite separate from the
25  interests the Court is trying to serve here.
```

P1FKHDRS

1              So, I don't have precise language, but we're trying to

2     pull it up.  So that's the concept, and we can propose language

3     to the Court, in consultation with the government, if that's

4     all right, and, obviously, Mr. Rehn can speak to the issue.

5              THE COURT:  Mr. Rehn?

6              MR. REHN:  I don't think we would have a problem with

7     the language being the same as what's in the FinCEN settlement.

8              THE COURT:  Okay.

9              MR. ESSEKS:  We will get that to the Court today, if

10    not momentarily, if that's all right.

11             THE COURT:  Okay.

12             In announcing the judgment, I will say:  Two years of

13    unsupervised probation subject to the following conditions:

14             First, HDR will report to the government and the

15    probation office the current state of its compliance obligation

16    to FinCEN, to assure that there are no U.S. users of its site,

17    report to the government and the probation office within

18    30 days; and (2) report to the government and the probation

19    office within 30 days of any change to its compliance program

20    described in condition one.

21             And if the parties request that I make any other

22    change in that condition, by agreement, you can send me a

23    letter.

24             MR. ESSEKS:  Very good, Judge.  We may have some --

25    let us look at it, and we will make a submission promptly.

P1FKHDRS

1          THE COURT:  I'm always concerned about changing the

2     sentence after it's announced, but if it's not a material

3     change, and the parties agree on it, I'm happy to do that

4     before the written judgment is entered.

5          MR. ESSEKS:  We have some further thoughts on that,

6     but let us not burden the Court with it now.  We will confer

7     with the government and come back to the Court very promptly.

8          THE COURT:  Okay.

9          Before I actually impose the sentence, Mr. Wilkinson,

10    I'll recognize you for anything you wish to tell me before I

11    actually impose the sentence.

12         MR. WILKINSON:  No, thank you, your Honor.

13         THE COURT:  Before I actually impose the sentence,

14    I'll recognize the government for anything the government

15    wishes to tell me.

16         MR. REHN:  Nothing further, your Honor.

17         THE COURT:  All right.

18         Pursuant to the Sentencing Reform Act of 1984, it is

19    the judgment of this Court that the defendant, HDR Global

20    Trading Ltd., also known as BitMEX, is hereby sentenced to two

21    years' unsupervised probation.

22         Within 72 hours, the defendant's representative shall

23    report to the probation office in this district.

24         While on unsupervised probation, the defendant shall

25    not commit another federal, state, or local crime.  This

P1FKHDRS

1    condition is necessary to assure that there is no further

2    violation of United States law.

3          Second, the defendant will report to the government

4    and the probation office within 30 days the current state of

5    the compliance obligation to FinCEN, to assure that there are

6    no U.S. users of its site.

7          And, third, the defendant shall report to the

8    government and the probation office within 30 days of any

9    change to the compliance program described in condition two.

10          The defendant shall pay a fine of $100 million, which

11   is due in 60 days.

12          It is further ordered that the defendant shall pay to

13   the United States a special assessment of $400, which shall be

14   due immediately.

15          I have already explained the reasons for the sentence.

16          Does either counsel know of any legal reason why this

17   sentence should not be imposed as I have so stated it?

18          MR. REHN:  No, your Honor.

19          MR. ESSEKS:  No, your Honor.

20          THE COURT:  I will order the sentence to be imposed as

21   I have so stated it.

22          There is no waiver of the right to appeal in this

23   case, right?

24          MR. ESSEKS:  Correct, your Honor.

25          MR. REHN:  Correct.

P1FKHDRS

1           THE COURT:  HDR Global Trading Ltd., also known as

2     BitMEX, you have the right to appeal the sentence.  The notice

3     of appeal must be filed within 14 days after the entry of the

4     judgment of conviction.  If for some reason you cannot pay the

5     cost of appeal, you have the right to apply for leave to appeal

6     in forma pauperis, and the clerk will prepare and file a notice

7     of appeal on your behalf immediately.

8           The judgment of conviction is entered promptly after

9     the judge announces the sentence, so you should discuss this

10    issue promptly with your lawyer.

11          Do you understand, Mr. Wilkinson?

12          MR. WILKINSON:  Yes, I do, your Honor.

13          THE COURT:  Okay.

14          Does the government move to dismiss any open counts?

15          MR. REHN:  I don't believe there are any, but in an

16    abundance of caution, to the extent there were any open counts,

17    we would move to dismiss them.

18          THE COURT:  Okay.

19          And the defense agrees?

20          MR. ESSEKS:  Yes.

21          THE COURT:  Any open counts dismissed on the motion of

22    the government.

23          The fine is due 60 days after the entry of the

24    judgment in this case.

25          MR. ESSEKS:  Judge, one -- the compliance program, the

P1FKHDRS

1    report?

2              THE COURT:  The compliance program -- the report on

3    the compliance program is within 30 days of the entry of the

4    judgment.

5              MR. ESSEKS:  Very good, Judge.

6              One, I guess, administrative issue:  Your Honor noted

7    a standard obligation of the defendant to report to probation

8    within 72 hours.

9              I raise a question whether that particular obligation

10   is appropriate here.  We're happy to do it if the Court likes.

11   I just wanted to flag that that would be my office contacting

12   probation, if that's all right.

13             THE COURT:  That's fine.  And I don't know what

14   probation would do with the initial --

15             MR. ESSEKS:  We're happy to contact them.  It will

16   just be my office doing that instead of Mr. Wilkinson.

17             THE COURT:  You represent the defendant, so that

18   should be fine.

19             MR. ESSEKS:  Great.  Thank you, Judge.

20             THE COURT:  Does the government have any observation

21   on that?

22             MR. REHN:  A company can only act through its agents,

23   your Honor, and I understand that Mr. Esseks will be acting as

24   an agent of the company.

25             THE COURT:  Mr. Fletcher says he will notify the

P1FKHDRS

1    responsible people that counsel will be contacting them.

2              MR. ESSEKS:  Thank you very much, Mr. Fletcher.

3         Thank you, Judge.

4              THE COURT:  Okay.  Anything further?  No?  Okay.

5         Good afternoon, all.

6              (Adjourned)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25